UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SYLVESTER COLLINS,

                     Plaintiff,

v.

                                          6:23-CV-1543
                                          (DNH/ML)

DINO JUKIC, Police Officer; JOHN P.
DETRAGLIA, Police Officer; and
PATRICK WEST, Police Officer,

                     Defendants.

_____

APPEARANCES:                               OF COUNSEL:

SYLVESTER COLLINS
   Plaintiff, *Pro Se*
Hale Creek ASACTC
Post Office Box 950
Johnstown, New York 12095

MIROSLAV LOVRIC, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

       The Clerk has sent a *pro se* complaint in the above captioned action together with a second amended application to proceed *in forma pauperis* and inmate authorization filed by Sylvester Collins ("Plaintiff") to the Court for review.  (Dkt. Nos. 1, 8, 9.)  For the reasons discussed below, I grant Plaintiff's second amended *in forma pauperis* application and recommend that Plaintiff's Complaint be dismissed in its entirety with leave to amend.  (Dkt. Nos. 1, 8.)

## I.      BACKGROUND

Construed as liberally[1] as possible, Plaintiff's Complaint alleges that defendants Dino Jukic, John P. Detraglia, and Patrick West (collectively "Defendants")—who are police officers employed by the City of Utica—violated his civil rights.  (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that on December 6, 2020, Plaintiff parked in the driveway of a private residence and Defendant Jukic parked his patrol vehicle on the street blocking the driveway where Plaintiff was parked.  (Dkt. No. 1 at 3.)  The Complaint alleges that Defendant Jukic reviewed Plaintiff's driver's license, determined that Plaintiff's driving privileges were suspended, and informed Plaintiff that he would be issuing citations for aggravated unlicensed operation of a motor vehicle in the third degree and failure to signal during a turn.  (*Id.*)  The Complaint alleges that Defendant Jukic told Plaintiff that Plaintiff would not be permitted to drive the vehicle away because of the suspension and Plaintiff told Defendant Jukic that a licensed driver would retrieve the vehicle.  (*Id.*)

The Complaint alleges that a few minutes later, Defendant Detraglia arrived on the scene and demanded that Plaintiff get out of the vehicle because it was being impounded.  (Dkt. No. 1 at 3.)  Plaintiff alleges that he told Defendant Detraglia that a licensed driver was on the way to retrieve the vehicle.  (*Id.*)  The Complaint alleges that Defendant Detraglia attempted to open the driver's side door to forcefully remove Plaintiff from the vehicle because Plaintiff refused Defendant Detraglia's commands to exit the vehicle.  (*Id.*)  The Complaint alleges that Defendant Detraglia threatened to break the vehicle's window, forcefully remove Plaintiff, and charge Plaintiff with a crime.  (*Id.*)  The Complaint alleges that Plaintiff "reluctantly, under

---

[1]     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

protest and duress exited the automobile" and stated that he did "not consent to any search and/or seizure of the automobile." (*Id*.)

The Complaint alleges that before Plaintiff exited the vehicle, two of Plaintiff's family members arrived on scene to retrieve the vehicle. (Dkt. No. 1 at 3.)  The Complaint alleges that notwithstanding the arrival of licensed drivers and Plaintiff's refusal to consent to a vehicle search, Defendants Detraglia and West began searching the vehicle. (*Id*.)

The Complaint alleges that Plaintiff walked down the street after being issued two traffic citations. (*Id*.)  The Complaint alleges after Plaintiff walked away from the scene, Defendant Jukic ran up behind Plaintiff, grabbed Plaintiff, and told Plaintiff that he was being placed under arrest based on evidence found in the vehicle during an inventory search. (*Id*.)

The Complaint alleges that Plaintiff was placed in handcuffs and refused to get into the patrol vehicle. (Dkt. No. 1 at 3.)  The Complaint alleges that Defendant Detraglia pushed Plaintiff into the backseat of the patrol vehicle. (*Id*.)  The Complaint alleges that non-party Officer Husney transported Plaintiff to the Utica Police Department. (*Id*.)

The Complaint alleges that during court proceedings, Defendant Jukic provided inconsistent testimony, which "ultimately le[]d to" and has continued to cause Plaintiff's incarceration for over one thousand days. (Dkt. No. 1 at 4.)

Based on these factual allegations, the Complaint asserts the following five causes of action: (1) a claim of unlawful seizure against Defendant Jukic in violation of the Fourth Amendment and 42 U.S.C. § 1983 based on the impoundment of Plaintiff's vehicle; (2) a claim of unlawful search against Defendant Detraglia in violation of the Fourth Amendment and 42 U.S.C. § 1983 based on the search of the vehicle; (3) a claim of unlawful search against Defendant West in violation of the Fourth Amendment and 42 U.S.C. § 1983 based on the search

of the vehicle; (4) a claim of deliberate indifference to Plaintiff's Fourth Amendment rights against Defendant Jukic for not intervening while Defendants West and Detraglia were conducting the unlawful search of the vehicle; and (5) a claim of unlawful arrest against Defendant Jukic in violation of the Fourth Amendment and 42 U.S.C. § 1983.  (Dkt. No. 1 at 4-5.)  As relief, Plaintiff seeks compensatory damages in the amount of $20,000 for the unlawful search, $20,000 for the unlawful seizure, and $1,000 per day that Plaintiff has been incarcerated. (Dkt. No. 1 at 6.)

## II.   PLAINTIFF'S SECOND AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged."  *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[2]  "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 8 at 2), and which

---

[2]     Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted.  *See* 28 U.S.C. § 1915(g).  The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service.  *See* http://pacer.uspci.uscourts.gov.  It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

demonstrates economic need.  *See* 28 U.S.C. § 1915(a)(2).  Plaintiff has also filed the inmate

authorization required in the Northern District. (Dkt. No. 9.)

Accordingly, Plaintiff's second amended application to proceed with this action IFP is

granted.  (Dkt. No. 8.)

## III.    LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

Having found that Plaintiff met the financial criteria for commencing this action *in forma*

*pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in

light of 28 U.S.C. §§ 1915(e).  Section 1915(e) of Title 28 of the United States Code directs that,

when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time

if the court determines that— . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state

a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is

immune from such relief."  28 U.S.C. § 1915(e)(2)(B); *see also* 28 U.S.C. 1915A(a) ("The court

shall review . . . as soon as practicable . . . a complaint in a civil action in which a prisoner seeks

redress from a governmental entity or officer or employee of a governmental entity.").[3]

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of

Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which

sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim

showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  The purpose of Rule 8

"is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity

to file a responsive answer, prepare an adequate defense and determine whether the doctrine of

---

[3]     To determine whether an action is frivolous, a court must look to see whether the
complaint "lacks an arguable basis in either law or in fact."  *Neitzke v. Williams*, 490 U.S. 319,
325 (1989).

res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), *rev'd on other grounds*, 682 F. App'x 30.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.*  Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be dismissed.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

A.      **Unlawful Seizure Claim Against Defendant Jukic**

Plaintiff's first claim relates to the impoundment of his vehicle.

The impoundment of a vehicle may implicate rights guaranteed by the Fourth Amendment's protection against unreasonable searches and seizures. *See Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) ("The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment."); *see also United States v. Coccia*, 446 F.3d 233, 237-38 (1st Cir. 2006) (considering a challenge to the towing of a vehicle as an unreasonable seizure in violation of the Fourth Amendment). However, "[i]n the interests of public safety and as part of what the [Supreme] Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." *S. Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "When a person is taken into custody after being stopped in his vehicle, it is reasonable for police officers to impound the vehicle under the community care functions where, among other things, the vehicle would otherwise potentially impede traffic, threaten public safety, or be subject to vandalism." *United States v. Colon*, 10-CR-0498, 2011 WL 569874, at *14 (S.D.N.Y. Feb. 8, 2011) (citing *United States v. Bailey*, 468 F. Supp. 2d 373, 392 (E.D.N.Y. 2006); *Opperman*, 428 U.S. at 373).

The Complaint alleges that Defendant Jukic "learn[ed] that [Plaintiff's] alleged driver's license and/or driving privileges were suspended." (Dkt. No. 1 at 3.)

This Court has held that a due process or constitutional claim regarding the impoundment of a vehicle is not viable where the plaintiff's drivers license had expired. *Derocha v. Dewitt Police Dep't*, Civil Action No. 5:22-CV-1344 (N.D.N.Y. filed Dec. 14, 2022) at Dkt. No. 5 at 3 n.2 (Baxter, M.J.) (citing *Carter v. Campanelli*, 22-CV-2702, 2022 WL 1667022, at *2-3 (E.D.N.Y. May 20, 2022) (finding no due process or other constitutional violations arising from

the impoundment of a vehicle with a suspended registration)), *report and recommendation adopted*, Dkt. No. 7 (Hurd, J.); *see also* N.Y. Veh. & Traf. Law § 509 (a valid driver's license issued by the State of New York is required to operate a motor vehicle).  Thus, it was not a constitutional violation for Defendant Jukic to impound Plaintiff's vehicle after determining that Plaintiff was not licensed to operate a vehicle.

Moreover, the Complaint alleges that Defendant Jukic testified (presumably during Plaintiff's criminal proceeding) that individuals on the property that Plaintiff's vehicle was parked on or near asked how long Plaintiff "would be in the driveway" which implied "that [Plaintiff] was blocking them from getting in or out."  (Dkt. No. 1 at 4.)  Hence, the vehicle was impeding the flow of traffic in and out of a private driveway and it was appropriate for Defendant Jukic to take the vehicle into custody based on the community caretaking function.

For each of these reasons, I recommend that Plaintiff's unlawful seizure claim with respect to the impoundment of Plaintiff's vehicle be dismissed for failure to state a claim upon which relief may be granted.

### B.      Unlawful Search Claims Against Defendants Detraglia and West

"The Supreme Court has long recognized that when police take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct."  *United States v. Williams*, 930 F.3d 44, 53 (2d Cir. 2019) (internal quotation marks omitted).  Plaintiff has not pleaded that Defendants' conduct—searching the vehicle—is inconsistent with an inventory search.  *See Colorado v. Bertine*, 479 U.S. 367, 374 (1987) (holding that reasonable inventory search regulations administered in good

faith satisfy the Fourth Amendment); *United States v. Williams*, 930 F.3d at 54 (noting that inventory searches must be performed using standardized criteria or established routine).

As a result, I recommend that Plaintiff's unlawful search claims related to the inventory search of his vehicle be dismissed for failure to state a claim upon which relief may be granted.

###     C.      Deliberate Indifference Claim

Plaintiff appears to allege that Defendant Jukic was deliberately indifferent to the unlawful search conducted by Defendants Detraglia and West (or that Defendant Jukic failed to intervene on Plaintiff's behalf during the unlawful search).  (Dkt. No. 1 at 5.)

Section 1983 recognizes "that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (internal quotations and citation omitted).  However, "the absence of any underlying constitutional violations requires dismissal of [P]laintiff's failure to intervene claims." *Sharpe v. City of New York*, 11-CV-5494, 2013 WL 2356063, at *9 (E.D.N.Y. May 29, 2013), *aff'd*, 560 F. App'x 78 (2d Cir. 2014).

As set forth above in Part IV.B. of this Order and Report-Recommendation, I find that Plaintiff failed to allege facts plausibly suggesting an unlawful search conducted by Defendants Detraglia and West.  As a result, I recommend that Plaintiff's failure to intervene claim against Defendant Jukic for failing to intervene during the search, be dismissed.  *Townsend v. Livingston Cnty.*, 19-CV-6636, 2023 WL 2457072, at *7 (W.D.N.Y. Mar. 10, 2023) (dismissing the plaintiff's failure to intervene claims where there was no surviving underlying misconduct).

### D.     False Arrest Claim

It is well-settled in this Circuit that a traffic stop based on a reasonable suspicion of a traffic violation comports with the Fourth Amendment.  *Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 295 (S.D.N.Y. 2020) (citing *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009)).

The Complaint alleges that Defendant Jukic informed Plaintiff "he would be issuing [Plaintiff] citations for . . . Failure to Signal During a Turn."  (Dkt. No. 1 at 3.)  The Complaint does not deny the allegation that Plaintiff committed a traffic violation or accuse Defendant Jukic of falsifying the allegation in order to create a pretext for a traffic stop.  (*See generally* Dkt. No. 1.)  The Complaint does not contain facts plausibly suggesting that Defendant Jukic lacked a reasonable suspicion to justify the traffic stop.  (*Id.*)

As a result, I recommend that, to the extent Plaintiff's unlawful detention claim relates to the initial traffic stop, it be dismissed for failure to state a claim upon which relief may be granted.

To the extent that the false arrest claim relates to Defendant Jukic's arrest of Plaintiff based on evidence located during the inventory search of the vehicle, I recommend that it be dismissed.

As set forth above, the Complaint fails to allege facts plausibly suggesting that the inventory search was unconstitutional.  Moreover, the Complaint fails to set forth what Plaintiff was arrested for or what evidence was allegedly located in the vehicle.  (*See generally* Dkt. No. 1.)

However, there was probable cause for Defendant Jukic to arrest Plaintiff for the traffic offenses that the Complaint appears to concede were committed.[4]  Even where a traffic "violation may be reasonably characterized as a 'minor' offense, it is well-established that an officer's direct observation of even a minor traffic violation is sufficient probable cause to arrest the violator."  *Smart v. City of New York*, 08-CV-2203, 2009 WL 862281, at *4 (S.D.N.Y. Apr. 1, 2009) (relying on *United States v. Scopo*, 19 F.3d 777, 781-782 (2d Cir. 1994) (officers had probable cause to stop and arrest defendant that they directly observed violate traffic laws by not signaling lane changes)); *Fleming v. Esposito*, 08-CV-4584, 2009 WL 10739921, at *4 (S.D.N.Y. Nov. 23, 2009) (noting that Section 155 of the New York Vehicle and Traffic Law states that "[f]or purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense" and that under N.Y. Crim. Proc. Law § 140, "a police officer may arrest a person for: (a) any offense when he [or she] has reasonable cause to believe that such person has committed such offense in his [or her] presence," though this is a matter of state law rather than the constitutionally required standard); *People v. Marsh*, 20 N.Y.2d 98, 101 (N.Y. 1967) (holding that "traffic violation may serve as a predicate for an arrest without a warrant pursuant to [Vehicle and Traffic Law § 155]"); *see People v. Miller*, 539 N.Y.S.2d 809, 812 (N.Y. 1989) ("[B]ased on the defendant's failure to produce a driver's license and his admission that he was operating the car, an arrest of the defendant for driving without a license was also warranted.").

---

[4]     The undersigned notes that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  *Jaegly v. Couch*, 439 F.3d at 154; *see also Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004) ("[A]n arresting officer's . . . subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.").

As a result, I recommend that Plaintiff's false arrest claim against Defendant Jukic be dismissed.

## V.     OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[5]

Given that this is the Court's first review of Plaintiff's pleading and that Plaintiff is a *pro se* litigant, out of an abundance of caution, I recommend that he be permitted to replead the Complaint.

---

[5]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

If Plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that "'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.'" *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's second amended application to proceed *in forma pauperis* (Dkt. No. 8) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 9) and notify that official that Plaintiff has filed this action and is required to pay

the Northern District of New York the entire statutory filing fee of $350.00 in installments, over

time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization

form (Dkt. No. 9) to the Financial Deputy of the Clerk's office; and it is further respectfully

      **RECOMMENDED** that the Court **DISMISS** the Complaint (Dkt. No. 1) **WITH**

**LEAVE TO REPLEAD** pursuant to 28 U.S.C. § 1915(e)(2)(B), 1915A(b); and it is further

      **ORDERED** that the Clerk of the Court shall file a copy of this order, report, and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[6]

      **NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within

which to file written objections to the foregoing report.[7]  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013);

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: June 20 , 2024
      Binghamton, New York

                           *Miroslav Lovric*

                           Miroslav Lovric
                           U.S. Magistrate Judge

---

[6]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[7]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous,

malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson* [3] *v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status

on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

- Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009). [4]

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury,

or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

#### IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

#### V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

#### All Citations

Not Reported in F.Supp.2d, 2010 WL 5185047

---

### Footnotes

1    At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

2    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

3    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

4      Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

5      Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

> *Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

> Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by State v. Williams, Mo.App. W.D., October 30, 2012

2011 WL 569874
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

UNITED STATES of America,
v.
Anibal COLON, Defendant.

No. 10 Cr. 498(RPP).
|
Feb. 8, 2011.

**Attorneys and Law Firms**

John J. Byrnes, Federal Defenders of New York Inc. (N.Y.C), New York, NY, Timothy Turner Howard, U.S. Attorney's Office, SDNY, New York, NY, for Defendant.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., District Judge.

**\*1** Defendant Anibal Colon moves to suppress physical evidence seized from his minivan on May 15, 2010 as fruits of an unlawful search.

Defendant filed the motion to suppress on September 24, 2010, and the Government filed a brief in opposition on October 5, 2010, followed by two revisions on October 7 and October 12, 2010. The Defendant filed a reply on October 13, 2010, and a suppression hearing was held on November 23, 2010. On December 16, 2010, at Defendant's counsel's request, this Court viewed the minivan from which the evidence was seized at an impound lot in Brooklyn. Post-hearing briefs were filed on December 21, 2010.

**BACKGROUND**

During the suppression hearing held on November 23, 2010, the Government called as witnesses Police Officers Malcolm Hart and Jean Paul Rodriguez. The Defense called Police Officers Debbie Abreu and Odalis Muniz, and the Defendant Anibal Colon.

*I. Testimony of Officer Malcolm Hart*

Officer Hart is an officer with the New York Police Department ("NYPD") and is a member of the Patrol Borough Bronx based out of the 40th Precinct, where he has been employed since January of 2010. (Suppression Hear'g Transcript ("Tr.") at 4.) On direct examination, Officer Hart testified that on May 15, 2010, he was working a 5:30 p.m. to 2:05 a.m. shift. (*Id.*) Officer Hart was patrolling on foot that evening with his partner Officer Debbie Abreu. (*Id.* at 5.) At approximately 10:45 that evening, Officer Hart was at the corner of East 149th Street and Third Avenue in the Bronx. (*Id.* at 4.) Officer Hart described this intersection as busy, with "people getting off the train, getting off the bus and on the bus, and you have regular ... citizens walking across the street." (*Id.* at 10–11.) While standing on the corner of East 149th and Third Avenue, Officer Hart heard "loud noise coming from a vehicle. It was music playing and it was unreasonable ....the bass could be heard from blocks away." (*Id.*) Officer Hart testified that when he first heard the noise, it sounded as though it was "about two blocks" away, and traveling southbound on Third Avenue toward his position at the corner of Third Avenue and East 149th Street. (*Id.* at 5, 9.) After the light turned green, the music came closer to him, and he saw that it was coming from a minivan. (*Id.* at 6.) The minivan "had TVs in it, which ... you could see from the distance, and it had [high intensity] lights." (*Id.*) The minivan came to a stop on East 149th Street behind a car that was stopped at a red light. (*Id.*)

Officer Hart asked the driver of the vehicle in front of the minivan not to move when the light changed to green, "so that the [minivan] doesn't speed off." (*Id.* at 7.) Officer Hart and Officer Abreu then approached the minivan, with Officer Hart approaching the driver's side and Officer Abreu approaching the passenger's side. (*Id.*) Mr. Colon was sitting in the driver's seat of the minivan. (*Id.* at 13.) He was the vehicle's only occupant. (*Id.*) Officer Hart asked Mr. Colon for his identification from the driver's side, and Officer Abreu asked the same question from the passenger's side. (*Id.* at 7.) Mr. Colon could not provide identification, but gave Officer Hart "his name, his date of birth, and his address. He [also] gave ... a client ID number, which is a 9–digit number ... posted on every New York State ID, on the driver's license." but did not provide a driver's license, or other identification. (*Id.* at 11.) After receiving the client ID number orally from Mr. Colon, Officer Hart stepped away from the minivan and called another "unit" to his location so that the number could be entered into a computer. (*Id.* at 12.) Officer Hart also asked

Mr. Colon to move his vehicle into the bus land and out of traffic. (*Id.*)

**\*2**  One or two minutes after Officer Hart requested assistance from another unit, Officers J.P. Rodriguez and Odalis Muniz arrived at the scene in a marked police van. (*Id.*) Officer Hart provided Officers Rodriguez and Muniz with Mr. Colon's client ID number. (*Id.* at 13.) Officers Rodriguez and Muniz entered the client ID into the computer system, and the system responded "non valid person." (*Id.*) At that time, Officer Hart looked toward the minivan, and saw Mr. Colon seated on the passenger side of the vehicle, calling to him. (*Id.*) He was unable to hear what Mr. Colon was saying, but Mr. Colon's "head was actually protruding outside the vehicle." (*Id.* at 13–14.) Officer Hart walked up to the vehicle slowly, and when he reached the vehicle, Mr. Colon "put his head further in the vehicle" and told the Officer that he had another client ID. (*Id.* at 14.) Mr. Colon did not provide a driver's license. (*Id.*)

As Mr. Colon provided Officer Hart with the new client ID number, Officer Hart "noticed that the glove box was open." [1] (*Id.*) Officer Hart was able to see inside the glove compartment and observed that "there was actually an item hanging from it and there was a strange smell coming from the vehicle." (*Id.*) Officer Hart identified the smell as marijuana. (*Id.*) He was unable to identify what the item was that he observed "hanging down from the glove compartment box," and backed away from the vehicle. (*Id.* at 15.)

Officer Hart testified that he then returned to the police van, and gave the new client ID number to Officers Rodriguez and Muniz to enter into the system. (*Id.*) While Officers Rodriguez and Muniz checked the new ID number, Officer Hart sat in the backseat of the van and began writing a summons for unreasonable noise. (*Id.*) Upon entering the new client ID number into the computer system, the Officers learned that there was a suspension and a warrant for arrest in the system for Mr. Colon. (*Id.* at 16.) Officer Muniz then approached the minivan on the driver's side in order to ask Mr. Colon about the suspension that came up in the computer. (*Id.* at 17.) Officer Muniz then returned to the van, by which time the actual arrest warrant had popped into the compuer system, so the officers could see it. (*Id.* at 18.) Officers Hart and Rodriguez then walked over to the minivan and approached Mr. Colon on the driver's side. (*Id.*) They asked Mr. Colon to step outside the vehicle, because there was a warrant for his arrest in the system. (*Id.*) The Officers then arrested Mr. Colon, patted him down for weapons, and placed him in the

backseat of the police van. (*Id.*) No weapons or contraband were found on the person of Mr. Colon. (*Id.* at 19.)

After placing Mr. Colon in the police van, Officers Hart and Rodriguez walked back to Mr. Colon's minivan and discussed how to transport the vehicle back to the 40th Precinct. (*Id.*) Officer Hart testified that the minivan had to be taken back to the precinct for vouchering because there were no other individuals in the vehicle, the driver had been arrested, and the vehicle was parked in the bus stop. (*Id.* at 20–21.) As they approached the vehicle, Officer Rodriguez was on the driver's side and Officer Hart was on the passenger side. (*Id.* at 21.) The Officers opened the minivan's front doors. (*Id.*) Officer Hart was able to see the object that he had observed earlier, "which was hanging out of the top of like the dashboard in the glove compartment box, which was partially opened and partially closed at the same time." (*Id.* at 22.) Officer Hart touched the item, and felt a ring that felt similar to the ring on his gun, as well as a "line sticking down, a metal, hard object." (*Id.*) He then grabbed the outside of it and could feel that it was a gun. (*Id.*) Officer Hart ripped the gun down from the material and placed it in his pocket. (*Id.*) He then called for his supervisor to arrive on the scene, because he found a gun inside the vehicle. (*Id.* at 22–23 .) The gun was loaded with 4 rounds of .38 caliber ammunition. (Affidavit of Malcolm Hart, dated May 16, 2010, submitted as Exhibit A to the Declaration of John Byrnes dated September 21, 2010.)

**\*3**  Once Officer Hart's supervisor and other officers arrived, Officer Rodriguez drove the vehicle back to the precinct. (*Id.* at 23.) When the minivan arrived at the 40th Precinct, the vehicle was vouchered and everything inside the vehicle was checked to make sure the vehicle was safe. (*Id.*) Officer Hart and Officer Rodriguez worked together to voucher the vehicle. (*Id.* at 26.) Officer Hart testified that the vouchering process is governed by section 1813 of the NYC Patrol Guide "Internal Search of Automobile and Other Property." (*Id.* at 23–24.) At the suppression hearing, Officer Hart read from the Patrol guide (Govt.Ex. 6) which states "whenever any property comes into custody of this department, an inventory search will be conducted as follows," and listed the areas of an automobile that are to be searched as part of an inventory search: "glove compartment, console, map pockets on doors, areas under the seat and around the seat stuffing and springs, under the floormats, under and behind the dashboard, inside the ashtray, in the air vents where accessible, under the hood, and trunk." (*Id.* at 25.)

In the course of the voucher search, Officer Hart and Officer Rodriguez found 19 decks of heroin, money and a bag of marijuana. (*Id.*) The heroin was labeled "Avatar," and had rubber bands around it, and was found in a container of rice in a plastic bag. (*Id.*) This plastic bag was found in a space above the glove compartment. (*Id.*) Officer Hart testified that "inside the glove compartment box, there was a hole on top of it in which the gun was hanging from inside a cloth. When the cloth was removed, [the bag with the heroin] was on the right-hand side of ... the gun, further up inside the dashboard" (*Id.* at 27.)

The Officers vouchered a 13–inch flat-screen TV that was connected to the ceiling of the car, and a Sony camcorder found on the floor on the passenger's side of the vehicle. (*Id.* at 30.) The black insulation cloth that surrounded the gun, as well as loose marijuana residue found on the cloth were each vouchered as Exhibit 9 and labeled Number 2. (*Id.* at 37–38.) A separate clear plastic bag which contained marijuana found in the area above the glove compartment, and its contents, were vouchered as Exhibit 9 and labeled Number 1. (*Id.* at 38–39.) Finally, the money found in the plastic bag containing the rice and the decks of heroin was vouchered, along with money found in Mr. Colon's pockets. (*Id.* at 46.) A total of $910 was vouchered. (*Id.* at 40.) Officer Hart testified that the Officers found about $500–600 on the person of Mr. Colon. (*Id.* at 48.)

On cross-examination, Officer Hart clarified that the space above the glove compartment, which was found to contain the bag of rice holding the heroin and cash, the bag of marijuana, and from which hung the gun wrapped in cloth, was connected to the glove compartment through a hole big enough to reach his hand into. (*Id* . at 54.) Officer Hart further testified that he cut the insulating cloth that was hanging from the hole free from the glove compartment with a knife. (*Id.* at 56.) Upon further questioning, Officer Hart explained:

> **\*4** "The cloth was hanging down. The cloth, when it was hanging down, is connected to the dashboard. All the items that I said was inside it was behind it. So at one point before I ripped the gun off, they were on the cloth but behind the gun. The gun was ripped off separately and the items

were remaining inside of it, inside the dashboard."

(*Id.* at 59.)

On cross-examination, Officer Hart was questioned about his initial approach to the vehicle, during which he requested Mr. Colon's identification. (*Id.* at 61–62.) Defendant's attorney pointed out that in his grand jury testimony, Officer Hart had testified that the Defendant provided him with registration and insurance, while on direct Officer Hart testified that he received no documents from Mr. Colon. (*Id.* at 62.) Officer Hart did not deny offering such testimony but also could not recall testifying that he received those documents. (*Id.* at 63.)

Officer Hart also testified on cross-examination that when Mr. Colon was trying to obtain his attention to provide the second client ID, while Officer Hart was in the police van, Mr. Colon was seated in the passenger seat of the van. (*Id.* at 66.) Officer Hart further testified on cross that when he first approached the minivan, he did not smell marijuana, and only smelled it when he returned to the vehicle and was provided the second client ID number. (*Id.* at 67.) Officer Hart explained that at the time he smelled the marijuana, he did not arrest Mr. Colon or write out a summons. (*Id.* at 68.) Officer Hart testified that "just smelling marijuana" was not a reason to arrest Mr. Colon. (*Id.* at 69.)

Officer Hart testified that when Mr. Colon was finally arrested, after the Officers had an arrest warrant appear in their computer system that corresponded to his client ID, Mr. Colon had some difficulty getting out of the car, "because his leg was hurting." (*Id.* at 72.) Officer Hart did not recall Mr. Colon having crutches with him in the vehicle. (*Id.*) Officer Hart testified on cross that he did not recall having any conversation with Mr. Colon regarding Mr. Colon's wife picking up the minivan. (*Id.* at 73.)

Officer Hart testified that he was unable to recall whether the marijuana odor he described was that of smoked marijuana or raw marijuana. (*Id.* at 81.)

On redirect, Officer Hart clarified that he smelled marijuana both when he approached the minivan to obtain Mr. Colon's second client ID number, and when he approached the minivan to arrest Mr. Colon on the warrant. (*Id.* at 86.) Officer Hart also affirmed that he "knew for a fact" that the odor was marijuana. (*Id.* at 87.)

### B. *Testimony of Officer Jean–Paul Rodriguez*

Officer Jean–Paul Rodriguez is employed by the NYPD and assigned to the patrol borough Bronx IRT unit, where he has been assigned for the past year. (*Id.* at 89.) His duties include patrolling the streets, usually on foot, to prevent crime and look for quality of life offenses. (*Id.*)

**\*5** On direct examination, Officer Rodriguez testified that on the evening of May 15, 2010, he was working the 6 p.m. to 2 a.m. shift with his partner Officer Muniz. (*Id.*) The two officers occupied van 8576, in which Officer Rodriguez was a passenger, while Officer Muniz drove. (*Id.*) At about 10:45 p.m., they overheard "on the air" that a car was stopped, and they reported to the location of the stop at Third Avenue and 149th Street. (*Id.* at 89–91.) They responded very soon after they heard about it on the radio. (*Id.* at 90.) When Officer Rodriguez arrived at the intersection, he first noticed a vehicle parked in a bus stop area. (*Id.* at 91.) He observed the Defendant in the driver's seat, and saw no one else in the vehicle. (*Id.*) Officers Hart and Abreu came to the van where Officer Rodriguez was sitting and provided Officer Rodriguez with a piece of paper with a New York State ID number written on it. (*Id.* at 92.) Officer Rodriguez then entered this number into the van's computer system. (*Id.* at 93.) The system replied that it had no record of that number. (*Id.*)

While Officer Rodriguez was entering the number, he looked toward the stopped minivan and saw the Defendant move into the passenger seat. (*Id.*) He testified that the Defendant was moving around in the passenger seat, and that he observed his "head bobbing." (*Id.*) After the computer system responded that the client ID number was invalid, he heard the Defendant yelling another number "outside the passenger window." (*Id.*) Officer Rodriguez was unable to tell what the number was. (*"Id."*)

Officer Rodriguez then watched Officer Hart go to the passenger side of the minivan to retrieve the second number. (*Id.* at 94.) Officer Hart returned and provided the new number, which Officer Rodriguez entered into the system. (*Id.*) The system showed that "the defendant had a warrant, that it specifically said something about that he was a gang member. There was a conditional on some motorcycle license that seemed awkward. It could have been for driving while impaired or something of that nature. It was just not of the usual." (*Id.* at 95.) The Officers then discussed placing the Defendant under arrest and bringing him to the 40th Precinct.

(*Id.*) Officer Rodriguez next saw Officer Hart arrest the Defendant and put him in handcuffs. (*Id.*) Officer Hart then brought the Defendant to the police van occupied by Officer Rodriguez. Next, Officers Hart and Rodriguez discussed what to do with the minivan. (*Id.* at 96.) Officer Rodriguez explained that they were discussing how to handle the vehicle because:

> "[T]here was nobody we could give the vehicle to. And because of the area that it was at, we knew we had to move it out of the area. It couldn't be left on Third Avenue, because it was left at a bus stop, a high density area, people. Because of the equipment, we could not just leave it there, because it might get broken into or whatnot. So we knew we would just have to bring it to the 40 Precinct."

**\*6** (*Id.* at 97.)

Officer Rodriguez then told Officer Hart that he would drive the van to the precinct. (*Id.*) The two officers approached the vehicle; Officer Rodriguez on the driver's side and Officer Hart on the passenger's side. (*Id.*) Officer Rodriguez testified that they scanned the front seat area for any safety risks before sitting in the car, pursuant to their normal procedure. (*Id.* at 98.) Officer Rodriguez focused on the driver's side floor and seat, "anything [his] body would be touching." (*Id.* at 98.) Officer Hart then asked him "Do you smell marijuana?" (*Id.*) Officer Rodriguez leaned toward the passenger's side of the vehicle and confirmed that he did smell marijuana. (*Id.*) Officer Rodriguez testified that the smell was coming from the front of the vehicle, and therefore he looked toward the glove compartment. (*Id.* at 99.) The glove compartment was open at the time he was scanning the vehicle. (*Id.*) He noticed a cloth sticking out from on top of the glove compartment. (*Id.* at 100.) He saw Officer Hart reach at the same cloth Officer Rodriguez had observed, and he watched as Officer Hart put his hand inside that cloth and say "I think I have a gun." (*Id.*) He then saw Officer Hart put the gun in his pocket. (*Id.*) Then Officers then radioed for a supervisor. (*Id.* at 101.)

After the sergeant arrived on the scene, Officer Rodriguez drove the minivan back to the 40th Precinct. (*Id.*) The Officers were then told by their supervisor to voucher the vehicle,

which he understood was because they found a gun in this vehicle. (*Id.* at 102.) As they vouchered the vehicle, Officer Hart searched the vehicle while Officer Rodriguez wrote down what was found. (*Id.*) While seated in the passenger's seat, Officer Hart found a white plastic bag containing money and what appeared to be heroin in the upper part of the glove compartment. (*Id.*) Officer Rodriguez was standing next to him outside the vehicle at this time. (*Id.* at 103.)

On cross-examination, Officer Rodriguez provided further explanation regarding the glove compartment. (*Id.* at 104–105.) He explained that the van's glove compartment "comes down and there is a pocket, so something can stick down from it." (*Id.* at 104.) With regard to the object he noticed in the glove compartment, Officer Rodriguez testified that "there was a cloth. There was something that did not-didn't look usual." (*Id.* at 108.)

Officer Rodriguez was then cross-examined regarding his recollection of smelling marijuana in the van. (*Id.* at 113–114.) Officer Rodriguez testified that the odor he detected was the odor of raw marijuana, not of someone smoking marijuana. (*Id.* at 114.) Defendant's counsel then asked whether Officer Rodriguez had any experience smelling marijuana that was in a Ziploc bag. (*Id.* at 115.) Officer Rodriguez replied that "You can't smell marijuana in a Ziploc bag." (*Id.*) He further testified that there some marijuana in a Ziploc bag was ultimately found in the vehicle, but "there was also loose." (*Id.*)

**\*7** Officer Rodriguez also testified on cross examination regarding the Defendant's efforts to attract police attention and provide his second client ID number. (*Id.* at 119.) Officer Rodriguez testified that he heard yelling outside the passenger's side of the vehicle, and that he observed as Officer Hart approached the Defendant from the passenger side. (*Id.* at 118–119.) Officer Rodriguez then testified that when Officer Hart returned to the vehicle to remove Mr. Colon and effect the arrest, Officer Hart approached the passenger's side of the minivan. (*Id.* at 121.) Officer Rodriguez also testified that he remembered the Defendant having difficulty walking and that he recovered crutches from the vehicle. (*Id.* at 122.)

Defendant's counsel next cross-examined Officer Rodriguez regarding the voucher search. (*Id.* at 123–126.) Officer Rodriguez testified that he and Officer Hart searched the van once it got back to the precinct. (*Id.* at 123.) He explained that during the voucher search he watched as Officer Hart removed the bag of rice and heroin from on top of the glove

compartment. (*Id.* at 124.) He saw that Officer Hart stuck his hand through an opening in the glove compartment, the same hole from which he originally pulled the gun. (*Id.* at 125.) Officer Rodriguez did not know how big the hole was. (*Id.*)

On re-cross examination, Officer Rodriguez was asked to describe the initial scan search he and Officer Hart undertook when they first approached the vehicle following Mr. Colon's arrest. Officer Rodriguez explained:

> "Both doors are open. Both of us are looking inside the vehicle and scanning inside. I can tell you I'm standing outside, leaning forward toward the passenger side, scanning, looking, looking, looking and then he tells me, do you smell marijuana? I put my head up, and that's when I leaned forward more and I say, yes. So I wasn't sitting down."

(*Id.* at 130–131.)

Officer Rodriguez further testified that when he saw Officer Hart touch the black cloth, Officer Hart was on the passenger side of the vehicle. (*Id.* at 131.)

C. *Officer Debbie Abreu*

The Defendant called Officer Debbie Abreu to testify. On direct examination, Officer Debbie Abreu testified that around 10:50 p.m. on May 15, 2010, she was working with Officer Hart, her partner, in the vicinity of 149th and Third Avenue in the Bronx. (*Id.* at 132–133.) Officer Abreu recalled that she and Officer Hart heard loud music playing, and eventually determined that it was coming from the defendant's vehicle. (*Id.* at 134.) When the Officers stopped the vehicle, Officer Abreu approached the driver's side and Officer Hart approached the passenger's side. (*Id.*) She testified that the minivan's windows were open when she requested Mr. Colon's credentials. (*Id.* at 135.) Mr. Colon provided her with the registration and insurance information, but not a driver's license. (*Id.* at 136.) Mr. Colon fumbled in his pocket looking for the information. (*Id.*) She testified that she "didn't look at the glove compartment," and didn't know whether it was open or closed. (*Id.* at 137.) She also did not remember smelling marijuana. (*Id.*)

**\*8** Officer Abreu testified that she and Officer Hart called a police van that has a computer in it to run the license number provided by the Defendant. (*Id.* at 138.) She and Officer Hart then asked Mr. Colon to move his car over to the side away from traffic. (*Id.*) After the van arrived, the license number was given to the officers in the van. (*Id.* at 138.) She then stayed in the van with Officer Muniz, and Mr. Colon was arrested and brought to the van. (*Id.* at 139.)

On cross examination, Officer Abreu testified that she only went to Mr. Colon's vehicle once, when he was initially stopped. (*Id.*) She also clarified that when Mr. Colon pulled his vehicle out of traffic, the minivan was parked at a bus stop. (*Id* . at 140.)

### D. *Testimony of Officer Odalis Muniz*
The Defendant next called Officer Odalis Muniz to testify. Officer Muniz testified on direct examination that she was also present at the arrest of Anibal Colon on May 15, 2010 of this year. (*Id.* at 141.) Officer Muniz was driving the police van equipped with a computer to check driver's licenses. (*Id.*) She recalled receiving a call on her cell phone, around 11 p.m. that evening from Officer Abreu. (*Id.* at 142.) When the police van arrived at the corner of 149th and Third Avenue, Officer Muniz saw Officers Abreu and Hart standing on the street as well as a minivan. (*Id.* at 143.) Officer Muniz then testified that either herself or Officer Rodriguez entered a number provided by either Officer Abreu or Hart into the computer system. (*Id.*) While this number was being entered, Officer Muniz was watching the minivan. (*Id.*) She watched the minivan because "that is standard procedure. If there is a car stopped, one of us has to keep an eye on the vehicle and occupant within the vehicle." (*Id.* at 144.)

Officer Muniz testified that at some point, she saw the Defendant's head on the passenger side of the vehicle. (*Id.*) She then saw Officer Hart go to the vehicle, and return a few minutes later with another number. (*Id.*) This second number was then ran in the computer system, and came up as the record of Anibal Colon. (*Id.*) Officer Muniz testified that "Mr. Colon's license came up with a double endorsement, one for regular driving privileges and another one with a motorcycle license endorsement. The motorcycle endorsement came up suspended. So I went to ask Mr. Colon what happened with that endorsement." (*Id.* at 145–146.) She approached Mr. Colon at the driver's side of the vehicle. (*Id.* at 146.) When she approached, the driver's side window was closed, and Mr.

Colon then lowered it halfway. (*Id.* at 147.) Officer Muniz did not smell marijuana in the car. (*Id.* at 146.)

On cross-examination, Officer Muniz testified that in addition to the motorcycle license that came up when they ran Mr. Colon's ID, a warrant also appeared in the system. (*Id.* at 147.)

### E. *Testimony of Anibal Colon*
**\*9** As a final witness, the defense called Anibal Colon. Mr. Colon testified that on the evening of May 15, 2010, he went to Pizza Hut with his wife and his two kids. (*Id.* at 149.) They were then going to go a movie, but because it was sold out, returned home. (*Id.*) Mr. Colon dropped his wife and kids at home, and then decided to go to a friend's house to pick up a DVD series. (*Id.* at 151.) His friend lived at 136th Street between St. Ann's and Cypress Avenue in the Bronx. (*Id.*)

He drove to his friend's house in his Nissan Quest, a minivan. (*Id.*) He was playing music as he drove. (*Id.*) As he pulled up to a red light at the intersection of Third Avenue and 149th Street, two police officers approached the car. (*Id.*) Mr. Colon testified that Officer Abreu approached his passenger's side, while Officer Hart approached his driver's side. (*Id.*) Mr. Colon lowered the window on the passenger's side, and Officer Abreu asked for license and registration. (*Id.* at 152.) Mr. Colon asked why she needed his license and registration. (*Id.*) Officer Hart then tapped on his driver's side window, which Mr. Colon pulled down, and asked for his license and registration. (*Id.*) Mr. Colon again asked why this was needed. (*Id.*) While searching for his papers, he opened and closed the glove compartment. (*Id.*) He then provided the Officers with his insurance and registration. (*Id.*) He did not provide his driver's license. (*Id.* at 153.)

In addition to the insurance and registration, Mr. Colon provided the officers with his license ID number. (*Id.*) He had this number memorized because he had spent a lot of time at the Department of Motor Vehicles prior to the stop. (*Id.*) Officer Hart then asked Mr. Colon to reverse his vehicle into a bus stop. (*Id.* at 154.) The Officers then told Mr. Colon to "sit tight." (*Id.*)

Mr. Colon then noticed that a police van that pulled up, and the officers who had approached earlier walked toward the police van. (*Id.*) Mr. Colon called his wife to check whether the numbers he provided to the police were correct. (*Id.* at 154–155.) His wife found his driver's license and recited the number to him, and Mr. Colon realized that the number he had provided had an incorrect digit. (*Id.* at 155.) He then

proceeded to get the officer's attention by waving his hand out the driver's side window, and shouting out the passenger side window. (*Id.*) Officer Hart then came back to the vehicle, and approached the passenger side. (*Id.* at 155–156) When Officer Hart returned, the glove compartment was closed. (*Id.* at 155–156.) Mr. Colon provided Officer Hart with the new license ID number. (*Id.* at 156.)

Mr. Colon testified that he was never seated in the passenger seat at any point during this incident. (*Id.*) He had rested on his arm on the passenger seat so he could lean out the window when he was trying to provide the police with the correct ID number. (*Id.*) The evening of May 15, 2010, Mr. Colon was wearing a brace on his knee and carrying crutches, because he was hit by a car that March, and had surgery on his knee. (*Id.* at 157.) Mr. Colon testified that it would have been difficult for him to go from the driver's side to the passenger's side in his vehicle. (*Id.*) Mr. Colon further testified that he did not smoke marijuana in his car that day, and that neither did anyone else. (*Id.* at 159.)

 **\*10** Next, Mr. Colon testified that Officer Muniz came up to his vehicle, on the driver's side, and asked him about his motorcycle license suspension. (*Id.* at 158.) Mr. Colon told her that he only had a motorcycle permit but that he knew his driver's license was valid because he had gone to the Department of Vehicles a week earlier and had to pay a fine to get his license back into valid status. (*Id.* at 158–159.) Officer Muniz responded that "it's coming up suspended," and walked toward the van. (*Id.* at 159.) Then, Officer Hart approached the vehicle, on the driver's side, and told Mr. Colon to step out and that he was being arrested. (*Id.*) Officer Hart helped Mr. Colon out of the vehicle because of his injury. (*Id.* at 160.)

Mr. Colon stated that Officer Hart next asked "if there was anyone who could pick up the vehicle, and I told him yes, that my wife could come. He said, all right, fine, I'll let you call her in a second." (*Id.*) Officer Hart then took Mr. Colon to the van and searched him. (*Id.*) Once he was placed inside the van, Officer Hart and Officer Rodriguez went to the minivan. (*Id.* at 161.)

Defense counsel next inquired about the glove compartment:

 Q: You opened and closed the glove compartment several times, is that right? You opened and closed that compartment because that was your van, right?

 A: Yes.

 Q: You used the glove compartment, is that right?

 A: Yes.

 Q: Was there any hole in the glove compartment that you were aware of?

 A: No Sir.

 Q: Was there any hole or was there any divider or anything that could fit some roughly 2–inch piece of cloth that could protrude over there, as far as you know?

 A: No.

(*Id.* at 164.)

At the precinct, the Defendant spoke to a detective, who asked him if he knew why he was there. (*Id.* at 165.) The Defendant replied that he was there for two warrants. (*Id.*) The detective replied "that's the least of your problems," and showed the Defendant a picture of a gun on his iPhone. (*Id.*) This conversation happened about five to ten minutes after Mr. Colon arrived at the precinct. (*Id.*)

Mr. Colon testified that he has been convicted of several crimes, including at least one felony. (*Id.* at 166.) Mr. Colon also testified that he had previously been convicted of robbery and drug crimes. (*Id.*)

On cross-examination, Mr. Colon testified that he had paid about $3,000 for his minivan about seven months prior to the incident. (*Id.* at 167.) He stated that he and his wife are the only people who drive the car. (*Id.*) Mr. Colon restated that he did not smoke marijuana in the car that day, but acknowledged that he had previously been arrested and pled guilty to charges of driving under the influence of marijuana and possessing marijuana while driving a car. (*Id.* at 170.)

Mr. Colon was next cross-examined on the availability of his wife to pick up the car. (*Id.* at 171.) Mr. Colon acknowledged that his wife was not standing outside the vehicle, and that he had no other friends or relatives standing just outside the vehicle. (*Id* .) The Court then asked Mr. Colon his home address, which is 1349 Franklin Avenue in the Bronx. (*Id.* at 172.) Mr. Colon explained that his home is about an eight minute drive from the corner of 149th Street and Third Avenue, where the arrest took place. (*Id.*) The Government introduced a sworn Declaration submitted by Mr. Colon, dated September 17, 2010, as Exhibit 33. (*Id.* at 174.) In that

document, Mr. Colon stated "while the officer was placing me inside the police vehicle, the officer asked me if anyone was immediately available to pick up my car. I advised the officer that my wife could pick up the minivan." (Declaration of Anibal Colon, September 17, 2010 at ¶ 7.)

**\*11** Mr. Colon was also cross-examined with regard to his minivan, and testified that after he purchased the car, he added a TV monitor and a sound system. (*Id.* at 175.)

At the conclusion of the cross-examination, the Court asked a few additional questions. The Defendant testified that he estimates that his van is about four feet wide from the passenger's side to the driver's side. (*Id.* at 177.) He also testified that he is 5′10″ tall. (*Id.*) The Court asked whether he didn't slide himself, with his good leg, into the passenger seat the evening he was arrested, and Mr. Colon denied doing so. (*Id.*) Mr. Colon explained that he leaned out the driver's side window and waved his hand out the driver's side, and then leaned over to het passenger side and yelled out that window. (*Id.* at 178.)

### DISCUSSION

#### I. *Automobile Exception*

The Government contends that the evidence seized from the minivan without a warrant is admissible pursuant to the automobile exception.

"[S]earches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted). One such exception is the "automobile exception." The automobile exception provides that law enforcement officers may conduct a warrantless search of a readily mobile vehicle "where there is probable cause to believe that the vehicle contains contraband." *United States v. Navas,* 597 F.3d 492, 497 (2d Cir.2010). Where the probable cause upon which the search is based "extends to the entire vehicle," the permissible scope of a search pursuant to this exception includes " 'every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search.' " *United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.1993) (alteration in original) (quoting *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).

This exception has been justified under two theories. "First, the Court has noted that a persons' expectation of privacy in a vehicle is less than his or her expectation of privacy in a home, *see Cardwell v. Lewis.* 417 U.S. 583, 590(1974), and second, the Court has held that because a vehicle is readily movable, exigent circumstances might require a warrantless search, *see Carroll v. United States,* 267 U.S. 132, 153(1925)." *United States v. Howard,* 489 F.3d 484, 492 (2d Cir.2007). "The mobility rationale ... does not turn on case-by-case determinations by agents in the field regarding either the probability that a vehicle could be mobilized or the speed with which movement could be achieved. Rather, '[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search.' *Howard,* 489 F.3d at 493." *Navas,* 597 F.3d at 498.

**\*12** In order for the seized evidence to be admitted pursuant to the automobile exception, the officers must demonstrate that at the time of the search, they had "probable cause to believe the vehicle contained contraband." *United States v. Navas,* 597 F.3d at 497. Under New York Penal Law § 221.05, the possession of marijuana is a violation punishable by a fine of not more than one hundred dollars. N.Y. Penal Law § 221.05 (McKinney 2008). Because the possession of marijuana is unlawful, marijuana is a form of contraband. The Government asserts that the officers had probable cause for such belief because they detected the smell of marijuana coming from the vehicle when talking with the Defendant through the open passenger's side window. The odor of marijuana coming from a vehicle can establish probable cause. *United States v. Jackson,* 652 F.2d 244, 252 n. 6 (2d Cir.1981); *United States v. Martin,* No. 09–1382, 360 Fed. Appx. 686, 690 (7th Cir.2010).

Both Officer Hart and Officer Rodriguez testified that they smelled marijuana around the passenger's side of the Defendant's minivan. Officer Hart testified that he first smelled marijuana when he approached the minivan for the second time, on the passenger's side, to obtain Mr. Colon's new client ID number. (Tr. at 14.) Officer Hart testified that at that time the glove compartment was open. (*Id.*) Officer Rodriguez also noticed the smell of marijuana. Officer Rodriguez explained that during the safety scan the officers conducted prior to driving the vehicle, he was scanning the driver's side, while Officer Hart was scanning the passenger's side. (*Id.* at 98.) Officer Hart asked Officer Rodriguez whether

he smelled marijuana, and when Officer Rodriguez leaned over to the passenger's side, at which point he smelled the odor of marijuana. (*Id.*) Officer Rodriguez was able identify the odor as that of raw, as opposed to smoked, marijuana. (*Id.* at 114.)

Defendant testified that no marijuana had been smoked, by himself or anyone else, in the car that day. (*Id.* at 149.) This testimony is not necessarily inconsistent with the Officers' testimony that they detected the odor of marijuana in the car, because Officer Rodriguez testified that the odor he smelled was of raw marijuana, not smoked marijuana. Probable cause determinations are made on the basis of what information the police had at the time of seizure, *United States v. Scopo*, 19 F.3d 777, 783 (2d Cir.1994), however, the fact that a small quantity of loose raw marijuana was ultimately found on the cloth in which the gun was found in the glove compartment lends credibility to the Officers' testimony that they smelled marijuana near the passenger's side of the vehicle.

Upon encountering the suspicious smell, Officers Hart and Rodriguez had probable cause to believe that the car contained contraband, namely, marijuana. It was only after Officer Hart detected the odor of marijuana that Officer Hart reached into the open glove compartment to investigate the unusual piece of cloth he observed hanging from the top of the compartment and found the gun. At the time this search was conducted, Officers Hart and Rodriguez had probable cause to believe the vehicle contained contraband, and therefore the search was not a violation of the Defendant's constitutional rights under the automobile exception to the warrant requirement.

## II. *Plain View/Feel Doctrine*

**\*13** In the alternative, the Government argues in its corrected Memorandum in Opposition filed on October 7, 2010, that the evidence was properly seized from the minivan pursuant to the plain view/plain feel doctrines. This argument was omitted from the post-hearing brief.

The plain view doctrine provides that law enforcement officers may lawfully seize an item without a warrant where 1) the agents have lawful access to the place from which the item can be plainly viewed; 2) the objects seized are in plain view at the time they are discovered; and 3) it is "immediately apparent" that there is probable cause to believe that the item constitutes evidence or fruit of a crime. *Horton v. California*, 496 U.S. 128, 136 (1990). The "plain feel" variation of the plain view doctrine provides similarly that law enforcement officers may lawfully seize evidence they touch

and can plainly feel is contraband or contains contraband. *Minnesota v. Dickerson.* 508 U.S. 366 (1993). The plain feel doctrine applies to the seizure of objects in containers as well as objects found on the person of a suspect. *United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981).

Neither *Ocampo* nor *United States v. Diaz,* 577 F.2d 821, 824 (2d Cir.1978), cases cited by the Government, support the application of the plain view doctrine to this case. There was no reason for the Officers to believe that the piece of cloth in the glove compartment posed an imminent threat to them as they relocated the van back to the precinct. Absent the probable cause established by the odor of marijuana, as previously discussed, there is nothing inherently incriminating about black cloth, and the Officers would have had no reason to touch it. The evidence presented does not demonstrate that the seizure of the gun is justified by the plain view or plain touch doctrines.

## III. *Inevitable Discovery*

The Government also contends that even if the seized evidence is not admissible pursuant to the automobile exception, it would still be admissible under the inevitable discovery doctrine.

Under the inevitable discovery doctrine, evidence is not suppressed where "the government can prove that the evidence would have been obtained inevitably even if there has been no statutory or constitutional violation." *United States v. Mendez,* 315 F.3d 132, 137 (2d Cir.2002). The inevitable discovery doctrine is applied "only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." *United States v. Heath,* 455 F.3d 52, 55 (2d Cir.2006).

In this case, the Government contends that the evidence would have been inevitably discovered during a legal inventory search of the vehicle after it was brought to the police precinct. Where the police lawfully take a vehicle into their custody, they are permitted to conduct an inventory search of the vehicle without a warrant or probable cause to believe the vehicle contains contraband. *United States v. Lopez,* 547 F.3d 364, 369 (2d Cir.2008). Inventory searches may permissibly implicate the inevitable discovery doctrine where the government establishes the following three elements:

**\*14** (1) That the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified; and

(2) That when the police in the police agency in question conducted inventory searches, they did so pursuant to 'established' or 'standardized' procedures'; and

(3) That those inventory procedures would have inevitably led to the discovery of the challenged evidence.

*Mendez,* 315 F.3d at 138.

### A. *The Legitimacy of the Police Custody of Defendant's Vehicle*

Under the first element of the *Mendez* test, the Government must demonstrate that the Officers' decision to impound the Defendant's vehicle was legitimate.

The Supreme Court has held that police have the power to impound vehicles where it is "[i]n the interests of public safety and as a part of what the Court has called 'community caretaking functions.' " *South Dakota v. Opperman,* 428 U.S. 364, 387 (1976). "Police officers may exercise their discretion in deciding whether to impound a vehicle, so long as that discretion is 'exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.' " *Colorado v. Bertine,* 479 U.S. 367, 375 (1987). "[W]hen a person is taken into custody after being stopped in his vehicle, it is reasonable for police officers to impound the vehicle under the community care functions where, among other things, the vehicle would otherwise potentially impede traffic, threaten public safety, or be subject to vandalism." *United States v. Bailey,* 468 F.Supp.2d 373, 392 (E.D.N.Y.2006). *See also South Dakota v. Opperman,* 428 U.S. at 373.

In this case, the minivan was taken into police custody after Mr. Colon had been arrested. (Tr. at 19.) There was no one else in the immediate vicinity to move the vehicle to a different location, (*Id.* at 97, 172) and the vehicle was parked at a bus stop in an area that the police witnesses testified was a busy area with transit connections. (*Id.* at 10, 97.) The Officers could reasonably have concluded that the presence of the minivan in a bus stop would impede traffic. In addition, had the vehicle been left unattended, it could have been susceptible to vandalism or theft, particularly in light of the fact that it contained an after-market stereo system and flat screen monitor. (*Id.* at 175.) Moreover, according to a post-hearing Affidavit submitted by Steven Csankany, Captain in the NYPD and currently commanding officer for the Bronx Anti–Crime Unit, "it is the practice and policy of the NYPD to properly safeguard vehicles when all the occupants of a vehicle is [sic] arrested."

Defendant contends that prior to impounding the vehicle, Officer Hart asked him whether there was anyone who could come and pick it up, to which Defendant replied that his wife was available to come and take the car. Officer Hart denied having such a conversation with the Defendant. (*Id.* at 73.) In any event, the Defendant testified that his wife was about an eight minute drive away from the car's location. (*Id.* at 172.) It is unclear how his wife would have arranged transportation to that site, or whether he knew if she was available to travel to that site and take custody of the car. Even if such a conversation took place, the Officers were entitled to employ their discretion, in the name of community caretaking, and impound the car rather than arranging for the Defendant's wife to arrive to pick the car up. *Bailey,* 468 F.Supp.2d at 392.

**\*15** Defendant's counsel argues that Officer Hart inquired whether someone would be available to take possession of the car, and only decided to impound the car upon discovering the gun during an allegedly improper search. Officers Hart and Rodriguez, however, testified that they returned to the minivan and began scanning the front seats so that Officer Rodriguez could drive the minivan to the Precinct and it could be vouchered. (Tr. at 21–23, 97–101.) It was only after they made the decision to take the car to the precinct that they found the gun.

Defendant testified that he was asked if anyone was available to pick up the car, and that he replied that his wife would come and pick it up. (*Id.* at 160.) Giving full credit to Defendant's testimony regarding this conversation, it still would have been reasonable, upon hearing Defendant's response and learning that there was no one in the immediate vicinity to take the car, for Officer Hart to decide to impound the vehicle. Indeed, Officer Rodriguez testified that he and Officer Hart discussed who would take the car back to the precinct "because there was nobody we could give the vehicle to."

Accordingly, the decision to impound the vehicle was reasonable under the Fourth Amendment. *See United States v. Barrios,* No. 07 Cr. 658, 2007 WL 3256945 (S.D.N.Y. November 1, 2007).

### B. The Conduct of the Inventory Search

In considering the second element of the *Mendez* test, the Court must consider whether the inventory search was conducted pursuant to "established" or "standardized" procedures. Officers Hart and Rodriguez testified that they followed the procedures set forth in the NYPD Patrol Guide, Section 218–13, "Inventory Searches of Automobiles or Other Property." The Guide, portions of which were read into the record, requires that all seized vehicles be searched "thoroughly," to protect property, prevent unwarranted claims of theft, and protect officers and others from danger. The procedures specifically state that the glove compartment can be searched. Therefore, even if Officer Hart's initial search of the glove compartment and seizure of the gun had been unlawful, the glove compartment still would have been searched as part of a standard inventory search once the minivan was taken to the Precinct.

### C. The Inevitability of Discovering the Seized Evidence

The final element of the *Mendez* test is whether the inventory procedures would have inevitably led to the discovery of the seized evidence. It is clear that an inventory search of the vehicle would have led to the discovery of the seized evidence. Upon scanning the glove compartment, the Officer would have observed the unusual-looking cloth hanging down from the glove compartment, and would have found the gun. Once the gun had been discovered, the Officers

would have, under the policies, been able to engage in a more intrusive search because they would have grounds to reasonably suspect that the vehicle contains contraband other weapons. Therefore, the discovery of the marijuana and heroin in the hidden compartment just adjacent to the location of the loaded gun would have been inevitable.

**\*16** Based on the application of the three-factor *Mendez* test, the impoundment and inventory search of Defendant's vehicle were reasonable. This Court finds that there is a high likelihood that the evidence seized would have been discovered during the inventory search even if Officer Hart had not found the gun at the scene of Defendant's arrest.

### CONCLUSION

The evidence seized from Defendant's minivan was seized lawfully under the automobile exception to the warrant requirement, and would have been inevitably discovered during a lawful inventory search. Defendant's motion to suppress is accordingly denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 569874

### Footnotes

1    When Officer Hart first stopped the Defendant, the glove compartment was not open. (*Id.* at 15.)

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-01543-DNH-ML Document 11 Filed 06/20/24 Page 30 of 101

Carter v. Campanelli, Not Reported in Fed. Supp. (2022)

2022 WL 1667022
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Onis George CARTER Jr., Plaintiff,

v.

Pom T. CAMPANELLI, John Doe,
Runway Towing Corp., Defendants.

22-CV-2702 (AMD) (LB)
|
Signed 05/25/2022

## MEMORANDUM DECISION AND ORDER

ANN M. DONNELLY, United States District Judge:

**\*1** The plaintiff, Onis George Carter Jr., proceeding *pro se*, commenced this action pursuant to 42 U.S.C § 1983 regarding the unlawful impoundment of his car. The Court grants the plaintiff's request to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915 solely for the purpose of this order. However, for the reasons set forth below, the plaintiff's action is dismissed with leave to amend for failure to state a claim upon which relief may be granted.

## BACKGROUND

The plaintiff alleges that on April 22, 2022 Officer Campanelli impounded his car because he had a suspended registration. (ECF No. 1 at 3-5.) The plaintiff asserts that his car was towed to Runway Towing Corporation. After he paid a fine, his car was towed back to his home. (*Id.* at 5.) According to the plaintiff, Officer Campanelli violated his rights under the Fourteenth Amendment. (*Id.* at 4.) The plaintiff seeks monetary damages. (*Id.* at 6.)

## LEGAL STANDARD

In order to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The plaintiff is proceeding *pro se*, so I construe his complaint liberally, and evaluate it by "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). Nevertheless, I must dismiss *sua sponte* an *in forma pauperis* action if it "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

## DISCUSSION

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

**\*2** The plaintiff alleges that defendants violated his rights under the Privileges and Immunities Clause of the Fourteenth Amendment by impounding his car. However, the Privileges and Immunities Clause of the Fourteenth Amendment protects only the enumerated privileges and immunities of federal citizenship. Property rights, which are created by state law, do not fall into this category. *Levine v. McCabe*, 357 F.

Carter v. Campanelli, Not Reported in Fed. Supp. (2022)

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 31 of 101

Supp. 2d 608, 619 (E.D.N.Y. 2005) ("Property rights have thus not been protected under the 'privileges and immunities' clause of the [Fourteenth Amendment.]"); *see also Slaughter-House Cases*, 83 U.S. 36 (1872).

Construing the plaintiff's complaint liberally, the Due Process Clause of the Fourteenth Amendment applies to actions by state actors and can give rise to Section 1983 claims under certain circumstances. "[T]he Due Process Clause of the Fourteenth Amendment prohibits the States[ ] from depriving any person of property without 'due process of law.' " *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). "[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Weisshaus v. Cuomo*, 512 F. Supp. 3d 379, 395 (E.D.N.Y. 2021) (quoting *City of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). Section 1983 claims that allege violations of due process must demonstrate that the defendants deprived the plaintiff of a federally protected interest and did so in the absence of procedural or substantive due process. *See Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 130 (2d Cir. 1998) (where a plaintiff claims he was deprived of property right in violation of the substantive due process doctrine, the court must begin "by determining whether a constitutionally cognizable property interest is at stake"); *NYTDA, Inc. v. City of New York*, No. 19-CV-6445, 2022 WL 824147, at *7 (E.D.N.Y. Mar. 18, 2022).

To bring a substantive due process claim, a plaintiff must plead (1) the deprivation of a constitutional right, and (2) state action that "was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021) (quoting *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012)). The plaintiff admits that his car was impounded because his car registration was suspended. Accordingly, Officer Campanelli appears to have had a valid basis for impounding the plaintiff's car, so his conduct was neither "egregious" or "outrageous." *See, e.g., Tsinberg v. New York*, No. 20-CV-749, 2021 WL 1536659, at *12 (S.D.N.Y. Jan. 22, 2021), *report and recommendation adopted sub nom.*, No. 20-CV-749, 2021 WL 1146942 (S.D.N.Y. Mar. 25, 2021) (finding that the plaintiff failed to allege that the City deprived him of his vehicle through arbitrary or outrageous actions that would "shock the conscience"); *Davis v. Nassau Cnty.*, No. 06-CV-4762, 2011 WL 5401663, at *6 (E.D.N.Y. Nov. 5, 2011) (finding that the plaintiff failed to allege any facts that demonstrate the defendants deprived him of his

license privileges through actions that "shock the conscience" because of their arbitrary or outrageous conduct); *Schaer v. City of New York*, No. 09-CV-7441, 2011 WL 1239836, at *6 (S.D.N.Y. Mar. 25, 2011) (noting that the seizure of vehicles to satisfy parking fines has been held to be constitutional and furthers a legitimate state interest); *Rackley v. City of New York*, 186 F. Supp. 2d 466, 480 (S.D.N.Y. 2002) ("While there is no dispute that plaintiff's property and liberty interests were implicated by the seizure of his car, plaintiff has failed to demonstrate that the defendants deprived him of these rights through actions that shock the conscience because of their arbitrariness or outrageousness"). Thus, the plaintiff has not stated a claim for a violation of his substantive due process rights. *See* 28 U.S.C. § 1915(e)(2)(B).

**\*3** Further, a claim under Section 1983 for deprivation of procedural due process "is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012) (citing *Narumanchi v. Bd. of Trustees*, 850 F.2d 70, 72 (2d Cir. 1988)); *Colson v. New York Police Dep't*, No. 13-CV-5394, 2015 WL 64688, at *9 (E.D.N.Y. Jan. 5, 2015). Deprivation of property by a state actor, whether done intentionally or negligently, will not support a due process claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Davis v. New York*, 311 F. App'x 397, 400 (2d Cir. 2009) (quoting *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (dismissing deprivation of property claim under § 1983 because other state remedies were available)).

To the extent that the defendants deprived the plaintiff of a property interest by impounding his car, the plaintiff has not pled facts sufficient to establish that he was deprived of that interest without due process. *See, e.g., Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 304 (S.D.N.Y. 2020) (noting that where the defendants' impounded the plaintiff's car following a traffic stop the conduct did not implicate procedural due process concerns); *see also Tsinberg*, 2021 WL 1536659, at *9-10; *Vasquez v. Yadali*, No. 16-CV-895, 2020 WL 1082786, at *12 (S.D.N.Y. Mar. 5, 2020) (noting that the plaintiff fails to allege the inadequacy of any post-deprivation hearings following the impoundment of his vehicle); *Domeneck v. City of New York*, No. 18-CV-7419, 2019 WL 5727409, at *10 (S.D.N.Y. Nov. 5, 2019) (dismissing plaintiff's Fourteenth Amendment claim regarding the deprivation of his vehicle because the plaintiff has not plausibly alleged that the process he received was

Carter v. Campanelli, Not Reported in Fed. Supp. (2022)

Case 6:23-cv-01543-DNH-ML  Document 11  Filed 06/20/24  Page 32 of 101

insufficient). Accordingly, the plaintiff fails to state a claim for a violation of his procedural due process rights. *See* 28 U.S.C. § 1915(e)(2)(B).

**CONCLUSION**

For these reasons, the plaintiff's complaint is dismissed for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). The Court grants the plaintiff leave to file an amended complaint within 30 days. Any new complaint must be captioned "Amended Complaint" and bear the same docket number as this order. If plaintiff chooses to file an amended complaint, he should clarify the circumstances under which his car was impounded, and also submit supporting materials. All further proceedings are stayed for 30 days. If the plaintiff does not file an amended complaint within 30 days, judgment must be entered.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1667022

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2356063
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Wynton SHARPE, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 11 Civ. 5494(BMC).
|
May 29, 2013.

**Attorneys and Law Firms**

Frederick K. Brewington, Law Offices Of Frederick K. Brewington, Hempstead, NY, for Plaintiff.

Eamonn Francis Foley, The City Of New York Law Department, New York, NY, for Defendants.

### *MEMORANDUM DECISION AND ORDER*

COGAN, District Judge.

**\*1** Plaintiff, a former Assistant District Attorney, brought this suit pursuant to 42 U.S.C. § 1983, asserting claims in connection with his May 2011 termination by the Kings County District Attorney's Office ("KCDAO"). Defendants have moved to dismiss plaintiff's amended complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

### *BACKGROUND*

The following facts are taken from the amended complaint and are assumed true for purposes of this motion. *See Bryant v. New York State Educ. Dep't,* 692 F.3d 202, 210 (2d Cir.2012).

Plaintiff was hired as an Assistant District Attorney in the KCDAO on or about November 11, 2004. Plaintiff was not a political appointee; he was hired based on merit. At the time that plaintiff was hired, defendant Charles Hynes, the Kings County District Attorney, knew plaintiff's father, Wellington Sharpe ("Wellington"), and was aware that Wellington had previously been a candidate for public office in Brooklyn.

Plaintiff never kept his family relationship with Wellington a secret.

Throughout his employment at the KCDAO, plaintiff's job performance was satisfactory. In October 2009, plaintiff was transferred to the Red Zone General Trial Bureau ("Red Zone"), which was responsible for a specific geographic area of Brooklyn.

At some point prior to plaintiff's assignment to Red Zone in 2009, Kevin Parker, a New York State Senator from Brooklyn, was arrested for several crimes, including assault, and ultimately indicted by a Grand Jury. Red Zone handled the prosecution of the case. Although he worked in Red Zone, plaintiff was not involved in Parker's prosecution, nor was he aware of any facts relating to the prosecution.

Plaintiff's father, Wellington, was a candidate in the 2010 State Senate race and was running against Parker. Wellington had run unsuccessfully against Parker on two occasions prior to 2010. Between his assignment to Red Zone in October 2009 and August 11, 2010, plaintiff was not employed by or involved in his father's campaign for State Senate in any way. Plaintiff alleges that Hynes and others in the KCDAO knew that Wellington was running against Parker in the 2010 State Senate race. [1]

On August 11, 2010, defendant James Leeper, the Bureau Chief of Red Zone, asked plaintiff if Wellington was his father, and plaintiff replied "yes." Leeper told plaintiff to report to defendant Amy Feinstein's office. [2] Feinstein was the Chief Assistant District Attorney. Feinstein also asked if Wellington was plaintiff's father and, after plaintiff confirmed that he was, Feinstein placed plaintiff on immediate suspension without pay or benefits. Feinstein did not explain her decision, reference any violation of policy, or give plaintiff an opportunity to be heard.

The next day, Leeper appeared before Justice Neil Firetog of the New York Supreme Court in *People v. Kevin Parker.* Leeper informed Justice Firetog that:

**\*2** [T]he People learned just yesterday afternoon that an assistant district attorney by the name of Wynton Sharpe, who works in the Red Zone ... his father is running in the primary against Senator Parker. He did not reveal that in time—I can't explain why he did not reveal that....

We do not know why Mr. Sharpe did not disclose this to myself or anybody else in the office, that his father was running against the defendant in this matter. If nothing else, it was profoundly flawed judgment that Mr. Sharpe did not disclose that to either myself or anybody else in the office. [3]

Leeper requested that a Special Prosecutor be appointed in the *People v. Parker* matter and advised that the KCDAO was seeking the appointment of a Special Prosecutor to investigate plaintiff's failure to disclose the potential conflict of interest.

On August 17, 2010, a Special District Attorney was appointed to prosecute the *Parker* case. That same day, Feinstein advised plaintiff that the Special District Attorney had also been appointed to review plaintiff's conduct and that the KCDAO would decide what action was appropriate when the inquiry was complete. Plaintiff cooperated with the Special District Attorney's investigation. Then, on September 28, 2010, the Special District Attorney informed plaintiff that the investigation had been concluded and that no criminal charges would be brought against him.

The next day, Feinstein refused plaintiff's request for reinstatement and informed plaintiff that he would be suspended with pay until the KCDAO completed its own internal review. In a subsequent correspondence, Feinstein explained that, unlike the Special District Attorney's investigation into possible criminal wrongdoing, the KCDAO was conducting a disciplinary review within its purview as plaintiff's employer. Plaintiff objected to the internal review, arguing that the KCDAO had not indicated at any time since plaintiff had been suspended that he would be subject to such review.

Several days later, Kin Ng, Director of Training in the KCDAO, requested that plaintiff appear for an inquiry regarding his failure to disclose his relationship with his father in the *People v. Parker* matter and advised plaintiff that if he chose not to appear for the inquiry, he could be subjected to additional disciplinary sanctions by the KCDAO. Ng scheduled the interview for October 15, 2010. However, on that day, before he could be interviewed, plaintiff was arrested following a dispute with his then-girlfriend and was therefore unable to attend the interview. He was charged with assault, among other crimes, and the KCDAO appointed a Special Prosecutor to handle these charges.

Ng informed plaintiff that it was in his best interests to put off the interview until resolution of the criminal charges. On March 4, 2011 the charges were dismissed and sealed pursuant to New York law. Plaintiff then contacted Ng and requested an interview.

Ng, along with John O'Mara of the KCDAO, interviewed plaintiff in connection with the KCDAO's internal disciplinary investigation on April 8, 2011. At the interview, plaintiff requested reinstatement with full back pay, a promotion to a position which he felt he would otherwise have achieved if not for the KCDAO's alleged wrongful treatment, and a statement by the KCDAO to counter previous statements made by KCDAO employees regarding plaintiff's actions. Because Ng and O'Mara were apparently not aware of Leeper's statements in court about plaintiff's conduct in the *Parker* matter, they asked plaintiff to provide copies of the relevant transcript and any news accounts referencing KCDAO statements about plaintiff. Shortly after the interview, plaintiff provided these items and asked that the KCDAO reinstate him and clear his name.

**\*3** When plaintiff did not hear from Ng about the status of the investigation, he informed Ng that he would file suit to challenge what he viewed as his wrongful suspension and termination. Then, by letter dated May 27, 2011, Feinstein informed plaintiff that he was being terminated immediately.

### DISCUSSION

Defendants move to dismiss plaintiff's three-count amended complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In Count One, plaintiff alleges that Hynes, Leeper and Feinstein deprived him of his due process, equal protection, and intimate familial association rights under the First and Fourteenth Amendments in violation of § 1983. [4] Count Two alleges municipal liability on the part of the City of New York and the KCDAO under § 1983. Finally, in Count Three, plaintiff alleges that Hynes, Leeper, and Feinstein failed to intervene to prevent a deprivation of plaintiff's constitutional rights.

On a motion to dismiss under Rule 12(b)(6), the Court must assume the truth of "all wellpleaded, nonconclusory factual allegations" in the complaint. *Harrington v. Cnty. of Suffolk,* 607 F.3d 31, 33 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009)). The Court must also draw "all reasonable inferences

in the plaintiff's favor." *Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). Nevertheless, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). In other words, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. at 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949.

**I. The Equal Protection Claim**

Defendants argue that the portion of plaintiff's § 1983 claim in Count One predicated on a denial of equal protection should be dismissed because plaintiff is proceeding on a "class of one" theory of equal protection and such claims are unavailable in the context of public employment.[5] Plaintiff, however, has clarified in his opposing papers that he "is not proceeding based on [a] 'Class of One' theory of Equal Protection" and, consequently, plaintiff has declined to respond to the arguments in defendants' motion with regard to this point. This is just as well, as the law is clear that public employees may not proceed on a class of one theory. *See Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 598, 128 S.Ct. 2146, 2151, 170 L.Ed.2d 975 (2008).

But having withdrawn his "class of one theory," it is not clear what plaintiff's theory of an equal protection violation is. In his original complaint, plaintiff clearly pled a race-based equal protection claim based on his being African–American. He dropped the allegations of racial discrimination in his amended complaint, but kept the equal protection allegations, as well as the original complaint's references to the parties' races. In addition, the amended complaint explicitly seeks a declaratory judgment against defendants stating that their "actions were part of a pattern and practice of unlawful, systemic discrimination, and/or retaliation, based on race, color" and other factors, all of which is also a carry-over from the original complaint.

**\*4** Having eschewed a class of one theory, there are only two other possible equal protection theories, and plaintiff has pled neither of them. First, courts in the Second Circuit have recognized equal protection claims predicated on the "selective enforcement" theory. *See, e.g., Frank Sloup & Crabs Unlimited, LLC v. Loeffler,* 745 F.Supp.2d 115,

130 (E.D.N.Y.2010). In order to prevail on a "selective enforcement" equal protective claim, a plaintiff must show "(1) that he was treated differently from others similarly situated, and (2) 'that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Gentile v. Nulty,* 769 F.Supp.2d 573, 578 (S.D.N.Y.2011) (quoting *Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 790 (2d Cir.2007)).[6]

There is no such claim here. Specifically, "demonstrating that a plaintiff has been treated different from similarly situated individuals is the *sine qua non* of a ... selective enforcement violation." *Goldfarb v. Town of West Hartford,* 474 F.Supp.2d 356, 368 (D.Conn.2007). For employees to be "similarly situated," they must be, at a minimum, "similarly situated in all material respects." *Emmerling v. Town of Richmond,* No. 09–CV–6418, 2010 WL 2998911, at * 12 (W.D.N.Y. July 27, 2010).[7] The amended complaint contains no factual allegations that plausibly suggest that plaintiff was "similarly situated" to other KCDAO employees. This is hardly surprising given the unique facts giving rise to plaintiff's claims—it cannot be often that the KCDAO prosecutes the political rival of an assistant's family member.

Thus, nowhere does plaintiff allege that any other KCDAO employees were related to someone who had a personal interest in the outcome of a KCDAO prosecution as plaintiff's father arguably did in *Parker* prosecution. *See id.* at * 13 (rejecting, in dicta, plaintiff's allegation that he was "similarly situated" to other municipal employees as implausible in light of the numerous differences between plaintiff's and the comparators' jobs, as well as other circumstances).[8] Because plaintiff has not alleged that there were other employees "similarly situated" to him, let alone that defendants treated him differently from such employees, plaintiff has failed to state a "selective prosecution" equal protection claim. *See Hirch v. Desmond,* No. 08–CV–2660, 2013 WL 494614, at *7 (E.D.N.Y. Feb. 7, 2013) (concluding that a prisoner's equal protection claim, whether construed as a "selective prosecution" or a "class of one" claim, fails as a matter of law because the complaint "does not identify any similarly-situated individuals—let alone any similarly-situated inmates that were treated differently").

The last hope for plaintiff's equal protection claim is for him to rely on his membership in a protected class. *Cf. Missere v. Gross,* 826 F.Supp.2d 542, 560 (S.D.N.Y.2011)

("A plaintiff who does not claim to be a member of a constitutionally protected class may bring an Equal Protection claim on one of two theories: selective enforcement or 'class of one.' "). Although plaintiff has plead that he is an African–American and the individual defendants are all white, at no point does plaintiff allege that he was terminated, subjected to discipline, or otherwise treated differently from other KCDAO employees because of his race. To the extent plaintiff states an equal protection claim on the grounds of race, his claim must fail because he "fail[s] to allege that any differential treatment was based on [his] membership in a protected class." *Seabrook v. City of New York,* 509 F.Supp.2d 393, 400 n. 4 (S.D.N.Y.2007).

## II. The Due Process Claim

**\*5** Although plaintiff does not clearly denominate the basis for the due process claim in his amended complaint, the parties agree that plaintiff is asserting a claim under the "stigma plus" theory of due process.

"A person's interest in his or her good reputation alone ... is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983[;]" however, the Second Circuit recognizes that "[l]oss of one's reputation can ... invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Patterson v. City of Utica,* 370 F.3d 322, 329–30 (2d Cir.2004). Specifically, "[f]or a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment." *Id. See also DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003) (" 'Stigma plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process.").

To make out a "stigma-plus" claim in the context of termination from government employment, a plaintiff must allege facts supporting three elements. First, a plaintiff must plead that the government made stigmatizing statements of alleged fact about him which call into question his "good name, reputation, honor, or integrity." *Segal v. City of New York,* 459 F.3d 207, 212 (2d Cir.2006) (internal citations and quotation marks omitted). *See also Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 630–31 (2d Cir.1995) (holding that statements that "denigrate [an] employee's

competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession" implicate protected interests). "A plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false." *Patterson,* 370 F.3d at 330. Second, plaintiff must allege facts showing that the stigmatizing statements were made public. *Segal,* 459 F.3d at 212. Third, plaintiff must allege facts showing "that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment." *Id.* [9]

Here, plaintiff alleges that his personal and professional reputation were damaged by the statements made by Leeper in the *Parker* proceedings, including that plaintiff did not disclose his relationship with his father to the KCDAO and that it was "profoundly flawed judgment" for plaintiff not to do so, and by an affirmation filed by Hynes in support of the KCDAO's application for a Special Prosecutor. Additionally, the amended complaint discusses "references to [plaintiff] in the press which were made by" Leeper, as well as "news accounts which reference sources from the [KCDAO] speaking about" plaintiff.

**\*6** Defendants argue that plaintiff has failed to state "stigma-plus" due process claim for three reasons. First, defendants contend that plaintiff cannot base his claim on expressions of opinion, such as Leeper's statement that plaintiff's failure to disclose his relationship with his father evinced "profoundly flawed judgment," because such statements are incapable of being proved false. Second, defendants argue that an attorney's statements in the context of judicial proceedings are privileged and cannot support plaintiff's claim. Third, defendants contend that plaintiff's "stigma-plus" claim is inadequate because plaintiff has failed to avail himself of the appropriate post-deprivation process. Defendants are largely correct.

The law is clear that a statement that "was not false ... cannot form the basis for a stigma plus claim, however stigmatizing it might appear to be." *Haiyan v. Hamden Pub. Sch.,* 875 F.Supp.2d 109, 131 (D.Conn.2012) (quoting *DiBlasio v. Novello,* 413 F. App'x 352, 356 (2d Cir.2011)). Consequently, courts have held that "a statement of opinion, rather than fact ... is not actionable as a stigmatizing remark." *Wiese v. Kelley,* No. 08–CV–6348, 2009 WL 2902513, at \* 6 (S.D.N.Y. Sept. 10, 2009). *See also Strasburger v. Bd. of Educ.,* 143 F.3d 351, 356 (7th Cir.1998) ("True but

stigmatizing statements that preclude further government employment do not support this type of claim. Nor do statements of opinion, even stigmatizing ones, if they do not imply false facts."). [10]

Here, Leeper's statement that it was "profoundly flawed judgment" for plaintiff not to disclose his relationship with his father to the KCDAO is a statement of opinion. The statement consisted of Leeper's personal assessment of plaintiff's actions rather than a factual representation. Accordingly, it cannot form the basis of a "stigma-plus" claim. *See Apionishev. Columbia Univ.,* 09 Civ. 6471, 2012 WL 208998, at *10 (S.D.N.Y. Jan.23, 2012) (dismissing plaintiff's defamation claims, in part, because the statements "amount to no more than a former employer's protected opinion regarding an employee's performance and the cause of his termination"); *Edsell v. Indep. Freightway, Inc.,* No. 94–CV–227, 1995 WL 375827, at *4 (N.D.N.Y. June 16, 1995) ("As a general rule, statements by an employer about an employee's work performance are expressions of opinion."). [11]

Plaintiff argues, though, that Leeper's statement contained false factual representations regarding the KCDAO's knowledge of plaintiff's relationship with his father and plaintiff's failure to disclose the fact that his father was running in the primary against Parker. Further, plaintiff argues that Leeper directly called his professionalism into doubt by stating that "the relationship between Assistant District Attorney Sharpe through his father, Wellington Sharpe, has compromised our position that in order to remove the appearance of impropriety, we are obligated to seek the appointment of a special district attorney to prosecute the case." And, in connection with the appointment of a Special Prosecutor, defendant Hynes submitted an affidavit.

 **\*7** Even if these additional statements could be considered constitutionally stigmatizing under the above-cited authorities, they cannot support a "stigma-plus" claim because "[s]tatements made in the course of court proceedings are absolutely privileged under New York common law." *Conte v. Newsday, Inc.,* 703 F.Supp.2d 126, 146 (E.D.N.Y.2010) (citing *Martirano v. Frost,* 25 N.Y.2d 505, 507, 307 N.Y.S.2d 425, 255 N.E.2d 693(1969) ("[A] statement, made in open court in the course of a judicial proceeding, is absolutely privileged if, by any view or under any circumstances, it may be considered pertinent to the litigation.")). [12] This privilege extends to judges, jurors, parties, witnesses, and attorneys. *Frierson–Harris v. Hough,*

05–CV–3077, 2006 WL 298658, at *7 (S.D.N.Y. Feb.7, 2006) (applying the New York privilege to dismiss a claim under § 1981). *See also Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976) ("activities [which] were intimately associated with the judicial phase of the criminal process" were protected by absolutely immunity in claim arising under *§ 1983*); *Schrob v. Catterson,* 948 F.2d 1402, 1417 (3d Cir.1991) (commenting, in the context of a *Bivens* action, that "[p]rosecutors and other lawyers were absolutely immune at common law for making false or defamatory statements in judicial proceedings").

Here, both Leeper's and Hynes' statements were made during the *Parker* criminal proceedings in connection with the KCDAO's prosecution of the case. The statements therefore fall squarely within the scope of the privilege that attaches to statements made in the course of judicial proceedings. Plaintiff has not addressed defendants' argument and, thus, has not put forward any reason why the statements at issue are actionable notwithstanding their immunity at common law. [13]

Plaintiff, however, attempts to circumvent the privilege for statements made in the course of judicial proceedings by arguing that the amended complaint "also alleges that Defendant [sic] published more false statements to the media —*outside of the court and outside of the judicial process* where absolute immunity would not be a factor." (emphasis in original). Although plaintiff conclusorily alleges that the KCDAO made statements to the media, at no point does the amended complaint make any allegations concerning what those statements were, who made the statements, when they were made, or how they were stigmatizing or false. Accordingly, plaintiff has failed to plead facts sufficient to show his entitlement to relief. *See Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964–65. *See also Biro v. Conde Nast,* 883 F.Supp.2d 441, 456 (S.D.N.Y.2012) (observing that, in the context of a defamation claim, Rule 8 "requires that each pleading be specific enough to afford defendant sufficient notice of the communications complained of to enable him to defend himself.") (internal quotation marks omitted). [14]

Lastly, the Second Circuit has held that the availability of "a reasonably prompt, posttermination name-clearing hearing satisfies constitutional due process as long as the procedures afforded at such a hearing are sufficient to protect the employee's reputational and professional interests." *Anemone v. Metro. Transit Auth.,* 629 F.3d 97, 121 (2d Cir.2011). For an at-will government employee, like plaintiff, "an Article 78 proceeding provides the requisite postdeprivation process—

even if [plaintiff] failed to pursue it." *Id.* Although plaintiff argues that an Article 78 proceeding would not have been sufficient to address his reputational injury, his argument is contrary to Second Circuit law. Therefore, plaintiff's due process claim is dismissed.

### III. The Interference with Intimate Association Claim

**\*8** Plaintiff asserts a claim under the Fourteenth Amendment for interference with his substantive due process right in his relationship with his father. [15] The Supreme Court has "long recognized" a substantive due process right in certain types of relationships, *see Roberts v. United States Jaycees,* 468 U.S. 609, 618–19, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984), and the Second Circuit has recognized the relationship between an adult and his father as one within the scope of protection afforded by the due process clause. *See Patel v. Searles,* 305 F.3d 130, 136 (2d Cir.2002).

The Second Circuit has not clearly ruled on whether intent to interfere with the intimate association on the part of a defendant is required as part of a claim under the Fourteenth Amendment. However, almost all of the circuit courts that have addressed this issue have held that intent is a necessary element of such a claim. *See Campos v. Weissman,* No. 07–cv–1263, 2011 WL 1204839, at \*2 (N.D.N.Y. Mar.29, 2011) (collecting cases). District courts within the Second Circuit have consistently held that intent to interfere is a necessary element. *Id. See also Laureano v. Goord,* No. 06 Civ. 7845, 2007 WL 2826649, at \*12 (S.D.N.Y. Aug.31, 2007) (report & recommendation) ("There is a cognizable distinction between a state actor that intentionally targets the intimate associations of a person, which is a protected right in this circuit, and circumstances ... whereby a state actor allegedly commits actions that indirectly affect those relationships. Were this Court to recognize the latter, it would authorize innumerable additional individual actions by family members of adult victims of state actions.), adopted at 2007 WL 2852770 (S.D.N.Y. Sept.28, 2007).

Instead of pleading any facts to show that defendants intended to interfere with the paternal relationship, plaintiff makes a single, conclusory allegation that defendants "intended to place a restriction on plaintiff's relationship and association with his father." Plaintiff contends that defendants' intent can be inferred from the fact that the KCDAO did not give him a reason or explanation, such as a violation of policy, for its actions and the fact that plaintiff was suspended, investigated, and ultimately terminated. These allegations do not, however,

plausibly suggest that defendants intended to interfere with plaintiff's relationship with his father, especially in light of the competing conclusion, which is supported by Leeper's statement and the other allegations in the amended complaint, that the KCDAO disciplined plaintiff in order to avoid the appearance of impropriety in its prosecution of Parker. *See Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Thus, plaintiff has pled no plausible factual allegations as to why defendants would seek to intentionally interfere with his relationship with his father, and, indeed, such a theory is fundamentally inconsistent with his description of what occurred. The clear inference from the allegations in the amended complaint is that defendants were embarrassed by their own failure to realize that plaintiff's position could jeopardize their prosecution of Parker, and rather than acknowledge their own failure to address that issue before initiating prosecution, they made plaintiff the scapegoat for not "reporting" to them something they already knew. That would be nasty politics and poor personnel management, and it might conceivably (although speculatively) injure plaintiff's relationship with his father, but any such injury would be the result, not the intent, of defendants' efforts to shift the blame. Accordingly, plaintiff's intimate association claim is dismissed.

### IV. Plaintiff's Remaining Claims

**\*9** Because the Court dismisses plaintiff's underlying constitutional claims, his remaining claims must also be dismissed. Absent an underlying constitutional violation, a district court need not address the possibility of municipal liability. *See Segal,* 459 F.3d at 219. Similarly, the absence of any underlying constitutional violations requires dismissal of plaintiff's failure to intervene claims. *See D'Attore v. City of New York,* No. 10 Civ. 6646, 2013 WL 1180395, at \*6 (S.D.N.Y. Mar. 15, 2013).

### CONCLUSION

Defendants' motion to dismiss for failure to state a claim [11] is granted and the amended complaint is dismissed. *See Faulkner v. Verizon Communications, Inc.,* 189 F.Supp.2d 161, 174 (S.D.N.Y.2002).

**SO ORDERED:**

All Citations

Not Reported in F.Supp.2d, 2013 WL 2356063

## Footnotes

1      According to plaintiff, the KCDAO did not have any policy, training, or supervision that required him to inform the KCDAO that his father was running for political office. Nor, from 2004 until 2011, were any employees of the KCDAO asked if they were related to or supported of a specific political candidate. Further, plaintiff's amended complaint cites several provisions from the KCDAO's handbook for Assistant District Attorneys concerning political activities and conflicts of interest with which, plaintiff maintains, he complied.

2      At various points in the amended complaint, Feinstein is incorrectly referred to as "Weinstein."

3      Although the amended complaint quotes Leeper's statements during the August 12, 2010 proceedings in *People v. Parker,* the transcript of those proceedings is not attached to the amended complaint. It was, instead, submitted as an exhibit in support of defendants' motion in order to correct an immaterial quotation error in the amended complaint. The Court considers the transcript in the context of this motion to dismiss because plaintiff both quotes the underlying proceedings in the amended complaint and bases his reputational injury claims in part on Leeper's statements in those proceedings. Consequently, the transcript may be considered on a Rule 12(b)(6) motion as either incorporated by reference or integral to the complaint. *See generally Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

4      In response to defendants' motion, plaintiff has withdrawn the portion of this claim predicated upon the alleged deprivation of procedural due process.

5      "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class," courts "have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001). To state a "class of one" equal protection claim, a plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."

6      There is confusion within this Circuit as to the distinction between a "class of one" and a "selective enforcement" equal protection claim and, as a result, the law in this Circuit is unsettled as to whether public employees' claims asserted under the "selective enforcement" theory can survive in light of *Engquist. See Gentile,* 769 F.Supp.2d at 579 ("While some courts within this Circuit have held that the Supreme Court's decision in *Engquist* bars public employees from asserting selective enforcement claims, others have generally treated selective enforcement and 'class of one' theories as 'distinct theories with distinct elements of proof.' "). The Second Circuit has not resolved this confusion. *See Kamholtz v. Yates Cnty.,* 350 F. App'x 589, 591 (2d Cir.2009) (summary order) (assuming that a public employee plaintiff's "selective enforcement" claim was not precluded by *Engquist* because plaintiff had, in any case, "failed to sufficiently state his claim."). To make matters worse, some courts require the same elements to state a "selective enforcement" claim as are required under the "class of one" theory. *See Felix v. Gotham Real Estate Corp.,* No. 12–cv–4559, 2012 WL 4563097, at *3 (E.D.N.Y. Oct.2, 2012).

This Court shares the *Gentile* court's skepticism that public employee plaintiffs may maintain "selective enforcement" claims in light of *Engquist. See Gentile,* 769 F.Supp.2d at 579. It is not necessary to resolve this issue, however, because plaintiff has failed to adequately plead a "selective enforcement" claim, to the extent his equal protection claim is construed as one.

7 There is some disagreement as to the meaning to "similarly situated" in the context of selective enforcement claims. *See Gentile,* 769 F.Supp.2d at 580. The Court need not take sides in this disagreement because, even applying the less stringent standard, plaintiff has failed to plead a claim.

8 All the amended complaint alleges is that, during plaintiff's employment, "no employees of the [KCDAO] were asked if they were related to or supporters of a particular political candidate." This allegation is insufficient to plead a "selective enforcement" claim for two reasons. First, plaintiff is complaining about being disciplined by the KCDAO, not about being asked about his relationship with his father. Second, the allegation oversimplifies plaintiff's circumstances; not only was he related to a political candidate, but that candidate was running in an election against the target of a prosecution being handled by plaintiff's own bureau within the KCDAO.

9 Defendants rely on an alternative formation of the "stigma-plus" standard, which requires a plaintiff to "establish 1) that [he] w[as] defamed; and 2) that the defamation occurred in the course of the termination of governmental employment or was coupled with a deprivation of a legal right or status." *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002). The distinction is immaterial.

10 As defendants point out, federal courts in New York often look to New York defamation law when analyzing a "stigma-plus" claim, *see, e.g., Pisani v. Westchester Cnty. Health Care Corp.,* 424 F.Supp.2d 710, 718 (S.D.N.Y.2006) ("Establishing defamation in the § 1983 context is no different than under New York State law."), and New York law provides that "[e]xpressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Mann v. Abel,* 10 N.Y.3d 271, 276, 856 N.Y.S.2d 31, 885 N.E.2d 884 (2008).

11 Additionally, as in *Esposito v. Metro–North Commuter R.R. Co. .,* 856 F.Supp. 799, 804 (S.D.N.Y.1994), Leeper's "statement about plaintiff—that he had made an inexcusable error in judgment ...—contains no accusations of dishonesty, illegality, or immorality ... [and] cannot fairly be read as a pervasive indictment of plaintiff's ability to do his job. It merely asserted that in one instance, he made an error in judgment, albeit a very serious one, and made no assessment of his overall competence. Thus, standing alone, defendant's statement is not sufficiently stigmatizing to ground a constitutional claim."

12 Although plaintiff's claim arises under federal constitutional law and not state law, "Congress did not intend § 1983 to abrogate immunities 'well grounded in history and reason.' " *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1147 (2d Cir.1995) (quoting *Buckley v. Fitzsimmons,* 509 U.S. 259, 268, 113 S.Ct. 2606, 2612–13, 125 L.Ed.2d 209 (1993)). The Supreme Court has recognized the immunity for statements made in judicial proceedings is "well grounded in history and reason" held that " § 1983 did not abrogate the absolute immunity existing at common law." *Briscoe v. LaHue,* 460 U.S. 325, 334, 103 S.Ct. 1108, 1115, 75 L.Ed.2d 96 (1983) (internal quotation marks omitted).

13 Separately, plaintiff has also failed to allege that defendant Feinstein made any public statements concerning him.

14 Moreover, the KCDAO's out-of-court statements about the *Parker* litigation, if it even made any, are privileged under New York law "to the extent that they represent fair and true reports of what occurred in the proceeding." *Long v. Marubeni Am. Corp.,* 406 F.Supp.2d 285, 294 (S.D.N.Y.2005). The Court cannot determine whether this privilege applies, however, because plaintiff has failed to identify any purportedly stigmatizing out-of-court statements.

15    Plaintiff also asserts this claim under the First Amendment. However, because plaintiff does not assert that he was retaliated against by defendants for any his father's First Amendment-protected actions, his claim is properly analyzed as a due process claim under the Fourteenth Amendment. *See Garten v. Hochman,* 08–cv–9425, 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) ("Where the intimate association right at issue is tied to familial relationships and is independent of First Amendment retaliation concerns, however, the Second Circuit has employed an analysis under the framework of the Fourteenth Amendment right to substantive due process.").

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

On Reconsideration   Townsend v. Livingston County,   W.D.N.Y.,   May 9, 2023

2023 WL 2457072
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Charles K. TOWNSEND, Sr., Plaintiff,

v.

LIVINGSTON COUNTY, et al., Defendants.

Case # 19-CV-6636-FPG
|
Signed March 10, 2023

**Attorneys and Law Firms**

Charles K. Townsend, Sr., Rochester, NY, Pro Se.

Michael P. McClaren, Shannon B. O'Neill Vandermeer, Vincent Thomas Parlato, Webster Szanyi, LLP, Buffalo, NY, for Defendants District Attorney McCaffrey, Sgt. Zambito, Deputy Brendon Flickner, Deputy Wade, Investigator Wiedrick.

DECISION AND ORDER

FRANK P. GERACI, JR., UNITED STATES DISTRICT JUDGE

**INTRODUCTION**

**\*1** *Pro se* Plaintiff Charles K. Townsend ("Townsend" or "Plaintiff") brings this civil rights action against Defendants Livingston County, the Livingston County Sheriff's Office, the Livingston County District Attorney's Office, District Attorney McCaffrey ("McCaffrey"), Sergeant Zambito ("Zambito"), Deputy Brendon Flickner ("Flickner"), Deputy Wade ("Wade"), and Investigator Wiedrick ("Wiedrick"). ECF No. 1. After a screening pursuant to 28 U.S.C. § 1915(e) (ECF No. 3), an amended complaint (ECF No. 4), and an additional screening (ECF No. 5), only McCaffrey, Zambito, Flickner, Wade, and Wiedrick remain collectively, ("Defendants"). *See* ECF No. 5 at 5. Plaintiff's remaining claims include (1) unlawful seizure of Townsend against Flickner ("First Claim"); (2) a 42 U.S.C. § 1981 claim against Flickner ("Second Claim"); (3) unlawful search and seizure

of Townsend's vehicle against Defendants ("Third Claim"); (4) false arrest and imprisonment against Defendants ("Fourth Claim"); (5) malicious prosecution against Defendants ("Fifth Claim"); (6) the denial of Townsend's right to a fair trial against Defendants ("Sixth Claim"); and (7) failure to intervene in the underlying misconduct against Wade, McCaffrey, Zambito, and Wiedrick ("Seventh Claim"). ECF No. 5 at 5.

Before the Court are Townsend's motion for summary judgment and Defendants' motion for summary judgment. ECF Nos. 85, 104. For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART, and Townsend's motion is DENIED.

**BACKGROUND** [1]

Townsend's claims arise from a traffic stop conducted on August 30, 2016 (the "Traffic Stop"). Flickner, a Livingston County Deputy Sheriff in Avon, New York, ECF No. 111 at 31, 35, allegedly observed Townsend commit multiple New York Vehicle and Traffic Law violations, including crossing a hazard marking and failing to keep right. ECF No. 104-16 ¶ 6. Townsend denies that he violated any traffic laws and alleges that Flickner initiated the Traffic Stop because of his race. *See* ECF No. 111 at 35; *see also* ECF No. 4 at 3.

**\*2** After Flickner stopped Townsend, Flickner discovered Townsend did not have a valid driver's license and allegedly smelled marijuana in the vehicle. ECF No. 104-16 ¶¶ 7, 8; ECF No. 111 at 35. Shortly after being stopped, Townsend requested the presence of Flickner's supervisor at the Traffic Stop. ECF No. 111 at 35. When Flickner's supervisor, Zambito, arrived, he also allegedly smelled marijuana in Townsend's vehicle. ECF No. 111 at 36. At Flickner and Zambito's request, a drug detecting canine was brought to the scene by Deputy Wade. *Id.* Defendants claim that the canine "alerted" on the passenger side door and glove box of Townsend's vehicle, indicating that it detected marijuana in that area. ECF No. 104-16 ¶ 15. Defendants performed an initial search of the vehicle, but not the glove box because it was locked. ECF No. 104-16 at 4-5. Townsend claims that the canine's "alert" was faked. ECF No. 111 at 37. Next, Flickner, Zambito, and Wade contacted District Attorney McCaffrey to discuss the Traffic Stop. *Id.* at 38. McCaffrey stated that the vehicle could be towed and impounded while a search warrant was prepared to authorize a search of the locked glove box for drugs, based on the officers' and canine's scent of marijuana.

*Id.* Townsend was issued traffic tickets for his alleged traffic law infractions, and his vehicle was impounded. *Id.* at 39.

On August 31, 2016, Wiedrick, investigator with the Livingston County Sheriff's Office, met with Flickner and applied for a search warrant to search Townsend's glove box. *Id.* After it was issued, Flickner, Wiedrick, Wade, and Livingston County Sheriff Sergeant Draper executed the search warrant. ECF No. 111 at 40. Before Townsend's glove box was opened, Defendants claim that two drug detecting dogs again "alerted" on Townsend's glove box. ECF No. 104-16 ¶ 23. Defendants also claim that, after opening the glove box, the officers found a partially smoked marijuana "blunt," a vial of marijuana, cocaine, and other drug paraphernalia. *Id.* ¶ 24. Townsend claims that this material was planted by Defendants. ECF No. 111 at 39-41. Townsend was arrested for possessing this material on September 17, 2016. *Id.* at 41.

On January 17, 2017, a probable cause hearing was held in Avon Town Court. *Id.* at 41-42. The court did not issue a final ruling on whether there was probable cause for Defendants' actions, instead indicating that it was inclined to find that there was and granting a continuance to issue a final determination at a later date. *Id.* at 41-42. The case appears to have proceeded to trial without a final determination. *Id.* at 42. At the beginning of Townsend's trial, Townsend requested an adjournment to obtain counsel, despite previously requesting to proceed *pro se*. *Id.* at 43. Before the trial resumed, Townsend moved to dismiss the case. *Id.* The district attorney's office did not oppose the motion and the case was ultimately dismissed. *Id.*

On December 1, 2016, Townsend filed a separate action in this Court against Livingston County, Flickner, McCaffrey, a John Doe sergeant with the Livingston County Sheriffs, and the Livingston County Administrator. *See Townsend v. Livingston County, et al.*, Case No. 16-CV-6773 (the "2017 Lawsuit"). On July 11, 2017, this Court screened Townsend's complaint pursuant to 28 U.S.C. § 1915(a). *See* ECF No. 104-3. There, this Court held that Townsend's § 1983 claim based on the seizure of his vehicle at the Traffic Stop was to be dismissed with prejudice. *Id.* at 5. The Court's decision was based on the presence of a meaningful post-deprivation remedy for Townsend's claim under § 9 of the New York Court of Claims Act or § 52 of the New York County Law. *Id.* at 4 (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)).

On August 28, 2019, Townsend filed the present action against Defendants in their individual capacities, along with Livingston County, the Livingston County Sheriff's Office, and the Livingston County District Attorney's Office. *See* ECF No. 1. After a screening of Townsend's amended complaint, only claims against McCaffrey, Zambito, Flickner, Wade, and Wiedrick remain. *See* ECF No. 4; *see also* ECF No. 5 at 5.

On April 5, 2022, Townsend moved for summary judgment against Defendants. ECF No. 85. On May 12, 2022, Defendants responded and cross-moved for summary judgment on all remaining claims. ECF No. 104. On June 8, 2022, Townsend filed his opposition to Defendants' motion and reply in further support of his motion. ECF No. 111. On June 23, 2022, Defendants replied. ECF No. 113. The Court addresses the parties' motions below.

## LEGAL STANDARD

**\*3** Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation and quotations omitted). This does not mean, however, that a *pro se* litigant is excused from following the procedural requirements of summary judgment. "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## DISCUSSION

For the reasons set forth below, Townsend adequately sets forth a portion of the First Claim, but fails to do so with respect to his remaining claims. The portion of Townsend's Third Claim concerning the seizure of his vehicle is barred by the doctrine of res judicata because it was litigated and dismissed with prejudice by this Court in the 2017 Lawsuit. Townsend's First Claim is adequately stated only with respect to the initiation of the Traffic Stop. The remainder of his First Claim, the portion of the Third Claim relating to the search of his vehicle, the Fourth Claim, and the Fifth Claim are barred by the existence of probable cause for Defendants' conduct. In addition, Townsend's Second, Sixth, and Seventh Claims must be dismissed because Townsend does not present sufficient evidence to establish those claims. Accordingly, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Townsend's opposing motion for summary judgment is DENIED.

### I. Townsend's Third Claim: Seizure of Vehicle

Townsend alleges in his Third Claim that Defendants executed an unreasonable seizure of his vehicle during the Traffic Stop. *See* ECF No. 5 at 5. Because this claim was dismissed in the 2017 Lawsuit, it is accordingly barred by the doctrine of res judicata.

The doctrine of res judicata provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980) (applying res judicata to § 1983 action). Res judicata thus bars a party from re-litigating a claim if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 285 (2d Cir. 2000).

On July 11, 2017, this Court screened Townsend's previous complaint in the 2017 Lawsuit pursuant to 28 U.S.C. § 1915(a). *See* ECF No. 104-3. There, this Court held that Townsend's § 1983 claim based on the seizure of his vehicle during the Traffic Stop was to be dismissed with prejudice. *Id.* at 5. Because a meaningful post-deprivation remedy for Townsend's claim under § 9 of the New York Court of Claims

Act or § 52 of the New York County Law, Townsend's claim was not cognizable under § 1983. *Id.* at 4 (citing *Love*, 714 F.2d at 208-09). Accordingly, this claim was resolved on the merits.

**\*4** In addition, the 2017 Lawsuit involved the same parties or those in privity with the parties in the present action, because Townsend was the plaintiff and Flickner and McCaffrey were defendants. *See generally id.* While Zambito, Wade, and Wiedrick were not expressly named in the 2017 Lawsuit, each Defendant is an officer in the Livingston County Sheriff's Office and each was allegedly involved in the Traffic Stop and subsequent arrest, and thus "in privity" with Flickner. *See Oliver v. Penny*, No. 21-111, 2022 WL 2165814, at *2 (2d Cir. June 16, 2022) ("Although [plaintiff] sued different individual defendants in her 2017 lawsuit, those defendants represent the same interests as the individuals named in [her 2015 lawsuit].... Two of the defendants overlap between the two lawsuits.... Employee defendants have a sufficiently close relationship with other employees when their challenged actions in both lawsuits consist of acts in their official capacities on behalf of their employer.") (citations omitted). Here, the 2017 Lawsuit involved two overlapping defendants, they represented the same interests as Zambito, Wade, and Wiedrick, and were working on behalf of the same employer. Accordingly, the Court finds Zambito, Wade, and Wiedrick were in privity with Flickner and McCaffrey in the 2017 Lawsuit.

Lastly, the Third Claim was raised in the previous action, as both actions are based on alleged Fourteenth Amendment violations stemming from the purportedly improper seizure of Townsend's vehicle during the Traffic Stop. *Compare* ECF No. 5 at 5 *with* ECF No. 104-3 at 4-5.[2] Accordingly, this aspect of the Third Claim meets the requirements for res judicata and is barred by this Court's previous ruling in the 2017 Lawsuit.

While Defendants argue that *all* of Townsend's claims could have been raised in the 2017 Lawsuit, and are likewise precluded by res judicata, the Court disagrees. Townsend's Third Claim is the only claim based upon the seizure of Townsend's vehicle. *See* ECF No. 5 at 5. Because this Court initially dismissed Townsend's 2017 Lawsuit on the basis that Townsend possessed a post-deprivation remedy for the recovery of his vehicle (*see* ECF No. 104-3 at 4), Townsend's additional claims were not adequately addressed by the Court at that time. Accordingly, the portion of the Third Claim

challenging the seizure of Townsend's vehicle is barred by the doctrine of res judicata.

## II. Townsend's First, Third, Fourth, and Fifth Claims

Townsend appears to allege an unlawful seizure of his person in his First Claim; an unlawful search of his vehicle in his Third Claim; false arrest and imprisonment in his Fourth Claim; and malicious prosecution in his Fifth Claim. For the reasons set forth below, only the First Claim may proceed. There is a factual dispute as to whether Flickner had reasonable suspicion to initiate the Traffic Stop of Townsend, which precludes summary judgment for either party with respect to this aspect of Townsend's First Claim. Probable cause, however, justified Defendants' subsequent actions such that Townsend's Third, Fourth, and Fifth Claims must be dismissed. Accordingly, the parties' motions for summary judgment are denied with respect to Townsend's First Claim to the extent it is based on the initiation of the Traffic Stop, but Defendants' motion for summary judgment is granted with respect to Townsend's Fourth and Fifth claim, as well as the portion of his Third Claim that appears to challenge the search of his vehicle during the Traffic Stop.

The existence of probable cause is a complete defense to § 1983 unlawful seizure claims. *Cozayatl Sampedro v. Schriro*, 377 F. Supp. 3d 133, 139 (D. Conn. 2019) ("It is well established that the existence of probable cause is a complete defense to a claim of unlawful seizure under § 1983."). Stopping a vehicle is a seizure within the meaning of the Fourth Amendment. *Brace v. Johnson*, No. 22-590, 2023 WL 2027274, at *1 (2d Cir. Feb. 16, 2023). However, a traffic stop merely requires reasonable suspicion to initiate the stop. *Id.* ("A police officer's decision to stop a vehicle is reasonable when the officer has probable cause or reasonable suspicion to believe that the vehicle's occupants are engaged in unlawful conduct.") (citing *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017)).

 **\*5** Townsend's First Claim is a § 1983 unreasonable seizure claim against Flickner. ECF No. 5 at 5. This claim is based on Flickner's alleged initiation of the Traffic Stop, followed by the seizure of Townsend and his vehicle. ECF No. 111 at 19. Here, there is a genuine dispute of material fact as to whether Flickner had a reasonable suspicion that Townsend committed any traffic violation justifying the Traffic Stop. Defendants claim that Flickner "observed Townsend commit multiple New York State Vehicle and Traffic Law Violations on Lakeville Road in the Town of Avon, including crossing a hazard marking, failing to keep

right, and unlicensed operation of a motor vehicle." ECF No. 104-16 ¶ 6. Defendants support this claim with Flickner's personal account of Townsend's actions and a drawing that shows the "approximate" turn Townsend made. ECF No. 104-29. ¶¶ 6, 7. Defendants admit that Flickner's dashboard camera footage is inconclusive, but affirm that he personally witnessed the improper turn. *Id.* ¶¶ 10, 11. Defendants also admit that Flickner did not discover Townsend's lack of a driver's license until after he had pulled him over. *Id.* ¶ 11 n.1. In opposition, Townsend claims he executed the turn properly. ECF No. 111 at 19. Because there is no evidence indicating either Flickner or Townsend's account cannot be reasonably disputed, it is improper for the Court to weigh these conflicting accounts on summary judgment. *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019) ("[A] § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact" so long as it is not "contradictory and incomplete" or "replete with inconsistencies and improbabilities."). Accordingly, Townsend's claim that Flickner executed an improper seizure by initiating the Traffic Stop may proceed.

To the extent Townsend's First Claim alleges an improper seizure of his person after the Traffic Stop, there is no dispute that Flickner's subsequent seizure of Townsend was reasonable. Townsend does not dispute that he did not have a driver's license at the time of the Traffic Stop. ECF No. 111 at 35. As stated above, Flickner claims he was made aware of this violation almost immediately after stopping Townsend. ECF No. 104-29 ¶ 11 n.1. Accordingly, the "seizure" of Townsend's person via the extension of the Traffic Stop was reasonable because Flickner almost immediately attained reasonable suspicion of a traffic violation; namely, operating a motor vehicle without a license. *See* N.Y. Vehicle & Traffic Law § 511 (prohibiting operating a car without a valid license); *United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019).

In addition, even if a claim for an improper seizure of Townsend's vehicle were not barred by res judicata as explained *supra* Section I, the seizure of Townsend's vehicle was reasonable once Flickner learned Townsend was not licensed to drive it. *See Ali ex rel. Cofield v. Liggett*, 1:22-CV-944 (GTS/ATB), 2022 WL 17478264, at *5 (N.D.N.Y. Sept. 20, 2022) (officer justified in towing unregistered vehicle driven by unlicensed driver), *report and recommendation adopted*, 1:22-CV-0944 (GTS/ATB), 2022 WL 16918289 (N.D.N.Y. Nov. 14, 2022); *People v. Huddleston*, 160 A.D.3d 1359, 1360 (4th Dep't 2018) (The

towing of a vehicle is lawful where "the police determined that neither the driver nor defendant had a valid driver's license."). Therefore, while summary judgment is precluded for either party with respect to Townsend's § 1983 unlawful seizure claim to the extent it is based on Flickner's initiation of the Traffic Stop, it is granted against the rest of the First Claim. [3]

With respect to Townsend's Fourth Claim for false arrest and Fifth Claim for malicious prosecution, summary judgment is likewise granted for Defendants. "Probable cause to arrest is a complete defense to an action for false arrest." *Ashley v. City of N.Y.*, 992 F.3d 128, 136 (2d Cir. 2021). Likewise, "probable cause is a complete defense against a claim for malicious prosecution." *Id.* at 138. Probable cause exists when, based on the totality of circumstances, an officer has "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

**\*6** Townsend's claims fail because Defendants had probable cause to arrest and prosecute Townsend. Townsend was arrested after Defendants searched the glove box of his impounded vehicle pursuant to a valid search warrant and found a partially smoked blunt, a vial of marijuana, cocaine, and other drug paraphernalia in violation of N.Y. Penal Law § 220.16 (McKinney) (prohibiting criminal possession of a controlled substance in the third degree). *See* ECF No. 104-16 ¶ 24. Townsend claims the drugs were planted, but presents no evidence to support this assertion. *See* ECF No. 111 at 39-41. Unlike Townsend's testimony that he did not commit any traffic violations before being pulled over, which was sufficient to withstand summary judgment against Flickner's contrary testimony, Townsend's allegation that the drugs were planted is not based on personal knowledge. *Compare DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("where a party relies on affidavits or deposition testimony to establish facts, the statements must be made on personal knowledge") (internal quotations omitted) *with Bellamy*, 914 F.3d at 746 (2d Cir. 2019) (plaintiff's testimony defeated summary judgment when it was about his own prior actions). Accordingly, because Townsend presents no evidence, based on his personal knowledge or otherwise, to support his claim that Defendants planted the drugs, there can be no reasonable dispute that probable cause existed to arrest and prosecute

Townsend for the above-referenced offense based on the items found in his vehicle's glove box.

Further, as stated *supra* Section I, to the extent any part of the Third Claim alleging an improper *search* of Townsend's vehicle during the Traffic Stop was not barred by the resolution of the 2017 Lawsuit, Defendants' motion for summary judgment on this claim is granted because there is no genuine dispute of material fact that probable cause existed to search the vehicle at the time of the Traffic Stop. Flickner, Zambito, and Wade each claim to have smelled marijuana in Townsend's vehicle. ECF No. 104-16 ¶¶ 8, 10, 11. Wade's canine also "alerted" near Townsend's passenger side door when it was brought to the scene. *Id.* ¶ 15. The "alert" is further supported by dashcam footage. ECF No. 104-17 ¶ 13. Townsend claims, without evidentiary support, that Wade was able to fake an "alert" from his canine and asserts that Defendants are lying. ECF No. 111 at 35-37.

To defeat summary judgment, Townsend must offer some "hard evidence" to support his claims and cast more than "a metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."). Townsend's claims do not survive summary judgment even when his claims are "liberally construed," as they must be, due to his *pro se* status. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Townsend's "bald assertions" that Defendants faked the "alert" and did not detect a scent of marijuana are insufficient to create a genuine dispute of material fact. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (summary judgment cannot be defeated by relying on allegations in the complaint, self-serving conclusory statements, or mere assertions that affidavits supporting the motion are not credible). Based on the evidence adduced by Defendants— Defendants' claims to have smelled marijuana, the dashcam footage, and the canine's alert on the vehicle—as well as the absence of evidence adduced by Plaintiff to support his claim that the "alert" was faked beyond his "bald assertions," no reasonable jury could find by a preponderance of the evidence that Defendants lacked probable cause to search Townsend's vehicle. Here, the facts Defendants allege are more than sufficient to establish probable cause to search a vehicle. *See Smith v. Vill. of Brockport*, No. 19-CV-6404 CJS, 2022 WL

597465, at *12 (W.D.N.Y. Feb. 28, 2022) (probable cause to search vehicle based on smell of marijuana alone); *see also United States v. Jenkins*, 452 F.3d 207, 214 (2d Cir. 2006) ("As the officers approached the SUV, they immediately detected an independent basis [(the odor of marijuana)] for continuing to detain the SUV and its occupants.... The officers then had a particularized and objective basis for suspecting legal wrongdoing, and were justified in continuing the detention of the SUV and its occupants.") (citations and internal quotation marks omitted); *United States v. Fable*, No. 3:18-CR-00003 (JCH), 2018 WL 3727346, at *5 (D. Conn. July 24, 2018) ("Detective Pontz was close enough to the vehicle to form a reasonable suspicion that the occupants had recently been smoking marijuana. Thus, the smell of marijuana provided an independent basis for continuing to detain the vehicle and its occupants."). Accordingly, summary judgment is granted with respect to any remaining portion of the Third Claim as well.

### III. Townsend's Second, Sixth, and Seventh Claims

**\*7**  Townsend's Second, Sixth, and Seventh Claims fail because he does not present sufficient evidence to establish their elements. Townsend's Second Claim is a § 1981 claim based on Defendants' allegedly race-based motive for pulling over and seizing his vehicle. *Id.* "To establish a claim under Section 1981, plaintiffs 'must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities.' *Anderson v. City of New York*, 817 F. Supp. 2d 77, 95 (E.D.N.Y. 2011) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999)).

Townsend's amended complaint alleges that Flickner initiated the Traffic Stop because of Townsend's race. *See* ECF No. 4 at 3. However, in his summary judgment motion and opposition to Defendants' summary judgment motion, Townsend does not appear to reference any racial motivation behind the Traffic Stop or present any evidence indicating the same. *See generally* ECF No. 85; ECF No. 111 at 1-16. Townsend merely alleges, in conclusory fashion, that the Traffic Stop was "unlawful," not that it was racially motivated. ECF No. 111 at 31, 32. A party must present some nonconclusory support to survive summary judgment. *F.D.I.C.*, 607 F.3d at 292. Accordingly, Townsend's Second Claim must fail because he has set forth no such support.

Townsend's Sixth Claim is similarly unsupported. Townsend alleges that Defendants denied him his right to a fair trial.

ECF No. 5 at 5. To show such a denial, Townsend must show that an "(1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

Townsend's claim fails at the second element. Townsend has presented no evidence that Defendants fabricated information. Townsend alleges three primary fabrications: (1) the smell of marijuana coming from his car during the Traffic Stop; (2) the alert from Defendants' drug detecting dog during the Traffic Stop; and (3) the planting of drugs in his vehicle after the Traffic Stop. ECF No. 85 at 4-5. Townsend does not present evidence, beyond his conclusory allegations, to support these allegations. *See* ECF No. 111 at 35-37, 39-41. As discussed *supra* Section II, Townsend's "bald assertions" that Defendants are lying, or not credible, are not sufficient. *See DiStiso*, 691 F.3d at 230. Because Townsend has presented no evidence that any information was fabricated, his Sixth Claim fails.

Last, Townsend's Seventh Claim for Defendants' failure to intervene fails because there is no surviving underlying misconduct. A failure to intervene claim requires a plaintiff to establish some underlying misconduct. *See Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) ("Failure to intervene claims are 'contingent upon the disposition of the primary claims underlying the failure to intervene claim.' ") (quoting *Matthews v. City of N.Y.*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)); *see also Ross v. City of New York*, No. 17-CV-3505 (PKC) (SMG), 2019 WL 4805147, at *11 (E.D.N.Y. Sept. 30, 2019) (granting summary judgment against failure to intervene claims where probable cause authorized the underlying arrest).

Here, the Court has concluded Townsend's Second through Sixth Claims must be dismissed. A portion of the First Claim remains, but involves only Flickner and his decision to initiate the Traffic Stop, with no other Defendants capable of failing to intervene in this decision. *See* ECF No. 111 at 35. Because only this aspect of Townsend's First Claim remains, there is no underlying misconduct upon which Townsend's Seventh Claim may be based.[4] Accordingly, the Seventh Claim is dismissed.

### CONCLUSION

**\*8**  For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 104) is GRANTED in part and DENIED in part and Townsend's motion for summary judgment (ECF No. 85) is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2457072

# Footnotes

1    The following facts are taken from Defendants' statement of facts (ECF No. 104-16), Townsend's purported statement of facts (ECF No. 111), and each statements' supporting material. Townsend's statement of facts fails to comply with Local Rule 56, because he did not submit a statement of facts with his initial motion papers. *See* ECF No. 85. While Townsend later submitted a document purported to be his statement of facts (*see* ECF No. 111), it appears to be a response to Defendants' properly submitted factual assertions. *See generally*, *id.* at 31-44 (document titled "Movants statement of Facts [sic]" but including a combination of original factual assertions and responses to Defendants' factual assertions). Due to Townsend's *pro se* status, the Court has exercised its discretion to review all of Townsend's filings (ECF No. 85 and ECF No. 111 at 1-16) in order to fully consider the substance of his arguments. *See Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) ("[W]here a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions.").

2    To the extent the 2017 Lawsuit failed to allege a claim for the improper *search* of Townsend's vehicle, and simply addressed a claim for the improper *seizure* of the vehicle, this aspect of Townsend's Third Claim is barred by the existence of probable cause as discussed *infra* Section II below.

3    This dispute of fact regarding whether the Traffic Stop was initiated properly does not bar summary judgment against Townsend's claims involving Defendants' subsequent conduct. *See Jenkins v. City of N.Y.*, 478 F.3d 76, 91 n.16 (2d Cir. 2007) ("This Court previously has held that the fruit of the poisonous tree doctrine cannot be invoked to support a section 1983 claim...."); *Guillen v. City of New York*, 19 Civ. 5655 (JPC) (OTW), 2022 WL 4072925, at \*9 (S.D.N.Y. Sept. 2, 2022) ("Moreover, to the extent Plaintiff seeks to argue that the Officer Defendants lacked probable cause to effect the traffic stop or to search his vehicle, the legality of the initial traffic stop or the search of Plaintiff's vehicle is irrelevant to his false arrest claim.") (collecting cases). Accordingly, summary judgment may be granted for claims involving Defendants' conduct after the Traffic Stop despite the stop allegedly being initiated improperly.

4    Because Defendants have met their burden to obtain summary judgment with respect to these claims, Townsend's summary judgment motion is denied with respect to these claims.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Santos v. New York City Dept. of Correction,  S.D.N.Y.,
February 25, 2010

2009 WL 862281
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ramon De Antonio SMART, Plaintiff,
v.
The CITY OF NEW YORK, Daniel
Matthews, Jeffrey Filizzola, Samuel
Zaroff and Anthony Piazza, Defendants.

No. 08cv2203 (HB).
|
April 1, 2009.

West KeySummary

1    **False Imprisonment**  👉 Probable Cause

The officers had probable cause to arrest
the plaintiff since they directly observed him
violating the traffic laws, thus the plaintiff's
claim of false arrest failed as a matter of law.
When the officers questioned the plaintiff about
his car being double parked in the opposite
direction of traffic, the plaintiff ran into a house
and had to be forcibly detained. Although the
traffic violation could be characterized as minor,
the officers direct observation provided probable
cause for the arrest. 42 U.S.C.A. § 1983; New
York State Vehicle and Traffic Law § 1203;
McKinney's Vehicle and Traffic Law § 155.

**OPINION AND ORDER**

Hon. HAROLD BAER, JR., District Judge.

**\*1**  On July 25, 2006, Plaintiff Ramon De Antonio Smart
was arrested and detained by officers of the New York
Police Department ("NYPD"). That incident forms the basis

of Plaintiff's complaint, filed *pro se,* which alleges claims
of false arrest, malicious prosecution, and violations of the
First, Sixth, Eighth and Fourteenth Amendments to the
Constitution, all in violation of 42 U.S.C. § 1983 ("Section
1983"). Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56. For the following reasons,
Defendants' motion is GRANTED IN PART and DENIED IN
PART.

**I. FACTUAL BACKGROUND**

At approximately 1:00 in the morning on July 25, 2006,
Ramon De Antonio Smart double-parked his 2000 BMW
in front of his mother-in-law's house on O'Brien Avenue in
the Bronx. (Pl.'s 56.1 Stmt. ¶ 1.) O'Brien Avenue is a two-
way, public street and Smart crossed the street's centerline
to stop alongside parked cars facing the opposite direction.
(Transcript of Ramon Smart Deposition, 11/6/2008, ("Smart
Depo. Tr.") at 145:16–25.) With the car running and the
headlights and hazard lights on, Smart waited for his wife
on the front steps the house. (*Id.* at 147:4–7, 22–24.) Then,
a police car pulled up next to Smart's car and parked behind
it. [1] (*Id.* at 149:1–6; 151:7–9.) The police officers, Defendants
Matthews and Filizzola, exited their vehicle and Matthews
attempted to open the driver's-side door of Smart's car. (*Id.* at
152:12–14.) Smart stood up and asked the officers if there was
a problem. (*Id.* at 152:15–16.) Matthews asked whether Smart
owned the double-parked BMW and Smart acknowledged
the car was his. (*Id.* at 155:13–15.) Smart complied with
Matthews' request to come down off the steps and turn the car
off. (*Id.* at 156:5–12.)

Matthews then demanded the keys to Smart's car, but Smart
refused to hand them over, maintaining that he had done
nothing wrong. (*Id.* at 159:5–7.) Instead, Smart offered to
provide Matthews with his license, registration, and proof
of insurance. (*Id.* at 159:5–7.) Smart alleges that Matthews
then twice lunged at him in failed attempts to snatch the car
keys, first from Smart's hand and then from his pocket. (*Id.* at
159:13–25; 160:1–25.) Smart maintains that he jumped back,
turned around, and called out to his wife, who had appeared
on the front steps, telling her to go get her step-father. (*Id.* at
161:7–9.) Smart contends that at this point Matthews grabbed
his shirt and Smart started to run towards the house, running
past his wife with Matthews and Filizzola in pursuit. (*Id.*
at 162: 21–25.)

In contrast to Smart's account, in the Criminal Complaint filed later in the Bronx Supreme Court, Officer Filizzola stated that Smart struck him in the left side of the head before running into the house. (Declaration of Philip Frank dated 1/23/09 ("Frank Decl .") Ex. H.) It is undisputed that the officers followed Smart into the home and that in the hallway a physical altercation ensued during which Smart grabbed onto a stairway banister and refused to let go. (Smart Depo Tr. at 176:13–20; Frank Decl. Ex. H.) It is also undisputed that during the struggle Matthews sprayed pepper spray into Smart's face. (*See* Declaration of Ramon Smart, dated 3/2/09, Ex. 8 ("CCRB Interview of Matthews"); Ex. 9 ("CCRB Interview of Filizzola.")) Smart contends that the officers kicked and punched him while he was holding onto the banister, and that Matthews placed him in a chokehold. (Pl.'s 56.1 Stmnt. ¶ 8.)

**\*2** Smart admits that after his hands were pried off the banister by his father-in-law, he lay on top of them to prevent the officers from handcuffing him. (Smart Depo. Tr. at 177:22–25.) But Smart maintains that at no time did he raise his hands or attempt to strike the officers, and maintains that after he was handcuffed the officers dragged him out the front door of the home by his legs, slamming his face into the right side of the concrete wall of the front steps. (Pl.'s 56.1 Stmt. ¶ 8.) The officers, for their part, contend that before he was restrained Smart flailed and twisted, tried to bite Matthews, escaped out the front door and then pushed Matthews, causing him to fall down the front steps and injure his leg. (*See* CCRB Interview of Matthews.) Matthews was treated at the Jacobi Medical Center for injuries to his leg. (*Id* .)

Smart was arrested, taken to the 43rd Precinct, and shortly thereafter was transported to Jacobi Medical Center where he was treated for abrasions and bruises. (Pl.'s 56.1 Stmt. ¶ 12.) Smart maintains that at the hospital, his eyes continued to burn from the pepper spray but the unidentified officer assigned to him did not permit his eyes to be flushed and refused to remove the handcuffs to allow Smart to be x-rayed. (Smart Depo. Tr. 187:8–9; 188:3–7; 189:9–16). Sometime between 8:30 and 9:00 a.m., Smart was transported back to the 43rd Precinct and placed in a holding cell. (Pl.'s 56.1 Stmt. ¶ 17.) Smart claims that he was held in the cell for more than fourteen hours without food, water or access to a restroom or a telephone and that he did not eat until approximately 1:30 a.m. on July 26, approximately 24 hours after his arrest, when he was taken to McDonald's as he was transported first to the 40th Precinct and then to Central Booking in the Bronx. (*Id.;* Smart Depo. Tr. 193:1–22.)

On July 26, 2006, Smart was arraigned on criminal charges of assault, resisting arrest, obstructing governmental administration, and harassment. (Frank Decl. Ex. H.) Smart appeared twice before the Bronx County Supreme Court before the charges against him were dismissed on January 24, 2007. (Pl.'s 56.1 Stmt. ¶ 21.) On May 21, 2008, the Court Clerk of the Supreme Court issued a Certificate of Disposition, which stated that pursuant to N.Y. CRIM. PRO. LAWW § 160.60 the dismissal deemed the arrest and prosecution "a nullity" and, pursuant to N.Y. CRIM. PRO. LAWW § 160.50(1C), the official record of the case was sealed. (Smart Decl. Ex. 23.)

On the night of his arrest the police also impounded Smart's BMW and provided him with a voucher that indicated the vehicle was taken into custody "for arrest evidence." [2] (Smart Decl. Ex. 24.) After the charges against him were dismissed, Smart obtained a District Attorney's Release for the vehicle, dated January 30, 2007. (*Id.*) Smart contends that shortly thereafter he made several phone calls to retrieve his car and "faxed his license, title, bill of sale, district attorney's release and a certificate of disposition to the NYPD Legal Bureau," but they refused to release his vehicle unless he paid $2,000. [3] (Pl.'s 56.1 ¶ 23.) A February 15, 2007 memorandum prepared by the NYPD's Vehicle Seizure Unit indicates that Smart had been offered a $2,000 settlement based on "[t]he underlying crimes, the value of the vehicle, and the defendant's criminal history." (Smart Decl. Ex. 25.) Although he acknowledges receipt of a letter from the NYPD that indicated he would be able to retrieve his car for $2,000, Smart contends that he was never informed of his right to a retention hearing. (Pl.'s 56.1 ¶ 23.) A May 5, 2008 memorandum recommended that NYPD Property Clerk dispose of Smart's vehicle because no formal demand had been timely filed. (Smart Decl. Ex. 25.) On July 29, 2008, the Smart's BMW was sold at a police auction for $3,800.00. (Smart Decl. Ex. 26.)

**\*3** On March 19, 2007, Smart was remanded to federal custody for an unrelated offense to which he later pled guilty. (Am. Compl. ¶ 66; Frank Decl. Ex. Q; *see* 06–cr–919 (RMB).) A criminal judgment dated January 29, 2009 ordered Smart to pay restitution to two banks and two taxing authorities and forfeit to the United States his interest in, among other things, the BMW.

## II. LEGAL STANDARD

A court will not grant a motion for summary judgment pursuant to Fed.R.Civ.P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys,* 426 at 554–55 (quoting *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996)). However, "the *mere existence* of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Anderson,* 477 U.S. at 252. [4]

## III. DISCUSSION

### A. Claims Arising under Section 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). To establish liability under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

### B. Liability of Defendants Zaroff and Piazza

" 'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Defendants Zaroff and Piazza were not among the officers who responded to the incident that led to Smart's arrest or otherwise involved in the commencement of criminal proceedings against him or impounding and auctioning his vehicle. (*See* Smart Decl., Exs. 13, 15, 20.) Consequently, Smart cannot establish that Zaroff or Piazza were personally involved in the events that

give rise to his claims of false arrest, malicious prosecution, excessive force, or procedural due process violations and Defendants' motion for summary judgment with respect to such claims as asserted against Zaroff and Piazza is GRANTED.

**\*4** Zaroff and Piazza were, however, the desk sergeants on duty at the 43rd Precinct where Smart was detained following his arrest. (*Id.* at Ex. 20.) Their potential liability for claims arising out of Smart's detention at the 43rd Precinct is addressed in Section III.G, below.

### C. Qualified Immunity

The doctrine of "[q]ualified immunity 'shields police officers acting in their official capacity from suits for damages ... unless their actions violate clearly-established rights of which an objectively reasonable official would have known.' " *Jones v. Parmley,* 465 F.3d 46, 55 (2d Cir.2006) (quoting *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999)). In a Section 1983 case, on summary judgment it is proper to "first determine whether taken in the light most favorable to the party asserting the injury, the facts alleged show that the [defendants'] conduct violated a constitutional right ... and only thereafter consider whether qualified immunity shields individual defendants." *Russo v. City of Bridgeport,* 479 U.S. 196, 203 (2007) (internal quotation marks and citations omitted). Consequently, I address below whether the Defendants are entitled to qualified immunity only where the facts show a potential constitutional violation.

### D. False Arrest

Liability for false arrest gives rise to liability under Section 1983. *See Cook v. Sheldon,* 41 F.3d 73, 77–79 (2d Cir.1994). In analyzing claims alleging the constitutional tort of false arrest, federal courts look to the law of the state in which the arrest occurred. *Russo,* 479 F.3d at 203. To state a claim for false arrest under New York law, a plaintiff must show that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003).

Because the Defendants do not dispute that Smart was, in fact, arrested, the only question is whether the arrest was "privileged" or "justified." *Id.* at 76. Justification may be established by showing that the arrest was based on probable cause. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

Probable cause exists when the police reasonably believe that "an offense has been or is being committed," *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988), and is measured as of the moment of arrest. *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997). "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006).

Here, Matthews and Filizzola had probable cause to arrest Smart because they directly observed him violating New York's traffic laws. Smart acknowledges that he double-parked his car facing the opposite direction of traffic, a violation of New York State Vehicle and Traffic Law § 1203, which requires that a "stopped, standing or parked" vehicle on a two-way roadway must be parked or stopped "parallel to and within twelve inches of the right-hand curb or edge of the roadway." (Smart Dep. Tr. 145: 16–25) Even though such a violation may be reasonably characterized as a "minor" offense, it is well-established that an officer's direct observation of even a minor traffic violation is sufficient probable cause to arrest the violator. *U.S. v. Scopo,* 19 F.3d 777, 781–782 (2d Cir.1994) (officers had probable cause to stop and arrest defendant they directly observed violate traffic laws by not signaling lane changes notwithstanding that the violation was "minor"); *see also,* N .Y.VEH. & TRAF. LAW § 155 (McKinney 1986 & Supp.1994) ("For purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense."); N.Y. CRIM. PROC. LAW § 140.10(1) (a) (McKinney 1992) (an officer may arrest a person for "[a]ny offense when [the officer] has reasonable cause to believe that such person has committed such offense in [the officer's] presence"); *People v. Cortes,* 86 Misc.2d 155, 382 N.Y.S.2d 445, 447 (Sup.Ct.1976) (a police officer may arrest a person for a traffic violation committed in the officer's presence); *see also Virginia v. Moore,* ––– U.S. ––––, ––––, 128 S.Ct. 1598, 1604, 170 L.Ed.2d 559 ("In a long line of cases we have said that when an officer has probable cause to believe a person committed even a minor crime in his presence ... [t]he arrest is constitutionally reasonable.") Because the officers had probable cause to arrest Smart, his claim of false arrest fails as a matter of law and Defendants' motion for summary judgment on this claim is GRANTED.[5]

**E. Malicious Prosecution**

**\*5** Liability for the tort of malicious prosecution can also give rise to liability under Section 1983. *Cook,* 41 F.3d at 77– 79. Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino,* 331 F.3d at 72. To state a cause of action for malicious prosecution under Section 1983, a plaintiff must also show that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2000).

Here, Smart suffered a post-arraignment restraint on his liberty because he was required to post bail at his arraignment —a condition of which required him to be amenable to process in New York at all times—and to make at least two court appearances before the charges against him were dismissed. Although in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), a Supreme Court plurality "refused to decide whether subjecting oneself to the restrictions that usually attach to release on bail constitutes a 'seizure' under the Fourth Amendment," *Singer v. Fulton County Sherif,* 63 F.3d 110, 117 (2d Cir.1995) (discussing *Albright* ), the Second Circuit has stated that a defendant who was released on his own recognizance but required to make several court appearances and prevented by statute from leaving the state sufficiently alleged a deprivation of liberty that implicated the Fourth Amendment. *Rohman,* 215 F.3d at 216; *see also Kirk v. Metro. Transp. Auth.,* No. 99 Civ. 3787(RWS), 2001 WL 258605, \*15 (S.D.N.Y. March 14, 2001) (defendant's required court appearances rendered him effectively seized because he was "subjected to restraints not shared by the public generally") (quoting *Murphy v. Lynn,* 118 F.3d 938, 945 (2d Cir.1997)). Consequently, the conditions of Smart's bail and his required post-arraignment court appearances constitute a restraint on his liberty sufficient to implicate the Fourth Amendment.

Turning to the elements of the state tort, Matthews' and Filizzola's liability for malicious prosecution turns on whether they knowingly made false statements about the circumstances of Smart's arrest. First, Defendants contend that they did not "initiate" the criminal proceedings against Smart because they did nothing more than report facts that the prosecutor considered in determining whether to initiate a prosecution. (Defs. Mem. at 11.) However, a police officer may be liable for malicious prosecution when it is found that he misrepresented or falsified evidence. *See White v. Frank,* 855 F.2d 956, 962 (2d Cir.1988); *Taylor v. City of New York,*

No. 03 Civ. 6477(RLC) 2006 WL 1699606, *4 (S.D.N.Y. June 21, 2006). Smart contends that Matthews lunged and grabbed at him while they were talking and his wife corroborates this account in a sworn declaration. (Smart Tr. 160:4–5, 161:2–6; Declaration of Raquel Smart, dated March 2, 2009, ¶ 14.) The criminal complaint signed by Filizzola, however, states that as Smart was being questioned, he struck Filizola in the head and then ran inside the house. (Frank Decl., Ex H.) Whether Smart or the officers escalated the situation from a verbal to a physical confrontation is relevant to whether criminal assault charges against Smart were justified. *See, e.g., People v. Baez,* 118 A.D.2d 507, 508, 500 N.Y.S.2d 3 (1st Dep't 1986) (use of abusive language does not make one an initial aggressor to whom justification defense is unavailable). It is for the jury to decide which account of the events is accurate, and drawing reasonable inferences in Smart's favor there is a genuine issue of fact as to whether Matthews and Filizzola falsely stated that Smart struck first.

**\*6** Second, the criminal charges against Smart were terminated in his favor. The Court Clerk of the Bronx County Supreme Court certified that the dismissal of all pending charges on January 24, 2007 constituted a "termination of the criminal charges in the action in favor of the accused." (*See* Frank Decl., Ex. N.) Defendants do not contest that the criminal proceedings were terminated in Smart's favor.

Third, there is a genuine issue of material fact as to the existence of probable cause to commence criminal proceedings against Smart. The probable cause determination in a malicious prosecution claim—which differs from that relevant to a false arrest claim—is "whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Mejia v. City of New York,* 119 F.Supp.2d 232, 254 (E.D.N.Y.2000) (citing *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 417 (2d Cir.1999)). The protection afforded to law enforcement agents by probable cause is not available when the agents have knowingly made false statements to the prosecutor. *Taylor,* 2006 WL 1699606 (citing *White v. Frank,* 855 F.3d at 961–2). Because only the jury can properly decide whether Matthews and Filizzola falsely stated that Smart initiated the physical confrontation, there is a genuine issue of fact as to the existence of probable cause to commence criminal proceedings against Smart for assault and resisting arrest. *See, e.g., People v. Carneglia,* 63 A.D.2d 734, 735, 405 N.Y.S.2d 298 (2d Dep't 1978) (reasonable acts of self defense may be justified where evidence "permits the inference that the defendant was the victim of an unprovoked police assault by

the use of excessive physical force in effectuating an arrest"); *People v. Roman,* 28 A.D.3d 589, 590, 813 N.Y.S.2d 211 (2d Dep't 2006) (in assault case, jury must be charged on "initial aggressor" concept where issue of fact exists as to who started the conflict).

Fourth, in a malicious prosecution action, malice is closely related to the lack of probable cause. *Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994). On a motion for summary judgment, malice may be inferred from evidence showing a lack of probable cause. *Id.* (citing *Maxwell v. City of New York,* 156 A.D.2d 28, 34–35, 554 N.Y.S.2d 502 (1st Dep't 1990)). Consequently, there is a genuine issue of fact as to whether Matthews and Filizzola are liable for malicious prosecution.

Finally, when the facts are viewed in the light most favorable to Smart, it is clear that qualified immunity will not shield Matthews and Filizzola from Section 1983 liability for malicious prosecution. Filing a false police report violates clearly-established rights of which an objectively reasonable police officer should surely be aware. *See Jones,* 465 F.3d at 55. Consequently, Defendants' summary judgment motion as to the Section 1983 claims asserted against Matthews and Filizzola and based on malicious prosecution is DENIED.

### F. Excessive Force

**\*7** A claim of excessive force in the context of an arrest is "properly analyzed under the Fourth Amendment's 'objective reasonableness standard.' " *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (quoting *Graham,* 490 U.S. at 397) (internal quotation omitted). Of course, "not every push or shove" is unconstitutionally excessive, *Id.,* and courts, including this one, have granted summary judgment where the use of force was *de minimis. See Perkins v. Brown,* 285 F. Supp .2d 279, 283, (E.D.N.Y.2003) (medical records established use of force *de minimis* ); *Bove v. City of New York,* No. 98 Civ. 8800(HB), 1999 WL 595620, (S.D.N.Y. Aug.6, 1999) ("bald and conclusory allegations" of beating and alleged injuries contradicted by hospital records insufficient to create genuine issue of fact as to excessive force). This is not, however, such a case.

Smart contends that the officers punched and kicked him in the hallway of the home, and that Officer Matthews sprayed pepper spray in his face from a distance of no more than 10 inches and placed him in a chokehold in violation of the New York Police Department Patrol Guide § 203–11. (Pls. 56.1 Stmt. ¶¶ 7–8.) Smart further maintains that he was dragged out of the house by his legs while he was handcuffed and "jerked" so that his "face was slammed into the right side of the concrete wall of the steps" leading to the ground from the stoop. (*Id.* ¶ 10.) At a minimum, the Court cannot conclude that, if Smart was already handcuffed, it was an objectively reasonable use of force to drag him out of the house by his feet, to say nothing of slamming his head against the concrete steps. *See, e.g., Kerman v. City of New York,* 261 F.3d 229, 240 (2d Cir.2001) (fact issues as to whether officers employed excessive force following the initial seizure and handcuffing of plaintiff precluded summary judgment.) Moreover, unlike the plaintiff's testimony in *Jeffreys,* 426 F.3d at 554, which was itself contradictory and incomplete, Smart's description of the officers' use of force has remained consistent from his interview with the Civilian Complaint Review Board in 2006 to his statement in opposition to the instant motion. (*See* Smart Decl. Ex. 4; Am. Compl. ¶¶ 15–17; Pls. 56.1 Stmt. ¶¶ 7–8.) Smart's account is also consistent with that of the eye-witnesses. (*See, e.g.,* Raquel Smart Decl., ¶¶ 19–20, 25.) Although a fact finder may elect to discount the testimony of the eye-witnesses—his wife and mother-in-law—because of their close relationship to Smart, this is the type of credibility determination that is strictly the province of the jury. Accordingly, I cannot conclude as a matter of law that Matthews' and Filizzola's use of force was objectively reasonable or *de minimis* under the circumstances.

**\*8** Finally, I cannot conclude as a matter of law that Matthews and Filizzola are protected by qualified immunity. Qualified immunity applies unless an officer's use of force violates "clearly established" constitutional rights and "even officers who are found to have used excessive force may be entitled to an extra layer of protection from the 'sometimes hazy border between excessive and acceptable force.' " *Stephenson v. Doe,* 332 F.3d 68, 77 (2d Cir.2003) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Here, because Smart admits that he ran from the police into the house and, after his hands were pried from the banister, that he laid on top of them to prevent being handcuffed, (Smart Depo. Tr. 162: 22–25;177: 22–25.), the use of *some* force by Matthews and Filizzola was almost certainly justified. However, Smart maintains that Matthews

placed him in a chokehold and that after he was handcuffed he was "slammed ... face first" on the concrete steps outside the house. (Smart Depo. Tr. 181: 3–4.) If Smart's account of events is credited, to grant qualified immunity to these policemen would be error. *See Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001). Accordingly, Defendant's motion for summary judgment as to Plaintiff's Section 1983 claim against Matthews and Filizzola premised on use of excessive force is DENIED.

### G. First, Sixth, and Fourteenth Amendment Claims

#### 1. *First Amendment Claim*

Although Smart's Amended Complaint alleges a violation of the First Amendment, presumably for being deprived of the ability to make telephone calls during his detention, he does not oppose Defendant's argument for summary judgment on this claim. Furthermore, the question of whether or not restricted telephone access impinges on a constitutional right is not settled, *Pitsley v. Ricks,* No. 96 Civ 0372(NAM), 2000 WL 362023 (W.D.N.Y.2000), and Smart does not dispute that he refused an offer to make a phone call shortly after his arrest on the morning of July 15, 2006. (*See* Defts.' 56.1 Stmt. ¶ 15.; Pl.'s 56.1 Stmt.) Because the contours of an inmate's right to use of the telephone are not clearly established, Defendants are entitled to qualified immunity from liability for alleged violations of the First Amendment arising from Smart's lack of access to a telephone during the period of his detention. Consequently, as it pertains to alleged violations of the First Amendment, Defendants' motion for summary judgment is GRANTED.

#### 2. *Sixth Amendment Claim*

Similarly, Smart appears to abandon his claim that his Sixth Amendment right to counsel was violated because he was denied access to a telephone to contact his attorney during the period of his detention. In any event, the Sixth Amendment right to counsel does not attach until the Government commits itself to prosecution by initiating adversary judicial proceedings, *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), and Smart was represented by counsel at his arraignment. (*See* Smart Depo. Tr. 194:14.) Accordingly, as it pertains to alleged violations of the Sixth Amendment, Defendants' motion for summary judgment is GRANTED.

#### 3. *Substantive Due Process Claim*

**\*9** Smart contends that in violation of the Eighth Amendment he was subjected to cruel and unusual punishment at the hands of the NYPD because he was denied medical treatment and was later denied food, water and the use of a restroom for over 14 hours during his detention at the 43rd Precinct. However, because Smart was a pretrial detainee, "challenge to the conditions of his confinement arises from the substantive component of the Due Process Clause [,] ... not from the cruel and unusual punishment standards of the Eighth Amendment." [6] *Iqbal v. Hasty,* 490 F.3d 143, 168 (2d Cir.2007) (citing *Benjamin v. Fraser,* 343 F.3d 35, 49 (2d Cir.2003)). Detainees have not been convicted of a crime, and consequently they "may not be punished in any manner—neither cruelly and unusually nor otherwise." *Benjamin,* 343 F.3d at 49–50. Because different standards apply, I consider separately Smart's claims based on alleged denial of medical treatment and those based on the circumstances of his confinement at the 43rd Precinct.

a. *Denial of Medical Attention.*

"The Second Circuit has applied the Eighth Amendment test for adequate medical care to a pre-trial detainee's right to the same." *Myrie v. Calvo/Calvoba,* 591 F.Supp.2d 620, 625 (S.D.N.Y.2008) (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000)). Thus, officials in custody of a pretrial detainee "may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst,* 101 F.3d 845 (2d Cir.1996). Here, no facts suggest Smart was deliberately denied medical attention for a serious medical condition. Smart contends that while at the hospital, the officer assigned to him prevented the prompt treatment for the pepper spray that had been sprayed in his eyes, but acknowledges his eyes were flushed by a nurse *after* he had seen a doctor. (Pl.'s Opp'n. at 20; Smart Depo Tr. at 189:13–23.) That the examining physician did not him or herself flush Smart's eye belies any argument that Smart's condition was sufficiently serious to support a constitutional violation. Smart's allegation that the officer refused to remove the handcuffs to permit Smart to be x-rayed fails for the same reason: a deferred diagnostic x-ray does not amount to denial of treatment for a serious medical condition. Consequently, to the extent Smart's Section 1983 claims are premised on alleged denial of adequate medical treatment, Defendant's motion for summary judgment is GRANTED.

b. *Denial of Food, Water and Access to a Restroom.*

Smart's contention that he was denied access to a restroom from 9:00 A.M. to approximately 11:30 P.M. and denied food for the twenty-four hours that followed his arrest presents a closer constitutional question. Because a pretrial detainee "may not be punished in any manner," *Benjamin,* 343 F.3d at 49–50, I must consider whether the particular circumstances of Smart's confinement rendered it punitive. *Iqbal,* 490 F.3d at 168. A condition of confinement that is "not reasonably related to a legitimate government objective" supports an inference of a punitive intent. *Id.* (citing *Bell v. Wolfish,* 441 U.S. 520, 537–38, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Absent an express intent to punish, whether conditions of detention "appears excessive in relation to the alternative purpose assigned [to it]," is also relevant to whether it is punitive in nature. *Bell,* 441 U.S. at 538 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 167, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

**\*10** Smart contends that during the more than fourteen hours that he was detained at the 43rd Precinct the officers disregarded his repeated requests for food, water, and use of a restroom. (Pl.'s SOF at 5.) Smart avers that he became extremely dehydrated and "even after [he] had thrown up in the cell, [he] was still denied use of the restroom." (Am.Compl.¶ 39.) [7] According to Smart, the officers to whom he directed his requests told him he needed to speak with his arresting officer or the desk sergeant on duty, but none of the officers responded to his requests. (Pl.'s SOF at 5.) Smart testified that although the officers acknowledged his "paper work" was complete when he arrived at the precinct at 9:00 A.M., he was not transferred to Central Booking until after 11:30 P.M. and that it was well known he was to be charged with assaulting an officer. [8] In support of this aspect of their motion, Defendants offer no facts to contradict those to which Smart would testify at trial.

Based upon the foregoing, a reasonable jury could conclude that the officer's consistent disregard of Smart's repeated requests was intended to have a punitive effect or, at a minimum, was not reasonably related to a legitimate governmental purpose which supports an inference of punitive intent. Although officers surely cannot be expected to cater to a pretrial detainee's every request and there are, for example, "legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station," *Webster v. City of New York,* 333 F.Supp.2d 184, 200 (S.D.N.Y.2004), deliberate denial of food, water or access to a restroom for fourteen hours is not reasonably related to any legitimate governmental purpose and thus the facts

before the Court support an inference of punitive intent. *See, e.g., Mahase v. City of New York,* 2000 WL 263742, 6 (E.D.N.Y.2000) (on motion to dismiss, detainee deprived of toilet paper and telephone call and who alleged officers exhibited hostility towards her was entitled to inference that conditions were imposed in part to serve a punitive purpose); *cf. Rush v. Astacio,* No. 97–2661, 1998 WL 480751 at *2 (2d Cir.1998) (absent allegation or evidence of intent to punish, denying pretrial detainee food for twelve hours while he was detained in a cold room did not violate his due process rights.) At a minimum, such treatment appears excessive in relation to any alternative purpose that Defendants may attribute to it. *Bell,* 441 U.S. at 538. Viewing Smart's testimony in its most favorable light and in the absence of any contradictory facts proffered by Defendants, a jury may reasonably conclude that the conditions of Smart's confinement violated his substantive due process rights under the Fourteenth Amendment.

Next, I must consider whether the Defendants were personally involved in the alleged constitutional violations and if they are entitled to qualified immunity. Defendants Zaroff and Piazza were the desk sergeants on duty during the period of detention. (*See* Smart Decl. Ex. 20.) Matthews received medical treatment after Smart's arrest and it is not alleged that he was present at the precinct during the period of Smart's detention. (See Am. Compl. ¶¶ 35–43; CCRB Interview of Matthews.) However, Smart alleges that Filizzola visited him in the holding cell dressed in civilian clothing. (Am.Compl.¶ 37.) As a result of his direct interaction with Smart and in the absence facts to the contrary, Filizzola was personally involved in the alleged constitutional violations stemming from the conditions of his confinement.

**\*11** In a conditions-of-confinement case such as this one, the personal involvement of a supervisor may be established by, *inter alia,* "showing that he directly participated in the violation," "failed to remedy the violation after being informed of it by report or appeal," or "was grossly negligent in supervising subordinates who committed the violation." *Iqbal,* 490 F.3d at 152–153 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Drawing all reasonable inferences in Smart's favor and, again, without contradictory facts offered by the Defendants, Zaroff and Piazza had knowledge of Smart's requests based on the reasonable inference that officers with whom Smart did speak communicated his requests to the desk sergeants on duty. If the alleged due process violations transgressed constitutional rights that are sufficiently well-established to deny the officers qualified immunity, Smart's testimony creates a genuine issue of a

material fact as to whether Zaroff and Piazza were personally involved by failing to remedy the violations once they learned of them.

Considering the substantial amount of litigation on the subject, I find that a pre-trial detainee's right to be free from punitive confinement is well established. *See, Benjamin,* 343 F.3d 49–50; *Iqbal,* 490 F.3d at 168 (citing *Bell v. Wolfish,* 441 U.S. 520, 537–38, 99 S.Ct. 1861, 60 L.Ed.2d 447). However, even when the law is clearly established, under the second element of the qualified immunity analysis a defendant is "entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001) (citation and internal quotation marks omitted). Nevertheless, in the absence of competing facts proffered by the Defendants, when Smart's testimony is viewed in its most favorable light a jury could not reasonably conclude that an objectively reasonable police officer would have doubts as to the illegality of deliberately denying Smart food, water or use of a restroom. *See Johnson v. Testman,* 380 F.3d 691, 698 (2d Cir.2004) (affirming denial of motion to dismiss on qualified immunity grounds where detention center guard left the plaintiff handcuffed in his cell for seven hours for no apparent reason.) Consequently, neither Filizzola, Zaroff, nor Piazza are entitled to qualified immunity and Defendant's motion for summary judgment for Smart's Section 1983 claims against these defendants based on the circumstances of his detention at the 43rd Precinct is DENIED.

## H. Section 1983 Claims Against City of New York

In order to hold a municipality liable as a "person" within the meaning of Section 1983, the plaintiff must prove the existence of both a policy that shows the municipality took some action that caused his injuries and a causal link between the policy and the deprivation of constitutional rights. *See Monell v. Department of Social Services,* 436 U.S. 658, 609–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Vives v. City of New York,* 524 U.S. 346, 352 (2d Cir.2008). Neither does Smart's complaint allege nor does the record contain any facts that suggest that the City of New York had a custom or policy that caused Smart's injuries, and Smart does not contend otherwise in opposition to the instant motion. Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's Section 1983 claims against the City of New York is GRANTED.

### I. State Law Claims

**\*12** Pursuant to NEW YORK GENERAL MUNICIPAL LAW § 50–e, a plaintiff who asserts state law tort claims against a municipal entity or against its employees for acts that occurred within the scope of their employment must file a notice of claim within ninety days after the incident giving rise to the claim or, with leave of court, within one year and ninety days after accrual of the action. *See Nunez v. City of New York,* 307 A.D.2d 218, 219, 762 N.Y.S.2d 384, (1st Dep't.2003). Late service of a notice of claim without leave of court is a nullity. *Laroc v. City of New York,* 46 A.D.3d 760, 761, 847 N.Y.S.2d 677 (2d Dep't.2007). Furthermore, an action based on the notice of claim must be commenced within one year and ninety days after the incident that gives rise to the claim. NEW YORK GENERAL MUNICIPAL LAW § 50–i. Here, although Smart contends that he filed a notice of claim on October 18, 2006, he did not file this action until March 5, 2008, which is more than one year and ninety days after the events of July 25–26, 2006 which give rise to his state law claims related to the circumstances of his arrest.

Smart's malicious prosecution claim did not accrue until the criminal charges against him were terminated in his favor in January 2007. *See Nunez v. City of New York,* 307 A.D.2d 218, 219, 762 N.Y.S.2d 384 (1st Dep't.2003). However, Smart does not allege that he filed a notice-of-claim for a malicious prosecution claim under state law. Consequently, Defendants' motion for summary judgment is GRANTED with respect to Smart's state law claims. [9]

### J. Procedural Due Process Claims

Finally, Smart's Amended Complaint is liberally construed to assert procedural due process claims based upon the NYPD's sale of his 2000 BMW at police auction, allegedly without providing Smart with notice of his right to a retention hearing. Although New York City's forfeiture statutes are no stranger to constitutional due process challenges, *see e.g. Krimstock v. Kelly,* 506 F.Supp.2d 249 (S.D.N.Y.2007), Smart is foreclosed from asserting such a challenge here because he forfeited his interest in the BMW to the United States in connection with the criminal judgment against him. [10]

"It is well-established that a valid liberty or property interest is an essential prerequisite to the successful assertion of due process rights, and that property interests 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such

as state law.' " *Grossman v. Axelrod,* 646 F.2d 768, 770–771 (2d Cir.1981) (*quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)); *see also Gordon v. Alexander,* 592 F.Supp.2d 644, 652 (S.D.N.Y.2009). Pursuant the federal criminal forfeiture statute, 18 U.S.C. § 982, "the court, in imposing sentence on a person convicted of a violation of [*inter alia,* 18 U.S.C. §§ 1028, 1029, and 1343 (affecting a financial institution) ] ... shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation." "[O]nce the Government wins a judgment of forfeiture, the relation-back doctrine provides that the right, title, and interest in the forfeited property vests in the United States at the time the defendant committed the offense that gives rise to the forfeiture." *U.S. v. Emerson,* 128 F.3d 557, 567 (7th Cir.1997) (citing 18 U.S.C. § 982 (which incorporates by reference the relation-back doctrine of 21 U.S.C. § 853(c)).

**\*13** Here, Smart forfeited his interest in the BMW to the United States pursuant the criminal judgment that followed his guilty plea to violations of 18 U.S.C. §§ 1028, 1029, and 1343, which, according to the indictment, were alleged to have occurred between January and August 11, 2006. *See* 06–CR–919(RMB), Doc. No. 10, Indictment, filed October 4, 2006. Consequently, regardless of the NYPD's actions, Smart lost title to the BMW when he committed the offenses to which he later pled guilty, i.e. prior to August 11, 2006. Because the property interests protected by the Due Process Clause "are created and their dimensions are defined by existing rules or understandings that stem from an independent source," *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), by virtue of the operation of the federal criminal statutes Smart had no constitutionally cognizable property interest in the vehicle during the period in which it is alleged that he was denied due process. [11]

Smart's failure to allege facts that support a reasonable inference that any of the individual Defendants were personally involved in the administration of his claim for return of the BMW or its sale at police auction or that suggest his damages stem from a policy or custom of the City, is an independent reason why Smart's Section 1983 claim for procedural due process violations must fail as a matter of law. *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006); *Vives v. City of New York,* 524 F.3d 346, 352 (2d Cir.2008). Accordingly, Defendants' motion for summary judgment with respect to Smart's procedural due process claims is GRANTED. [12]

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED with respect to (i) all claims against the City of New York; (ii) all state law claims; (iii) Plaintiff's Section 1983 claims premised on false arrest, procedural due process violations, and violations of the First and Sixth Amendment against all Defendants, (iv) Plaintiff's Section 1983 claims premised on malicious prosecution and use of excessive force against Defendants Zaroff and Piazza; and (v) Plaintiff's Section 1983 claims premised on violations of the due process clause of the Fourteenth Amendment for the conditions of Plaintiff's pretrial detention against Defendants Matthews. Defendant's motion for summary judgment is DENIED with respect to (i) Plaintiff's Section 1983 claims against Defendants Matthews and Filizzola to the extent premised on malicious prosecution and use of excessive force; and (ii) Plaintiff's Section 1983 claims against Defendants Filizzola, Zaroff and Piazza premised on the conditions of Plaintiff's pretrial detention.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 862281

---

**Footnotes**

1    The arrest report prepared by the police officers states that a computer check of Smart's license plates "came up voluntarily surrendered." (Frank Decl., Ex H.) It is not clear from the record whether the police officers ran a computer check of Smart's license plates prior to exiting their squad car and approaching Smart's vehicle.

2    Smart also contends that certain items of personal property, including a video camera and a radar detector, were in the BMW when it was impounded and not returned to him. (Pl.'s 56.1 Stmt. ¶ 20.) Smart did not receive a voucher for these items. (*Id.*)

3    A telephone intake sheet from the NYPD's Vehicle Seizure Unit corroborates that in early February 2007, Smart informed the NYPD he had a district attorney's release for the vehicle. (Smart Decl. Ex. 25.)

4    Defendants contend that pursuant to Local Rule 56.1(c), Plaintiffs' statement of facts should be disregarded because it does not include correspondingly numbered paragraphs that respond to each of the statements in Defendants' statement. However, Plaintiff proceeds *pro se* and has made substantial effort to comply with Local Rule 56.1. Moreover, Plaintiff's Rule 56.1 Statement follows the same chronology of events as that of the Defendants. Accordingly, the Court will consider the competent evidence submitted by Plaintiff to ascertain whether there are disputed issues of material fact.

5    Because Smart's acknowledged violation of New York Vehicle & Traffic Law § 1203 justified his arrest, the Court need not determine whether the allegedly invalid license plates on his vehicle or his act of running from the officers provided an independent justification for his arrest.

6    As he proceeds *pro se,* the Court liberally construes Smart's Eighth Amendment claims to assert claims under the Due Process Clause. *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (courts must interpret *pro se* pleadings "to raise the strongest arguments that they suggest").

7    Smart verified his Amended Complaint by declaring under penalty of perjury that its contents are true. "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

8    Smart testified that when he "got to central booking ... all the officers were standing around, ... everybody was asking 'who is the kid that assaulted the officer?' " (Smart Depo. Tr. 191:9–12; 194:19–23.)

9    The Court will reconsider this disposition with respect to Smart's malicious prosecution claim under New York law if he is able to establish that he filed a notice-of-claim within ninety days of the date on which the criminal charges against him were terminated in his favor.

10   To the extent he asserts them, Smart's Section 1983 claims based on the loss of personal property he alleges was in the vehicle when it was impounded also fail as a matter of law because Smart had adequate remedies to recover the property under state law. *See, Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (unauthorized intentional deprivation of property by prison guard did not constitute violation of due process clause because meaningful post-deprivation remedies for the loss were available under state law). As alleged by Smart, the deprivation resulted from "random and unauthorized" acts instead of the "operation of established state procedures," and therefore the existence of state law remedies—namely, the administrative procedures for return of property held in police custody and an action under Section 9 of the New York Court of Claims Act for appropriation of personal property—defeat Smart's Section 1983 claim. *See Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990).

11   Smart argues that he suffered financial injury because he "remains responsible for the value of said BMW in restitution ... to the federal government." (Pl.s' Opp'n. at 19.) However, "because forfeiture and restitution serve distinct goals, a defendant generally has no right or entitlement to use forfeited funds to satisfy an additional restitution obligation." *U.S. v. O'Connor,* 321 F.Supp.2d 722, 729 (E.D.Va.2004). Although I have neither authority nor inclination to interpret Judge Berman's sentence, I note that because Smart pled guilty to fraud offenses, it appears that the restitution ordered to be made to two banks and two taxing authorities was mandatory and imposed *in addition to* any other authorized penalty. *See* 18 U.S.C. § 3663A(a)(1). Furthermore, pursuant to 18 U.S.C. § 982(a)(2), forfeiture of any property obtained directly or indirectly as a result of the fraud was *also* mandatory and thus calls for a separate penalty. Although, the Government has broad discretion to direct disposition of forfeited property including to victims of the crime, *see* 21 U.S.C. § 853(i), nothing in the criminal judgment indicates that Smart is entitled to offset the value of the BMW against his restitution obligations. The mere possibility that the Government *might* have elected to "credit" the value of the BMW towards restitution does not give Smart a constitutionally cognizable property interest in the vehicle.

12   It merits note, however, that on the limited record before me I would be unable to conclude as a matter of law that the NYPD complied with applicable municipal regulations or the standards of constitutional due process, and I am dubious that the NYPD would have ultimately prevailed in a forfeiture action in which it bore the burden to prove that the BMW was an instrumentality of the crimes for which Smart was arrested. The NYPD was within its rights to elect to seek forfeiture of the vehicle after the charges against Smart were dismissed, and they appear to have done so within twenty-five days of their receipt of the district attorney's release as required. *See* 38 R.N.Y.C. § 12–36; *McClendon v. Rosetti,* 460 F.2d 111 (2d Cir.1972). Although Smart acknowledges he received a February 10, 2007 letter offering settle the forfeiture proceeding for $2,000, that letter is not part of the record before me and consequently I cannot render an opinion as to whether it provided adequate notice of Smart's rights to a retention hearing as required by the decisions in *Krimstock v. Kelly, see e.g.* 306 F.3d 40, 69 (2d Cir.2002), or an adequate statement of the grounds upon which the property clerk sought to justify the forfeiture as required by 38 R.C.N.Y. § 12–36(b). However, to the extent its present posture requires me to view the facts of this case in the light most favorable to Smart, who contends that the letter he received directed him to *either* pay $2,000 *or* forfeit the car, I have grave reservations as to the constitutional propriety of phrasing a settlement offer—in a case in which the NYPD ultimately has the burden to prove the impounded vehicle constitutes an instrumentality or the proceeds of a crime—so as to cause claimants to believe that they must choose between the proposed settlement offer or forfeiture of their vehicle.

End of Document                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-01543-DNH-ML  Document 11  Filed 06/20/24  Page 61 of 101

Fleming v. Esposito, Not Reported in Fed. Supp. (2009)

2009 WL 10739921
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ermyne FLEMING, Plaintiff,
v.
P.O. John ESPOSITO, Captain Paul Astrologo,
and the City of Peekskill, Defendants.

08 Civ.4584 (LMS)
|
Filed 11/23/2009

**Attorneys and Law Firms**

Alan D. Levine, Kew Gardens, NY, for Plaintiff.

William J. Florence, Jr., Peekskill, NY, for Defendants.

**DECISION AND ORDER**

Lisa Margaret Smith, United States Magistrate Judge

**\*1** Defendants P.O. John Esposito, Capt. Paul Astrologo, and the City of Peekskill (herein, "Defendant Esposito," "Defendant Astrologo," and "Defendant City," respectively) seek summary judgment in their favor in the above captioned civil rights lawsuit filed under 42 U.S.C. § 1983. See Docket #22, Defendants' Notice of Motion. Plaintiff Ermyne Fleming's claims arise out of an incident that occurred on May 24, 2007. Pl.'s Am. Compl., 3. While operating her vehicle, Plaintiff made an illegal u-turn and, after a verbal altercation, was arrested by Defendant Esposito. Pl.'s Rule 56.1; Defts.' Rule 56.1. As a result, Plaintiff initiated this suit alleging general violations of Plaintiff's rights under 42 U.S.C. § 1983 [1], as well as state law claims for false arrest, battery, and negligence. See generally Pl.'s Am. Compl. Defendants move for summary judgment on the ground that Defendant Esposito and Defendant Astrologo are entitled to qualified immunity as to Plaintiff's claims under § 1983. See Docket #23, Defts.' Mem. Of Law, 4-5. Plaintiff opposes Defendants' motion for summary judgment, arguing that Defendant Esposito is not entitled to qualified immunity because he did not have legal authority to arrest Plaintiff. See Docket #25, Pl.'s Mem. of Law.

The parties have consented to the jurisdiction of the undersigned for all purposes, including decision on

Defendants' Motion for Summary Judgment pursuant to 28 U.S.C. § 636(c). See Docket #8, Consent to United States Magistrate Judge for All Purposes. For the following reasons Defendants' motion for summary judgment is GRANTED. Additionally, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. Therefore, Plaintiff's Amended Complaint is dismissed with prejudice.

**BACKGROUND**

A. Facts
The following facts are drawn from the parties' Local Rule 56.1 submissions and the declarations, affidavits, and exhibits submitted in connection with Defendants' motion for summary judgment.

It is uncontested that on May 24, 2007, while operating her vehicle on the roadway, Plaintiff made an illegal u-turn. See Pl.'s Rule 56.1, ¶ 1 and Defts.' Rule 56.1, ¶ 1, Docket #24, 27. Subsequently, Defendant Esposito pursued Plaintiff and pulled Plaintiff over to issue her a traffic summons for the u-turn. See Pl.'s Rule 56.1, ¶ 3 and Defts.' Rule 56.1, ¶ 3.

Thereafter the parties disagree as to what transpired. Defendant Esposito contends that upon reaching Plaintiff's vehicle, he requested Plaintiff's license, registration, and insurance card. Defts.' Declaration in Supp. of Mot. for Summ. J., 4-5. Defendant further contends that Plaintiff refused to identify herself, aside from stating that she was an off-duty New York City Police Department Sergeant. Id. at 5. Plaintiff requested that Defendant request the presence of a superior officer, which Defendant Esposito did. Id. Despite repeated requests by Defendant Esposito for Plaintiff's identification, Plaintiff refused to produce any identification. Id. Defendant Esposito then advised Plaintiff that he was arresting her for obstruction of governmental administration. Defts.' Rule 56.1, ¶ 4.

**\*2** Alternatively, Plaintiff asserts that when Defendant Esposito pulled his vehicle alongside hers, Defendant Esposito spoke to Plaintiff in an extremely rude manner. Pl.'s Mem. Of Law, 2. Defendant Esposito and Plaintiff argued back and forth, during which time Plaintiff informed Defendant Esposito that she was a New York City Police Sergeant. Id. Defendant asked to see Plaintiff's license and registration. Id. Plaintiff informed Defendant Esposito that she had her license and registration in her handbag, along

with her service weapon, and as she was attempting to retrieve her license and registration, Defendant Esposito told Plaintiff that he was arresting her for obstructing governmental administration. Id.

The parties agree that after these disputed events Plaintiff was handcuffed, placed into Defendant Esposito's patrol car, and taken to the police station. Pl.'s Mem. Of Law, 2; Defts.' Decl., 6. While at the police station, Defendant Astrologo called an Assistant District Attorney to assess whether Plaintiff could properly be charged with obstructing governmental administration. Pl.'s Mem. Of Law, 3. After determining that Plaintiff could not be so charged, Plaintiff was formally charged with making an illegal u-turn and she was released. Id.; Defts.' Decl., 6. Ultimately, Plaintiff was tried and found guilty of making an illegal u-turn. Id.; Defts.' Mem. Of Law, 5.

B. Defendants' Motion for Summary Judgment
Defendants' rather truncated memorandum of law apparently argues both that Defendants Esposito and Astrologo are entitled to qualified immunity, and that Defendant Esposito had legal authority to arrest Plaintiff for making an illegal u-turn and for obstructing governmental administration. Defts.' Mem. Of Law, 4. Defendants conclude that Plaintiff's rights were not violated by her arrest. Id. at 5. Without fully articulating the legal or factual basis for their conclusions, and by conflating the asserted lawfulness of the arrest with the question of qualified immunity, Defendants argue that Plaintiff's Complaint should be dismissed with prejudice in its entirety. Defts.' Notice of Mot.

C. Plaintiff's Opposition
Plaintiff counters that Defendant Esposito is not entitled to qualified immunity for his arrest of Plaintiff regardless of whether he arrested Plaintiff for making an illegal u-turn or for obstructing governmental administration. See generally Pl.'s Opposition. Plaintiff asserts that the case relied upon by Defendants, Atwater v. City of Lago Vista, 532 U.S. 318 (2001), for the proposition that Defendant Esposito had legal authority to arrest Plaintiff for making an illegal u-turn, is inapplicable to the facts of this case. Pl.'s Mem. Of Law, 3-4. Plaintiff goes on to argue that New York's statutory scheme may provide Defendant Esposito with authority to arrest Plaintiff for a traffic infraction, however, New York case law shows a disapproval of this practice. Id. at 5-6. Plaintiff, who also conflates the question of lawfulness of the arrest with the issue of qualified immunity, then argues that Defendant

Esposito did not have probable cause to arrest Plaintiff for obstructing governmental administration and is therefore not entitled to qualified immunity. Id. at 9-13. Lastly, Plaintiff argues that Defendants have not met their burden to establish that they are entitled to summary judgment. Id. at 14-15.

## DISCUSSION

A. Summary Judgment Standard
Pursuant to the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 320-23 (1986). A fact is "material" when it may affect the outcome of a case under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. Id. at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. Id.

 *3  Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting Celotex, 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (quoting Anderson, 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see also Anderson, 477 U.S. at 261 n.2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Cruden v. Bank of New York,

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 63 of 101

Fleming v. Esposito, Not Reported in Fed. Supp. (2009)

957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)).

## B. Plaintiff's Federal Claim

It is not entirely clear to this Court what federal claims Plaintiff attempts to assert through her Amended Complaint. Plaintiff's first cause of action is purportedly brought under 42 U.S.C. § 1983. (Pl.'s Am. Compl., 3.) However, § 1983 does not, in and of itself, constitute a private right of action; rather it "provides a method for vindicating federal rights elsewhere conferred.". Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979))(internal quotation marks omitted). Paragraph 44, which is the crucial portion of the first cause of action, appears to raise a false arrest and a false imprisonment claim.[2] The Court proceeds on that basis.

### 1. False Arrest and False Imprisonment

**\*4** The elements of a cause of action for false arrest are the same as those for false imprisonment, because false arrest is a form of false imprisonment. See Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995), cert. denied, 517 U.S. 1189 (1996). The elements are: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged. Weyant v. Okst, 101 F.3d 845, 853 (2d Cir. 1996). These claims will therefore be considered together.

Defendants argue that probable cause existed to support Plaintiff's arrest, and that therefore the claims of false arrest and false imprisonment must be dismissed. Although Plaintiff attempts to present a contrary argument, Plaintiff concedes that under New York law, Defendant Esposito had legal authority to arrest Plaintiff for making an illegal u-turn. See Pl.'s Mem. Of Law, 4-5. As Plaintiff points out, § 155 of the New York Vehicle and Traffic Law states that "[f]or purposes of arrest without a warrant, pursuant to article one hundred forty of the criminal procedure law, a traffic infraction shall be deemed an offense." Pursuant to New York Criminal Procedure Law § 140, "a police officer may arrest a person for: (a) any offense when he [or she] has reasonable cause to believe that such person has committed such offense in his [or her] presence." Plaintiff admits that she made an illegal u-turn, and does not contest that Defendant Esposito witnessed her making the illegal u-turn. Therefore, under New York law, Defendant Esposito had probable cause to arrest Plaintiff

for making the illegal u-turn. As set forth further below, the existence of probable cause to arrest Plaintiff for the traffic violation is sufficient to support the arrest, whether or not there was probable cause to arrest her for Obstruction of Governmental Administration, and therefore the claims of false arrest and false imprisonment must be dismissed.

Plaintiff attempts to save her claim of false arrest by referencing various New York State cases that Plaintiff asserts demonstrates the courts' disapproval of arresting persons for traffic violations. Pl.'s Mem. Of Law, 6-7. First, I note that as Plaintiff states herself, these cases are offered to show the "courts' disapproval of arrest for a traffic infraction," not as binding legal authority that arrest based on a traffic infraction is unlawful or a violation of the constitution. Id. at 6. Regardless, Plaintiff's reliance on these cases is misguided as they do not stand for the legal proposition for which Plaintiff offers them, and they are factually distinguishable from this case. The cases cited by Plaintiff deal primarily with defendants who were arrested for a traffic violation and then were searched incident to the arrest. People v. Howell, 49 N.Y.2d 778, 779 (1980); People v. Troiano, 35 N.Y.2d 476 (1974)[3]; People v. Marsh, 20 N.Y.2d 98 (1967); People v. Carvajales, 152 A.D.2d 675 (2d Dep't 1989). The respective courts in each of these cases state that full-blown searches incident to arrest for a traffic infraction is not always justified. Howell, 49 N.Y.2d at 779; Troiano, 35 N.Y.2d at 478; Marsh, 20 N.Y.2d at 101; Carvajales, 152 A.D.2d at 676. Additionally, while the court in Marsh did say that officers are authorized to issue a summons in lieu of making an arrest, the court also stated that a "traffic violation may serve as a predicate for an arrest without a warrant pursuant to [Vehicle and Traffic Law § 155]." 20 N.Y.2d at 101. In any event, although New York State courts have expressed a preference for a summons to be issued rather than an arrest to be effectuated for a traffic violation, see People v. Cooper, 38 A.D.3d 678, 680 (2007), this is a matter of state law, not a constitutionally required standard. Defendants' argument in this regard misses the mark, and is inapplicable to the issue of whether probable cause existed to support the arrest.

**\*5** Plaintiff further argues that when Defendant Esposito arrested Plaintiff, Defendant Esposito stated that he was arresting Plaintiff for obstructing governmental administration, but that he did not have probable cause to do so. However, whether Defendant Esposito intended to arrest Plaintiff for making an illegal u-turn or for obstructing governmental administration is immaterial to the question of probable cause as a constitutional matter. Defendant

Esposito had probable cause to arrest Plaintiff for making an illegal u-turn, and therefore the arrest was lawful. Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("a claim for false arrest turns only on whether probable cause existed to arrest a defendant ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."); see also Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004) ("[A]n arresting officer's ... subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.") Therefore, Defendants' motion for summary judgment as to Plaintiff's claims of false arrest and false imprisonment against Defendant Esposito is GRANTED.

The first cause of action in the Amended Complaint, alleging the constitutional claims, does not identify which of the Defendants are the intended targets of the claim. However, as the central claim in the first cause of action is false arrest, and as the second cause of action asserts a state law claim of false arrest against all three Defendants, the Court assumes that the first cause of action is also intended to be brought against all three Defendants.

There is nothing in the Amended Complaint, or in any of the Plaintiff's other submissions, which allege any facts supporting a claim of false arrest or false imprisonment against Defendant Astrologo. Defendant Astrologo was not present when Plaintiff was arrested by Defendant Esposito. Defendant Astrologo was present when Plaintiff was detained at Police Headquarters, but he is not alleged to have taken any steps which caused either the arrest or the subsequent detention. Although there are allegations that Defendant Astrologo had subsequent conversations with Plaintiff in which he asked her to waive any claims that she might have relating to her arrest and incarceration, those factual allegations are not related to the actual arrest on probable cause, or to the subsequent imprisonment. There are no constitutional claims raised which would rely on those facts, and those facts do not implicate Defendant Astrologo in the claimed false arrest and false imprisonment charges. Therefore, as Defendant Astrologo had no personal involvement in the arrest and subsequent detention of Plaintiff, Defendants' motion for summary judgment as to Plaintiff's claims of false arrest and false imprisonment against Defendant Astrologo is GRANTED.

Although the motion for summary judgment argues only that the individual Defendants are entitled to qualified immunity,

and makes no argument in support of its claim to be entitled to summary judgment in favor of the Defendant City of Peekskill, the Court *sua sponte* considers the question of whether the case survives as against the City, in light of the decision herein.

The first cause of action also fails to identify whether it is intended to be brought against the Defendant City of Peekskill. Even if that is the intent, there are absolutely no allegations in the Amended Complaint that the actions undertaken by the individual Defendants were the result of any official custom, policy, or practice of the City of Peekskill or its Police Department. The sole allegation in that regard is in the fourth cause of action, which alleges a state law claim of negligence, and which asserts that the "aforementioned false, improper and illegal arrest of plaintiff and the battery [Defendant Esposito] committed upon her by tightly handcuffing her were a direct result of the negligence, carelessness, and recklessness of defendant CITY OF PEEKSKILL in its screening, hiring, training, supervising, and retaining of him as a police officer." Pl.'s Am. Compl., ¶ 65.

**\*6** As discussed *supra*, summary judgment has been granted for Defendants Esposito and Astrologo, and as there are no allegations of any constitutional violation by any other municipal employee, summary judgment must also be granted in favor of the Defendant City of Peekskill. Additionally, even if any municipal employee could be found to have committed a violation of Plaintiff's constitutional rights, there is absolutely no basis for municipal liability under the circumstances presented here.

The Supreme Court in 1978 established the requirement for municipal liability under Section 1983 for constitutional violations committed by employees of that municipality. In Monell v. New York City Dept. Of Social Servs., 436 U.S. 658, 691 (1978), the Court said

> the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature cause a constitutional tort. In particular, we conclude that a municipality cannot be held liable

**Fleming v. Esposito, Not Reported in Fed. Supp. (2009)**

Case 6:23-cv-01543-DNH-ML    Document 11    Filed 06/20/24    Page 65 of 101

solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

There is nothing in the allegations of the first cause of action, which is not even clearly brought against the Defendant City of Peekskill, which would support a Section 1983 claim against the Defendant City. Even if the Court takes the leap of assuming that the allegations in Paragraph 65 were intended to be incorporated into the first cause of action, no allegations have been included in Plaintiff's Rule 56.1 statement in support of those allegations. Therefore, because the Plaintiff cannot show that any employee of the City of Peekskill committed any constitutional violation, and because even if a constitutional violation had occurred, the Plaintiff alleges no basis for the City of Peekskill to be found responsible for any such constitutionally impermissible actions of any of its employees, to the degree that Plaintiff has made claims of false arrest and false imprisonment against Defendant City of Peekskill, those claims are dismissed. [4]

For all of these reasons, the Defendants' motion for summary judgment as to the constitutional claims asserted in the first cause of action is GRANTED in its entirety as to all of the Defendants.

C. Plaintiff's State Law Claims

The only remaining claims are claims that are brought pursuant to state law. This Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. [5] See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 121-22 (2d Cir. 2006). Therefore, Plaintiff's Amended Complaint is dismissed with prejudice.

### CONCLUSION

**\*7** For the aforementioned reasons, Defendants' motion for summary judgment is granted in its entirety and Plaintiff's claims under 42 U.S.C. § 1983 are dismissed with prejudice. Additionally, this Court declines to exercise supplemental jurisdiction over Plaintiff's pendent state law claims and, in any event, finds them to be without merit. Therefore, Plaintiff's Amended Complaint is dismissed with prejudice in its entirety. The Clerk of the Court is directed to terminate Defendants' Motion for Summary Judgment, Docket #22 and to close the file in this case.

This constitutes the Decision and Order of the Court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2009 WL 10739921

---

### Footnotes

1    In paragraph 44 of the Amended Complaint Plaintiff appears to assert that she was deprived of due process under the 4th and 14th amendments, by being falsely arrested, falsely imprisoned, and being "tightly and painfully handcuffed." In paragraph 45 she asserts that as a result of these due process violations she suffered a loss of liberty and public humiliation, and she was investigated by her employer.

2    Paragraph 44 of Plaintiff's Amended Complaint also alleges that Plaintiff was tightly and painfully handcuffed. It is unclear whether Plaintiff intended to assert an excessive force claim through this allegation. Given the lack of further allegations or evidence supporting such a claim, including any claimed injury or any allegations that the force utilized by Defendant Esposito was unnecessary or excessive, this Court finds that Plaintiff has not pled a claim of excessive force. Even if Plaintiff had pled such a cause of action, this Court would still grant summary judgment in Defendants' favor and dismiss the claim.

**Fleming v. Esposito, Not Reported in Fed. Supp. (2009)**

Case 6:23-cv-01543-DNH-ML    Document 11    Filed 06/20/24    Page 66 of 101

Allegations of excessive force arising out of an arrest are governed by the 4th Amendment, which utilizes a "reasonableness" standard to analyze such claims. Graham v. Connor, 490 U.S. 386, 394-395 (1989). Under this standard, "the nature and quality of the intrusion on the individual's Fourth Amendment interests" is balanced "against the countervailing governmental interests at stake." Id. at 396 (quotations omitted). For a claim of excessive force based on the use of handcuffs to be actionable, the plaintiff must have suffered some articulable injury as a result of the handcuffs being too tight. Golio v. City of White Plains, 459 F.Supp.2d 259, 264 (S.D.N.Y. 2006).

In this case, Plaintiff has not alleged that she suffered any physical injury as a result of being handcuffed. Additionally, Plaintiff has not submitted any evidence to establish that she sustained any physical injuries as a result of being handcuffed. Therefore, to the extent that Plaintiff may arguably have pled an excessive force cause of action, which this Court does not believe she has, this Court finds no dispute as to any material fact and further finds that Defendants are entitled to judgment as a matter of law. Accordingly, any claim of excessive force brought by Plaintiff is dismissed with prejudice.

3    Plaintiff takes a quote from Troiano completely out of context. The complete sentence, with the portion quoted by Plaintiff italicized, is: "There is, perhaps, an area of traffic violation (arrest) where a full blown search is not justified, but it might seem to be confined to a situation where an arrest *was not necessary because an alternative summons was available* or because the arrest was a suspect pretext[.]" Troiano, 35 N.Y.2d at 478.

4    To the degree that Plaintiff intended to include a claim of excessive force against the Defendant City in its first cause of action, it is dismissed for the same reasons. See n.2 supra.

5    Even if the Court were to consider the state law claims, they would not survive a motion for summary judgment. The state law false arrest claim has the same elements as the constitutional claim, and therefore the analysis set forth above applies to the state law claim. The battery claim, brought against Defendant Esposito and the City, alleges only tight handcuffing. Although the existence of probable cause to arrest does not bar a battery claim based on excessive force, there must be at least some evidence of touching or force exercised in excess of what is inherent in an arrest. See Sylvester v. City of New York, 23 Misc.3d 1139 (N.Y. Sup. 2009). There is no force alleged here beyond what would be expected in an arrest. The final cause of action, as against Defendant City of Peekskill, alleges negligence. However, as there is no evidence that would support a finding of wrongdoing by the officers, there can be no negligence by the City.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    6

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 68 of 101

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 69 of 101

no clear error on the face of the record in order to accept the recommendation").

**\*3**  Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1]  The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In

October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4**  Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 71 of 101

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

**B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.**

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

**C. Motion to Dismiss by Herman, Stewart and Stanford.**

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

**D. Plaintiff's "John Doe" Claims.**

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

**E. Discovery Motions.**

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 6:23-cv-01543-DNH-ML    Document 11    Filed 06/20/24    Page 72 of 101

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

End of Document                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 73 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

1995 WL 316935
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mina POURZANDVAKIL, Plaintiff,

v.

Hubert HUMPHRY, Judisicial Systeam of The State of
Minnesota and Olmested County Court Systeam, and
State of Minnesota, Saint Peter State Hospital, Doctor
Gammel Stephelton, et el Erickson, North West Bank
and Trust, Olmested County Social Service, J.C. Penny
Insurnce, Metmore Finicial, Traveler Insurnce, Comecial
Union Insurnce, Hirman Insurnce, Amrican State
Insurnce, Farmers Insurnce, C. O Brown Insurnce, Msi
Insurnce, Steven Youngquist, Kent Chirstain, Micheal
Benson, United Airline, Kowate Airline, Fordmotor
Cridite, First Bank Rochester, George Restwich,
British Airways, Western Union, Prudenial Insurnce,
T.C.F. Bank, Judge Sandy Kieth, Judge Niergari,
Olmestead County Judgering, Judge Mores, Judge
Jacobson, Judge Challien, Judge Collin, Judge Thomase,
Judge Buttler, Judge Morke, Judge Moweer, Sera
Clayton, Susan Mudhaul, Ray Schmite, Defendants. [1]

Civ. A. No. 94-CV-1594.
|
May 23, 1995.

## Attorneys and Law Firms

Hubert H. Humphrey, III, Atty. Gen. of the State of Minn.,
St. Paul, MN, Jerome L. Getz, Asst. Atty. Gen., of counsel,
for Hubert H. Humphry, III, Judicial System of the State
of Minnesota, St. Peter Regional Treatment Center, Gerald
Gammell, MD, William Erickson, MD, Thomas Stapleton,
MD, the Honorable James L. Mork, Chief Judge Anne
Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge
Dennis Challeen, and Judge Lawrence Collins.

Condon & Forsyth, P.C., New York City, Stephen J. Fearon,
Michael J. Holland, of counsel, for British Airways, P.L.C.
and Kuwait Airways Corp.

Dunlap & Seeger, P.C., Rochester, MN, Gregory J. Griffiths,
of counsel, for Olmsted County, Raymond Schmitz, Susan
Mundahl, Norwest Bank Minnesota, N.A. (the Northwest
Bank & Trust), C.O. Brown Agency, Inc.

Arthur, Chapman, McDonough, Kettering & Smetak, P.A.,
Minneapolis, MN, Eugene C. Shermoen, Jr., of counsel, for
J.C. Penney Ins. Co. and Metropolitan Ins. Co.

Shapiro & Kreisman, Rochester, NY, John A. DiCaro, of
counsel, for Metmor Financial, Inc.

Costello, Cooney & Fearon, Syracuse, Paul G. Ferrara, Robert
J. Smith, of counsel, for Travelers Ins. Companies; Hirman
Ins.; Commercial Union Ins. Companies.

Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, Thomas
N. Kaufmann, of counsel, for American States Ins. Co. and
Prudential Ins. Co.

Steven C. Youngquist, Rochester, MN, pro se.

Thomas J. Maroney, U. S. Atty., Syracuse, NY, William F.
Larkin, Asst. U. S. Atty., of counsel, for Michael Benson,
Postmaster N. D. of New York.

George F. Restovich & Associates, Rochester, MN, George F.
Restovich, of counsel, for George F. Restovich.

Conboy, McKay, Bachman & Kendall, L.L.P., Watertown, NY,
George K. Myrus, of counsel, for Western Union.

Richard Maki, Rochester, MN, pro se.


MEMORANDUM-DECISION AND ORDER

POOLER, District Judge.


INTRODUCTION

*1 In the four and one-half months since she filed this
action, plaintiff Mina Pourzandvakil has filed three amended
complaints and ten motions. She also has sought and received
entry of default against ten defendants, none of whom she
properly served. She twice has sought and been denied
temporary restraining orders. She has included in her action
defendants with no apparent connection to this forum, that
were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of
defendants have filed a total of twelve motions, some seeking
vacation of the defaults entered against them, some seeking
dismissal and others seeking both. We grant defendants'
motions insofar as they seek vacation of the clerk's entries of
default and dismissal of the complaint. We vacate *sua sponte*

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 74 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.


BACKGROUND

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

**\*2** The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*)[2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper[3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 75 of 101

The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or Rule 12 of the Federal Rules of Civil Procedure. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to Fed. R. Civ. P. 12(b) or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

**\*3** Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against

them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

ANALYSIS

The Defaults

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. Fed. R. Civ. P. 4(e)(2). Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. Fed. R. Civ. P. 4(e)(1). Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. Fed. R. Civ. P. 4(h)(1) and 4(e)(1). Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See* N.Y. Civ. Prac. L. & R. §§ 308, 311 (McKinney Supp. 1995); N.Y. Bus. Corp. Law § 306 (McKinney Supp. 1995); Minn. Stat. § 543.08 (1995); Minn. R. 4.03 (1995). Finally, service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. Fed. R. Civ. P. 4(j)(2). Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 76 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

II. The Jurisdictional Arguments

**\*4** In addition to raising various other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

A. Personal Jurisdiction

Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to Rule 14 or Rule 19 of the Federal Rules of Civil Procedure and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. Fed. R. Civ. P. 4(k). Defendants

are not subject to federal interpleader jurisdiction and they were not joined pursuant to Rule 14 or Rule 19. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to Rule 4(k). *See* N.Y. Civ. Prac. L. & R. § 302 (McKinney Supp. 1995). This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id.* §302(a). The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of Section 302(a). Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

B. Subject Matter Jurisdiction

Pourzandvakil's complaint does not contain the jurisdictional allegations required by Fed. R. Civ. P. 8(a)(1). Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff was a party. *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 482 (1983). These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

**\*5** The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 77 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. 28 U.S.C. § 1332. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under 28 U.S.C. § 1367(a). Section 1367(a) requires a relationship between the state and federal claims so that "they form part of the same case or controversy." Id. Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. Id. Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them.[6]

We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

## C. Venue
Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

**\*6** 28 U.S.C. § 1391(a). Section 1391(b) provides that federal question actions, except as otherwise provided by law, may be brought only in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Id. § 1391(b). The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Id. § 1406(a). Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. The purpose of the court's

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 78 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir. 1993) (holding that it was an improper exercise of discretion to dismiss rather than transfer when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ. No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

### III. Failure to State a Claim on Which Relief Can be Granted and Frivolity

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b) (6). [7] We already have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the Rule 12(b)(6) issue only on ASI's motion. *See Bell v. Hood,* 327 U.S. 678, 682-83 (1946) (subject matter jurisdiction); *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir. 1963) (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

**\*7** Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved

in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr,* 810 F. 2d at 363.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 79 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to amend her pleading and plaintiff still was not able to offer specifics.[9] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White,* 886 F. 2d 721, 724 (4th Cir. 1989)). We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

**\*8** We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under 28 U.S.C. §1915(d), holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. The Supreme Court explicitly has acknowledged a district court's power under Section 1915(d) to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id.* at 329 n.8. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y. 1993), *aff'd* 41 F.3d 1500 (2d Cir. 1994); *cf. Pillay v. I.N.S.,* 45 F.3d 14, 17 (2d Cir. 1995) (*per curiam*) (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler,* 151 F.R.D. at 540.

IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture,* 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991). Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id.* at 694 (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief, however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id.* at 695.

CONCLUSION

**\*9** All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 188-9 (5th Cir. 1986) (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co.,* 377 F.2d 194, 199 n.3 (2d Cir. 1967) (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871, 875 (3d Cir.) *cert. denied,* 322 U.S. 740(1944) (dismissal for lack of personal jurisdiction is not a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 80 of 101

Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)

**All Citations**

Not Reported in F.Supp., 1995 WL 316935

## Footnotes

1       Names in the caption are spelled to reflect plaintiff's complaint.

2       Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

3       Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

4       The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against non-moving defendants for failure to state a claim on which relief can be granted.

5       The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

6       We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. 28 U.S.C. § 1332(a). However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id.* § 1332(a)(2). Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of 28 U.S.C. § 1603. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See* 28 U.S.C. § 1330. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under Section 1332. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1511-1512 (11th Cir. 1989), *cert. denied,* 115 S.Ct. 1362 (1995) (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under 28 U.S.C. § 1332.

**Pourzancvakil v. Humphry, Not Reported in F.Supp. (1995)**

Case 6:23-cv-01543-DNH-ML   Document 11   Filed 06/20/24   Page 81 of 101

7    J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

8    Former Supreme Court Justice Harry A. Blackmun.

9    We note also that plaintiff has not requested leave to amend in this action.

---

**End of Document**                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MATTHEW DEROCHA,

Plaintiff,

v.                                                                    5:22-CV-1344
                                                                      (DNH/ATB)
DEWITT POLICE DEPARTMENT, et al.,

Defendants.

MATTHEW DEROCHA, Plaintiff, pro se

ANDREW T. BAXTER
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a pro se complaint filed by plaintiff Matthew DeRocha, in which he has sued the Town of DeWitt Police Department and three individual officers based on several civil rights claims pursuant to 42 U.S.C. § 1983. (Dkt. No. 1) ("Compl."). Plaintiff has moved to proceed in forma pauperis ("IFP") (Dkt. No. 3) and for appointment of counsel (Dkt. No. 4).

## I.    In Forma Pauperis ("IFP") Application

Plaintiff's IFP application declares that he is unable to pay the filing fee. (Dkt. No. 3). After reviewing his application, this court finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious;

(ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).  Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources.  *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974).  Although the court has a duty to show liberality toward pro se litigants, and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed.  *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).  The court will now turn to a consideration of the plaintiff's complaint under the above standards.

2

## II.   **Complaint**

Plaintiff alleges that on September 25, 2020, he was approached, at a gas station convenience store in East Syracuse, New York, by several police officers who advised that they had received a report that plaintiff had been told to leave the store by the attendant. (Compl., Dkt. No. 1 at 3).[1]  The officers asked for plaintiff's driver licence, which had expired, and then advised plaintiff that he could not drive his vehicle home. (*Id*.)  After the officers observed copper in the back seat of plaintiff's vehicle, which they allegedly suspected was stolen, they advised plaintiff that his car would be confiscated and towed by the police.  (*Id*.)

Plaintiff, believing that the officers had no right to confiscate his vehicle,[2] started videotaping them, presumably with his cellular telephone. (Compl. at 3).  The officers allegedly told plaintiff that he was acting "sporadically"[3] and had harassed the officers, leading them to handcuff the plaintiff and place him in the back of a patrol car.  (*Id*.) Plaintiff alleges that one officer choked him in the back of the patrol car and "maliciously" hurt him emotionally and physically.  (Compl. at 3, 5).  When the vehicle door was reopened, plaintiff exited, sat on the ground, "and started kicking and

---

[1] The complaint consists of selected pages of a Civil Rights Complaint form, interspersed with several pages of copies of what appear to be Gmail e-mails, which provide factual details. Because the pagination of the complaint is not consistent, the court will refer to the page numbers assigned by the court's electronic docketing system, CM-ECF.

[2] To the extent plaintiff is claiming the impoundment of his vehicle violated his due process or other constitutional rights, that claim would not be viable in light of the fact that his drivers license had expired.  *See, e.g., Carter v. Campanelli*, No. 22-CV-2702, 2022 WL 1667022, at *2-3 (E.D.N.Y. May 20, 2022) (finding no due process or other constitutional violations arising from the impoundment of a vehicle with a suspended registration).

[3] The court presumes the plaintiff meant that the officers stated that he was acting eratically.

3

screaming for help" because he was scared and believed the officers had falsely accused him of harassment.  (Compl. at 3).  After a few minutes, the officers put plaintiff back into the patrol car and eventually charged him with "assault second, resisting arrest and harassment."  (*Id*.)

Plaintiff alleged that, after a trial in late April 2022, he was acquitted on the felony assault second charge and the harassment charge, but convicted of resisting arrest.  (Compl. at 4).  Plaintiff contends that the outcome of the trial, as well as video evidence of the arrest, establish that defendant police officers, James Dean, Justin Baum, and Jared Petrie, lied when they accused plaintiff of kicking Sgt. Petrie and Det. Baum.  (*Id*.)  Plaintiff claims that, as a result of his incarceration from July 22, 2021 to April 29, 2022, he was confined for 39 days longer than the allowed eight month "Can Only Hold Me" period.  (Compl. at 4, 5).

Plaintiff's First Cause of Action is entitled "Punitive" and is difficult to decipher, but appears to claim, inter alia, that plaintiff was injured as a result of reckless and malicious conduct of the defendants.  (Compl. at 6).  The Second Cause of Action is entitled "Overdetention" and claims that plaintiff was held in jail for 37 days longer than they could hold him based on his conviction for resisting arrest.  (*Id*.)  The Third Cause of Action appears to claim malicious prosecution and references "emotional distress" for which plaintiff appears to claim that he was hospitalized.  (*Id*.)  Plaintiff seeks to recover $1 million in damages.  (Compl. at 7).

## III.   **Excessive Force**

### A.   **Legal Standards**

"The Fourth Amendment, which protects against unreasonable seizures, governs a claim that excessive force was used in connection with an arrest." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances . . . ." *Id*. "[T]he inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

When performing this balancing, the Court is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id*. As to the third factor, "[t]he fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of some degree of force, but it does not give the officer license to use force without limit. The force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 165-66 (2d Cir. 2000). "A plaintiff need not demonstrate serious injury to prevail in an excessive force claim [under the Fourth Amendment] . . . nonpermanent injuries are sufficient." *Jackson v. Mastrangelo*, 405 F.

Supp. 3d 488, 492 (W.D.N.Y. 2019) (*quoting Sforza v. City of New York*, No. 07 Civ.

6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009)).

## B.    Analysis

The police officers confronted plaintiff for allegedly refusing to leave a

convenience store when asked to do so by the attendant, and they may have suspected

that his car contained stolen copper.  Based on the allegations in the complaint, plaintiff

did not endanger the three officers surrounding him when he objected to the

impoundment of his vehicle and started to video tape them.  Liberally construed,

plaintiff's complaint alleges that, while in handcuffs in the back of a patrol car, and

before he exited the car and began to kick and scream, an officer maliciously choked

him, causing plaintiff injury.[4]  While plaintiff's allegations are sketchy and might not

withstand a fully-developed dispositive motion, they are sufficient to survive initial

review.  See, e.g., *Valenti v. McDonald*, No. 1:19-CV-530 (LEK/DJS), 2019 WL

2746174, at *2 (N.D.N.Y. May 29, 2019), *report and recommendation adopted*, 2019

WL 2743530 (N.D.N.Y. July 1, 2019) (plaintiff's allegation that defendant McDonald

threw her to the ground, handcuffed her, and later choked her while she was strapped

down were sufficient for the excessive force claim to survive initial review); *Pesola v.

City of New York*, No. 15-CV-1917, 2016 WL 1267797, at *7-8 (S.D.N.Y. Mar. 30,

2016) (plaintiff's allegation that the arresting officer used an unlawful "choke hold"

---

[4] While plaintiff has not specified which officer allegedly choked him, all three defendant officers were in the immediate vicinity and could be liable, in the alternative, for use of unreasonable force or failure to intervene.  Given plaintiff's participation in his criminal trial, he may know more about the conduct of the particular officers than he alleged in his complaint and could seek to amend his complaint accordingly.  If not, such information might be developed during discovery in this action.

was sufficient to state a plausible excessive force claim).

## IV.  Plaintiff's "Overdetention" Claim

Given that plaintiff was released from custody at the time he filed his lawsuit,[5]

his allegation that he was held in jail longer than his mandated release date on his

conviction for resisting arrest[6] might support an Eighth Amendment or substantive due

process claim.  *See Hurd v. Fredenburgh*, 984 F.3d 1075, 1084-89 (2d Cir.), *cert.*

*denied*, __ U.S. __, 142 S. Ct. 109 (2021) (former prisoner who, as a result of an error,

was imprisoned for almost one year following his mandated release date under New

York law, suffered harm of constitutional magnitude under the Eighth Amendment and

had a cognizable liberty interest in conditional release for purposes of a substantive due

process claim).[7]  However, it is clear that neither the Town of DeWitt Police

Department, nor the individual defendant officers, would be the appropriate defendants

---

[5] If plaintiff was claiming that he was imprisoned beyond his maximum release date while still in custody, or, perhaps, if he filed this action while he was still in custody, such a claim might be barred by *Heck v. Humphrey*, 512 U.S. 477 (1984) and would need to be pursued by way of a habeas corpus petition, instead of a Section 1983 action for damages.  *See Jackson v. Cuomo*, No. 20-CV-8930, 2022 WL 310154, at *6-8 (S.D.N.Y. Feb. 2, 2022).

[6] It is difficult to determine, from plaintiff's complaint, whether he truly was held in custody beyond some mandatory release date under New York law.  Plaintiff acknowledged that he was convicted of resisting arrest, which is an "class A" misdemeanor under N.Y.S. Penal Law § 205.30.  Class A misdemeanors carry a maximum sentence of imprisonment of up to 364 days (N.Y.S. Penal Law § 70.15(1)), and plaintiff's time in custody was less than that.  Plaintiff's complaint does not clearly state what sentence was imposed on his resisting arrest conviction, although he alleges he was released at the conclusion of his trial.  In any event, given that plaintiff's "overdetention" claim, as pled, fails on other grounds, these issues are not critical to my decision.

[7] As discussed in *Hurd*, there are other elements of Eighth Amendment and substantive due process claims that plaintiff might well not be able to establish.  *Id*.  However, given that plaintiff has not named any defendant who would have been personally involved in any error resulting in his confinement beyond a mandatory release date, the court will not engage in that analysis.

7

on a claim that plaintiff was confined beyond his mandatory release date.

It has long been established that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983 . . . ." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Once a criminal defendant appears in court, arresting police officers and agencies do not control or determine the duration of custody or the legal limits on such custody. Suits regarding illegal confinement beyond a mandatory release date are typically brought against correctional or parole officials involved in determining how long a criminal defendant is actually confined. *See, e.g.*, *Hurd v. Fredenburgh*, *supra* and *Jackson v. Cuomo*, *supra*.[8] Accordingly, plaintiff's Second Cause of Action has not stated a plausible claim for "overdetention," at least against the defendants he has named.

## V.  <u>**Malicious Prosecution and Related Claims**</u>

As noted, plaintiff's Third Cause of Action references emotional distress and malicious prosecution. It is unclear from the complaint whether these claim relate to the conduct of the defendant police officers at the time of plaintiff's arrest on September 25, 2020, and/or subsequent conduct relating to the investigation and prosecution of the criminal charges brought against plaintiff.

---

[8] The prosecutors or judges involved in a criminal prosecution might, in some cases, be theoretically responsible for the confinement of a criminal defendant beyond a legally mandated release date, but those officials are generally protected by absolute immunity in connection with their prosecutorial or judicial actions. *See, e.g., Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022) (prosecutorial immunity); *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (judicial immunity).

### A.    Malicious Prosecution

"The elements of a malicious prosecution claim under section 1983 are derived from applicable state law." *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (citation omitted).  "We have stated these elements, under New York law, to be (1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice.  *Id*. at 111-12.  Based on a recent decision of the Supreme Court, "[a] plaintiff need only show that the criminal prosecution ended without a conviction," to satisfy the favorable termination element.  *Thompson v. Clark*, __ U.S. __, 142 S. Ct. 1332, 1341 (2022).

"Where a criminal prosecution concluded in acquittal on some but not all charges, the court must determine whether the charges are 'sufficiently distinct to allow a malicious prosecution claim to proceed on the charge for which there was an acquittal.'" *Jones v. City of New York*, No. 19-CV-9126, 2020 WL 1503509, at *4 (S.D.N.Y. Mar. 27, 2020) (quoting *Janetka v. Dabe*, 892 F.2d 187, 190 (2d Cir. 1989)) , *aff'd*, 846 F. App'x 22 (2d Cir. 2021).  "Courts examine several factors in determining whether charges are sufficiently distinct: (1) disparity in sentencing ranges; (2) the elements of each crime; and (3) whether the crimes were related or separate acts." *Bailey v. City of New York*, 79 F. Supp. 3d 424, 447-48 (E.D.N.Y. 2015) (citation omitted).

"Courts in this Circuit frequently apply *Janetka* where a plaintiff, charged with multiple []counts, is acquitted on counts that arise from a distinct set of factual allegations from the counts for which he was convicted." *Dunham v. City of New York*,

295 F. Supp. 3d 319, 333-35 (S.D.N.Y. 2018) (citing, inter alia, *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 337 (E.D.N.Y. 2006) (*Janetka* requires a court to look at "whether the elements of each charge are different, whether one charge is a lesser included offense of the other, **and whether the alleged convictions were directed at different people**") (emphasis added)).  In this case, however, the three criminal charges against plaintiff[9] all related to his conduct over a few minutes on September 25, 2020, all directed at the three defendant police officers who encountered and eventually arrested him.  Under the reasoning of cases such as *Goree v. Gunning*, 738 F. Supp. 79, 82-83 (E.D.N.Y. 1990), the plaintiff's conviction on resisting arrest charges precludes him from asserting a favorable termination necessary to support a malicious prosecution claim on the acquitted charges, even though the offenses have different elements:

> The resisting arrest, criminal possession of a weapon and menacing charges all arose from Goree's actions directed at [police officer] Tully during the course of Tully's attempts to arrest him, and the harassment and disorderly conduct charges arose from Goree's alleged use of abusive and obscene language and obscene gestures toward Tully immediately prior to the arrest.  Moreover, although the criminal possession of a weapon in the fourth degree and menacing charges are separate offenses with elements different from the other charges, the allegations forming the bases of these charges and the resisting arrest charge are not distinct. Thus, the present case is distinguishable from *Janetka* and *Cuthrell* in that in both of those cases distinct allegations formed the bases of the different charges involved.  Here, the same conduct which formed the bases for the criminal

---

[9] Plaintiff was charged with and acquitted of Assault 2nd, a class D felony under N.Y.S. Penal Law § 120.05 carrying a maximum sentence of seven years (N.Y.S. Penal Law § 70.00(2)(d)), and "harassment," which is either a violation or a misdemeanor, depending on whether it is charged as Harassment 1st under N.Y.S. Penal Law § 240.25 (class B misdemeanor) or Harassment 2nd under N.Y.S. Penal Law § 240.26 (violation).  Plaintiff was convicted of Resisting Arrest, a class A misdemeanor under N.Y.S. Penal Law § 205.30 carrying a maximum sentence of 364 days.

possession and menacing charges also formed the basis for the resisting arrest charge. In addition, Goree was convicted of the resisting arrest charge, one of the two class A misdemeanor charges.

*Id*.

Similarly, the reasoning of *Sampson v. Pia*, No. 3:15-CV-359, 2017 WL 1138127, at *5-6 (D. Conn. Mar. 27, 2017) further supports a finding that plaintiff's conviction for resisting arrest bars a malicious prosecution claims in spite of his acquittal on other charges:

> The . . . information on which Sampson was tried included two counts, assault on a police officer and interfering with a police officer. Sampson was acquitted of assault on a police officer and convicted of interfering with a police officer.
>
> * * *
>
> Sampson was acquitted on the more serious charge. However, the elements of the two charges are similar because both involve actions designed to prevent a police officer from performing his duties. Both charges were based on Sampson's conduct toward Pia, and the Connecticut Appellate Court has held that interfering with a police officer is a lesser included offense to assault on a police officer.
>
> * * *
>
> Because the conviction offense was a lesser included offense of the acquittal offense and both were based on actions taken toward Pia, I conclude that the acquittal on the charge of assault on a police officer is not a favorable termination for the purposes of asserting false arrest and malicious prosecution claims.

**B.  Due Process/Fair Trial**

Interpreting plaintiff's complaint liberally, it may vaguely suggest a Fourteenth Amendment Due Process claim. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983."

*Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (citations omitted). To succeed on a Section 1983 claim alleging a fair trial violation, a plaintiff must prove that "an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Ross v. City of New York*, No. 17-CV-3505, 2019 WL 4805147, at *5 (E.D.N.Y. Sept. 30, 2019) (*quoting Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)). "Whether the proceeding was terminated in a manner indicative of innocence . . . is not dispositive in the context of a section 1983 fair-trial claim." *Smalls v. Collins*, 10 F.4th 117, 138-39 (2d Cir. 2021). "Where the plaintiff asserts a section 1983 fair-trial claim based on fabricated evidence, all that is required is that the underlying criminal proceeding be terminated in such a manner that the lawsuit does not impugn an ongoing prosecution or outstanding conviction." *Id*. at 139 (citing *McDonough v. Smith*, __ U.S. __, 139 S. Ct. 2149, 2158 (2019)).

Plaintiff's complaint does not allege when and how the defendant officers passed on fabricated evidence to the prosecutors, but emphasized the false testimony of the defendant officers that plaintiff kicked defendants Petrie and Baum. (Compl., Dkt. No. 1 at 4). The defendants are protected by absolute immunity to the extent plaintiff's claims are predicated on their testimony before a grand jury or at trial. "[W]itnesses, including police officers, who testify in judicial proceedings[,] . . . 'are integral parts of the judicial process' and, accordingly, are shielded by absolute immunity." *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (citations omitted).

While the case law reflects somewhat different standards for the "favorable termination element" of a malicious prosecution claim and the corresponding element of a due process/fair trial, that difference may have been narrowed by the Supreme Court's clarification of the favorable termination element, which found that the absence of a conviction is sufficient.  In any event, the court's prior analysis, indicating that the resisting arrest charge on which plaintiff was convicted was not sufficiently "distinct" from the offenses on which he was acquitted in connection with the malicious prosecution claim, is also sufficient to establish that any due process/fair trial claim would "impugn an . . . outstanding conviction" and would, thus, also be barred.

Moreover, plaintiff has not stated a viable claim that he "suffered a deprivation of life, liberty, or property as a result" of the defendant officers' conduct, which as noted, cannot include the testimony for which they are protected by absolute immunity. The officers initiated the three criminal charges against plaintiff, allegedly based, in part, on false allegations, and that certainly contributed to plaintiff's eventual prosecution on those charges.  However, plaintiff would have been subjected to the same court proceedings and other consequences even if he had been charged only on the resisting arrest charges on which he was convicted.[10]  See *Jones v. City of New York*, 2020 WL 1503509, at *4 ("The Court also dismisses the malicious prosecution claim as to the trespassing charge because Plaintiff cannot show that he suffered a post-arraignment seizure based on that charge alone.  Even if he had not been

_____

[10] As noted earlier, the defendant officers would have played no role with respect to the duration of plaintiff's confinement beyond what he contends was his eight-month maximum expiration date, and he was confined for less than the maximum jail term authorized on a resisting arrest charge.

prosecuted on the trespassing charge, the controlled substance charge for which he was convicted justified any deprivation of liberty that he suffered.").[11]

## C.   Intentional Infliction of Emotional Distress

The New York Court of Appeals "has enumerated four elements of a cause of action for intentional infliction of emotional distress: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46, 56, (2016) (citation omitted). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community'" *Id.* (citation omitted).  This is a state law claim and this court would not appear to have diversity jurisdiction over the claim given that all the parties appear to be citizens of New York.  However, the court could, in its discretion, exercise supplemental jurisdiction over such a claim if plaintiff was able to assert a separate viable federal law claim.

A "cause of action to recover damages for intentional infliction of emotional distress is barred by the one-year statute of limitations." *Kwarren v. Am. Airlines*, 303 A.D.2d 722, 722, 757 N.Y.S.2d 105, 106 (2d Dept. 2003) (citing, inter alia, N.Y.C.P.L.R. § 215[(3)]); *Gomez v. City of New York*, No. 14 Civ. 05932, 2016 WL 5115499, at *6 (S.D.N.Y. Sept. 16, 2016).  This action was filed in December 2022

---

[11] As the ruling in *Jones* indicates, this rationale would also preclude a viable malicious prosecution claim.

14

and, according to his complaint, plaintiff was arrested and criminally charged by the defendant officers in September 2020.  Although some of the officers apparently testified at a trial in April 2022, that conduct is protected by absolute immunity, as noted above.  Although plaintiff does not specify what other actions these defendants took with the intention of inflicting emotional distress upon him, they apparently occurred in and around the time plaintiff was arrested and charged in September of 2020.  Hence, it appears that the statute of limitations on any intentional infliction of emotional distress claim would have passed well before plaintiff filed this lawsuit.

Moreover, plaintiff would have experienced the same investigation and trial if he had only been charged with the resisting arrest charge on which he was convicted.  Thus, even if the alleged wrongdoing of the defendant officers–falsely alleging that he assaulted one of them–could be viewed as "go[ing] beyond all possible bounds of decency, and . . . be regarded as atrocious," it does not appear that plaintiff can establish a causal connection between the defendants' alleged misconduct and any injury he may have suffered as a result of the criminal investigation and trial.

## VI. Claims Against the "DeWitt Police Department"

The police department of the Town of DeWitt is a sub-entity of the Town and is not a distinct legal entity subject to suit under Section 1983.  *See, e.g., Griffith v. Sadri*, No. CV-07-4824, 2009 WL 2524961, at *8 (E.D.N.Y. Aug. 14, 2009) ("a police department, which is an administrative arm of a municipality, does not have a legal identity separate and apart from the municipality and cannot sue or be sued") (collecting cases).  Even if the plaintiff had sued the Town of DeWitt, his claim would

15

not survive initial review.  In order to state a claim against a municipality or municipal agency, plaintiff must present evidence that the alleged deprivation of his constitutional rights was caused by an official custom, policy or practice.  *Monell v. Dep't of Social Services*, 436 U.S. 658, 691-94 (1978).  A single incident of unconstitutional activity by a municipal employee is generally insufficient to infer a custom, policy or practice as required by *Monell* to impose municipal liability.  *Griffith v. Sadri*, 2009 WL 2524961, at *8 (collecting cases).  Plaintiff's conclusory allegations that the conduct of the defendant officers "has happened a bunch of times before" (Compl., Dkt. No. 1 at 3) is clearly not sufficient to state a plausible claim of *Monell* liability.  See, e.g., *McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 705 (S.D.N.Y.1999) ("Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation.") (collecting cases).

## VII.  <u>Opportunity to Amend</u>

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  This court recommends that plaintiff be granted an opportunity to amend his complaint, other than with respect to any claims against the Town of DeWitt Police Department, which as noted, is not an entity properly subject to suit.  PLAINTIFF IS ADVISED THAT HE SHOULD NOT SEEK TO FILE A MOTION TO AMEND UNTIL U.S. DISTRICT COURT JUDGE HURD

RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO

PLAINTIFF'S ORIGINAL CLAIMS.  ANY MOTION TO AMEND FILED BEFORE

JUDGE HURD'S DECISION WITH RESPECT TO THIS COURT'S

RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT

BE CONSIDERED BY THE COURT.  As noted below, however, the plaintiff may file

objections to this court's recommendations.

## VIII.  **Request for Counsel**

This is a ***civil*** action for damages, and unlike a criminal case, there is no

constitutional right to an attorney in a civil action. *See Castro v. Manhattan E. Suite

Hotel*, 279 F. Supp. 2d 356, 357 (S.D.N.Y. 2003) (civil litigants, unlike criminal

defendants do not have a constitutional right to appointment of counsel).  Volunteer

lawyers to represent pro se parties in civil cases are a very scarce resource, so the courts

must necessarily be very selective about when to appoint counsel.  *See, e.g., Cooper v.

A. Sargenti Co.*, 877 F.2d 170, 172 (2d Cir. 1989) ("Volunteer lawyer time is a precious

commodity" that must be reserved for a "deserving cause").

There is no bright line test to be applied when a pro se, indigent civil litigant

seeks appointment of counsel.  *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir.

1997).  The factors informing the decision of whether to exercise discretion in favor of

appointing counsel were summarized by the Second Circuit in its decision in *Hodge*:

> In deciding whether to appoint counsel . . . , the district judge should first
> determine whether the indigent's position seems likely to be of substance.  If the
> claim meets this threshold requirement, the court should then consider the
> indigent's ability to investigate the crucial facts, whether conflicting evidence
> implicating the need for cross-examination will be the major proof presented to

the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986).  In weighing these factors, each case must be decided on its own merits.  *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (citing *Hodge*, 802 F.2d at 61).  Of these criteria, the Second Circuit has "stressed the importance of the apparent merits of the indigent's claim." *Cooper*, 877 F.2d at 172.

Although the court has identified one of plaintiff's claims that may survive initial review, his complaint is based solely on his fairly conclusory allegations, which have not been tested through the discovery process or through dispositive motions challenging the merits of his claims.  The surviving claim, interpreted as an excessive/unreasonable force claim, is relatively straightforward and can reasonably be litigated by a pro se plaintiff, at least until the time of a possible trial.[12]

In this case, plaintiff requests the appointment of counsel because he has "no income and [a] learning disability."  (Dkt. No. 4).  This is not a basis, however, for appointing counsel, nor is it a circumstance that is unique to plaintiff.  Many pro se litigants, like plaintiff, are limited in their education and are not trained in the law, but that is not a dispositive consideration for determining whether a court appoints pro bono counsel.  Plaintiff has already shown some aptitude in litigating this action by

---

[12] Ordinarily, it is the Court's practice to appoint counsel to pro se litigants in the event an action proceeds to trial.

18

filing his complaint and seeking in forma pauperis status.  The court finds that, at this time, there are no special circumstances that warrant appointment of counsel for the plaintiff.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 3) is **GRANTED FOR PURPOSES OF FILING**, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE**, and it is

**RECOMMENDED**, that all claims against the Town of DeWitt Police Department be **DISMISSED WITH PREJUDICE**, and it is

**RECOMMENDED,** that plaintiff's Second and Third Causes of Action against the individual defendants be **DISMISSED WITHOUT PREJUDICE,**[13] and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Order and Report-Recommendation on the plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE**

---

[13] Surviving initial reivew is plaintiff's First Cause of Action against defendants Petrie, Baum, and Dean, interpreted by the court as a claim that those officers used excessive/ unreasonable force against plaintiff, and/or failed to intervene in preventing such force.

19

**REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: January 20, 2023

Andrew T. Baxter
U.S. Magistrate Judge